# Exhibit 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to all related dockets

Master Docket 18-md-02865 (LAK)
ECF Case

---

## DECLARATION OF FOREIGN LAW OF KASPER BECH PILGAARD

---

# TABLE OF CONTENTS

I.    My Original Rule 44.1 Declaration ................................................................2

    A.    The Danish Constitution & The Role Of The Danish Parliament ...........2

    B.    Funding of the Danish Government.................................................3

    C.    The Finance Act...................................................................4

    D.    The Role of the Ministry of Finance...........................................5

    E.    The Role of the Ministry of Taxation..........................................6

    F.    *Skatteforvaltningen* Acts As A Tax Collection Agent for Non-Government Entities...................................................................................9

    G.    Authority to Bring Suit ..........................................................9

II.    Response to Declaration of Mads Bryde Andersen .......................................10

III.    SKAT's Ability To Pursue Claims Against Taxpayers In Denmark.......................15

    A.    The Tax Authorities' option to pursue a claim as a claim for compensation ........15

        1.    Locus standi .............................................................16

        2.    Venue/territorial jurisdiction..........................................17

        3.    Limitation period .......................................................18

        4.    How to file a compensation lawsuit....................................19

        5.    The consequences – the case where The Danish Tax Administration wins a compensation claim in Denmark..........................19

IV.    Dividend Taxation in Denmark ..............................................................20

    A.    Dividend Withholding Tax ......................................................20

    B.    The US-Denmark Double Taxation Treaty......................................23

    C.    SKAT's Administration Of Dividend Withholding Tax .........................27

    D.    Additional Danish Law Regarding The Evaluation Of Reclaim Applications.....................................................................31

V.    Beneficial Ownership & Danish Tax Law...................................................33

    A.    All Listed Shares Are Dematerialized .........................................34

    B.    Ownership of Shares Is Acquired On Trade Date ..............................35

    C.    Danish Cases Addressing "Beneficial Ownership" .............................40

    D.    OECD Commentary Regarding Beneficial Ownership .........................43

VI.    Dividends .....................................................................................48

VII.    Danish Law On Securities Settlement ......................................................53

i

## BACKGROUND

I, the undersigned Kasper Bech Pilgaard, state the following:

1.     I have written this legal opinion at the request of certain Defendants in the above-captioned litigation, to be submitted to the United States District Court for the Southern District of New York, in the United States of America, as evidence of Danish law.

2.     The opinion rendered herein is a legal opinion on legal matters, which I am entitled to give on the basis of my knowledge of Danish law.

3.     My compensation for rendering this opinion has been agreed on a per-hour fee basis.  My compensation does not depend in any way on the opinions I have rendered.

4.     I have also been retained as counsel for Richard Markowitz and to advise certain pension plans in connection with their appeals before the Danish National Tax Tribunal agency in Denmark.

5.     I have based my legal opinion exclusively on official rules and documents, without regard to any other fact of which I may have been informed by Defendants or any other person.

6.     Attached to my declaration are true and correct copies of certain of the Danish laws, regulations, and materials that I have cited herein, and accompanying English translations as needed.

## EXPERTISE

7.     I am a lawyer in Denmark, and I currently practice law at the TVC Law Firm (formerly, Advokatfirmaet Tommy V- Christiansen).  From 2010 to 2015, I served as a litigation specialist in tax matters at this firm, and since 2015, I have served as a partner.

8.     I received my law degree from Aarhus University in 2006.

9.     I was head of section at the Danish National Tax Tribunal from 2007 to 2010.

10.     In 2008 and 2009, I served as an external lecturer at Aarhus University, and since 2010, I have taught several seminars regarding tax law and relevant issues.

11.     In 2014, I received a master's degree in taxation from the Copenhagen Business School, with an award for thesis of the year.

## LEGAL OPINION

12.     In 2019, I filed a declaration in this case that addressed the Danish Constitution, the role of the Danish Parliament, the funding of the Danish government, the Finance Act, the role of the Ministry of Finance, the role of the Ministry of Taxation, SKAT's role as a tax collection agent for non-government entities, and SKAT's authority to bring suit. I repeat the contents of that declaration immediately below. I understand that in response to my previous declaration, SKAT submitted a declaration of Mads Bryde Andersen. I respond to that declaration further below. After that, I address several additional matters of Danish law, including SKAT's ability to pursue the claims it has asserted in this case within Denmark, SKAT's administration of dividend withholding tax, the meaning of "beneficial ownership," and certain topics relating to securities law.

## I.     My Original Rule 44.1 Declaration

### A.     The Danish Constitution & The Role Of The Danish Parliament

13.     The Constitution of Denmark provides for a constitutional monarchy system of government. *See* Exhibit 1 (The Constitution of Denmark), at Section 2.

14.     Section 3 of the Constitution of Denmark formally establishes the division of power between the King (or Queen), the courts, and the Parliament (*Folketinget*) of Denmark. *See* Exhibit 1, at Section 3. According to the Constitution, the King and *Folketinget* jointly hold the legislative authority, whereas the King holds executive authority, and the courts hold the judicial authority. Exhibit 1, at Section 3.

2

15.     Reference to the King is merely of historic significance, and the Royal Family in Denmark has in practice no political influence or power.

16.     The 179 members of *Folketinget* are elected by Danish, Faroe Island, or Greenland citizens and pass legislation through a defined legislative process.  Once the members of the *Folketinget* have been established through an election, a government is constituted by way of political negotiation between the parties.

17.     The prime minister appoints ministers.  The Constitution of Denmark also provides that "[t]he Ministers shall be responsible for the conduct of government; their responsibility shall be defined by statute."  Exhibit 1, at Section 13.

18.     Consistent with this Constitutional provision, there were currently 22 ministries in Denmark, including the Ministry of Finance and the Ministry of Taxation, immediately prior to the June 5, 2019 election.

**B.      Funding of the Danish Government**

19.     With regard to the funding of the Danish government, Section 45 of the Constitution of Denmark states that the government shall submit a Finance Bill to the *Folketinget* no later than four months before the beginning of the applicable fiscal year.  Exhibit 1, at Section 45.

20.     Section 46(2) of the Constitution of Denmark states that government funds can only be expended if the *Folketinget* passes a Finance Act, or a supplementary or provisional appropriations act providing for funding.  Exhibit 1, at Section 46(2).

21.     The monies that fund the Danish government are contained in the Public Accounts.

22.     The authority governing the funding and maintenance of these accounts is set out in the Public Accounts Law (*Regnskabsloven (Lov nr. 131 af 28. marts 1984 om statens*

3

*regnskabsvasen m.v.) See* Exhibit 2. This law also states that the Minister of Finance is permitted to issue relevant service regulations for the maintenance of the funds and accounts.

23. In turn, the relevant service regulation *(regnskabsbekendtg0relsen)* states that the Public Accounts shall be used to finance state expenses and that the Agency for Modernisation (*Moderniseringsstyrelsen*) is responsible for the management of the funds. *See* Exhibit 3.

24. In accordance with Section 47(2) of the Constitution of Denmark, the *Folketinget* elects auditors who "examine the annual Public Accounts and ensure that all the revenues of the State have been duly entered therein, and that no expenditure has been defrayed unless provided for by the Finance Act or some other Appropriation Act." Exhibit 1, at Section 47.

### C. The Finance Act

25. Consistent with Section 46(2) of the Constitution of Denmark, the Finance Act provides funding for all Danish government ministries and their subordinate institutions, such as universities and the armed forces of Denmark, known as the Danish Defence. *See* Exhibit 4 (Overview section of 2019 Finance Act).

26. The *Folketinget* must pass a new Finance Act every year. Exhibit 1, at Section 45(1).

27. As a result of a long-standing political tradition, the Minister of Finance initiates the process by introducing a Finance Bill no later than August 31 for the following financial year.

28. The Finance Committee of the *Folketinget*, which includes 17 members, then reviews the Finance Bill. The Finance Committee's mandate is to oversee matters related to the Danish government's draft budget, as well as applications for funding, additional appropriations, government borrowing, public accounts, and financial policies generally. From September through December, all ministers must lobby for funding for their ministries.

4

29.     The *Folketinget* typically holds a final vote on the budget in December, and the enacted budget takes effect once the King (or Queen) and the Minister of Finance signs it into law, and the government publishes it, which is typically on January 1.  Exhibit 1, at Sections 14, 22.

30.     The Finance Committee also has exclusive control over in-year adjustments to the budget.  At the end of the year, the Ministry of Finance collects the adjustments that the Finance Committee has approved throughout the year, and it submits a Supplementary Appropriation Act to the *Folketinget* for formal approval.

31.     If an agency spends more than it is allotted by the Finance Act, then the *Folketinget*, with a request from and the support of the Minister of Finance, is responsible for providing funding to the agency to continue its operations.

32.     There are three ways in which the *Folketinget* and the Minister of Finance can provide additional funding: (1) by supplementary permit, (2) through Provision 45 of the Finance Act, which provides for supplementary authorization of funding, or (3) by application to the Finance Committee.

**D.     The Role of the Ministry of Finance**

33.     The Ministry of Finance plays a central role in the administration of the Danish government's budget.

34.     With the authorization of the Finance Act, the Ministry of Finance provides funding to other agencies.  Traditionally, the funding is allocated to the relevant ministries through the Finance Act, and each provision contains a specification as to how much money is allocated to each of the agencies.  *See generally* Exhibit 4.

35. According to Provisions 2(2) and 3 of the State Account's Act, the Minister of Finance is also authorized to establish rules that govern the bookkeeping of the government of Denmark. *See* Exhibit 5.

36. Consistent with this responsibility, the Minister of Finance has established Ministerial Order No. 116 of February 19, 2018 *(Bekendtg0relse om statens regnskabsvwsen mv.)* (Order No. 116) to establish the procedures that govern the expenditure of state funds. *See* Exhibit 6.

37. Provision 4 of Order No. 116 states that the Ministry of Finance provides funds to the agencies to realize the tasks assigned to them. *See* Exhibit 7; *see also* Exhibit 1, at Section 45.

38. Provision 6 of Order No. 116 states that the Agency for Modernisation, an agency under the Ministry of Finance, is responsible for distributing the funds to those agencies. *See* Exhibit 3.

39. The Ministry of Finance is also responsible for the payment of Denmark's government debts. *Cf.* Exhibit 8 ("Agreement between the Ministry of Finance and Danmarks Nationalbank on the division of tasks in the area of government debt"); *see also* Exhibit 9 (Consolidated Act no. 849 of 22 June 2010).

**E.    The Role of the Ministry of Taxation**

40. With regard to taxation in Denmark, Section 43 of the Constitution of Denmark states, "No taxes shall be imposed, altered, or repealed except by statute; nor shall any man be conscripted or any public loan be raised except by statute." Exhibit 1, at Section 43.

41. The Ministry of Taxation is the government agency authorized to collect taxes on behalf of the Danish government.

42. In 1975, the Ministry of Taxation was moved out of the Ministry of Finance, and it was established as a distinct and independent ministry.

43. As a result, today the Ministry of Taxation is not part of the Ministry of Finance; it is a separate agency with a separate set of responsibilities.

44. The Ministry of Taxation comprises four parts: (1) the Danish Customs and Tax Administration, also known as *Skatteforvaltningen*, (2) the Department of the Ministry, (3) the Danish Gambling Authority, and (4) the Danish Tax Appeals Agency.

45. *Skatteforvaltningen*, in turn, comprises seven agencies: (1) the Danish Tax Agency, (2) the Danish Customs Agency, (3) the Danish Motor Vehicle Agency, (4) the Danish Debt Collection Agency, (5) the Danish Property Assessment Agency, (6) the Administration and Services Agency of the Danish Ministry of Taxation, and (7) the IT and Development Agency of the Danish Ministry of Taxation.

46. The independence of the Ministry of Taxation from the Ministry of Finance is reflected in several laws that allocate the competence to make decisions and to issue rules and regulations for particular areas of the law to each minister's portfolio.

47. The Danish laws governing the authority of the Ministry of Taxation, such as the State Tax Act (*statsskatteloven*), the Danish Tax Assessment Act (*ligningsloven*), the Danish Tax Control Act (*skattekontrolloven*), the Tax at Source Act (*kildeskatteloven*), the Tax Administration Act (*skatteforvaltningsloven*), and the Collection of Debt Act (*inddrivelsesloven*), each allocate specific decision-making, rule-making, and regulation-promulgation authority to the Ministry of Taxation. *See, e.g.*, Exhibits 10, 11, 12, 13 (Danish Tax Assessment Act, Provisions 14G(6-7), 32D, 33A(4), & 34); Exhibits 14, 15, 16, 17 (Danish Tax Administration

Act, Provisions 8, 15A, 49, & 64); Exhibits 18, 19, 20, 21 (Danish Tax Control Act, Provisions 8, 14, 41, & 52; Exhibits 22, 23, 24, 25 (Tax at Source Act, Provisions 54, 55A, 85, & 114 ).

48.     All of these decision-making, rule-making, and regulation-promulgation authorities relate to the assessment and collection of taxes.

49.     Although *Skatteforvaltningen* is the agency responsible for the collection of taxes, *Skatteforvaltningen* is obligated to pay the tax revenues and other funds that it collects to the Ministry of Finance.

50.     This requirement is derived from the Ministry of Finance's exclusive competence to allocate and expend state funds, including the distribution of funds to other government agencies, as authorized by the Finance Act.  *See* Exhibit 1, at Section 46(2).

51.     As noted above, the tax revenues that the Ministry of Finance receives from *Skatteforvaltningen* are contained in the Public Accounts that belong to the Kingdom of Denmark and are administered by the Ministry of Finance, as described above.  *See supra* 10.

52.     I am not aware of any legal authority that provides a legal title or ownership interest to *Skatteforvaltningen* in the tax revenues and other funds it collects in administering the tax laws.

53.     *Skatteforvaltningen* does not distribute the tax revenues to any other parties or agencies, nor does it have a role in determining how funds are allocated among government ministries or agencies, as this responsibility and authority belongs to the Ministry of Finance and the *Folketinget.  See supra* ¶¶ 22-23.

54.     In fact, *Skatteforvaltningen* has no obligation to pay a fixed or certain sum to the Ministry of Finance or any other government agency.  In the event of a shortfall in the collection of tax receipts for any reason, *Skatteforvaltningen* does not suffer any financial loss; nor is there

8

any recourse against *Skatteforvaltningen* in the event that the amount of taxes it remits to the Ministry of Finance does not reach a certain level in any given fiscal year or is less than what was budgeted for the year.  Similarly, *Skatteforvaltningen* does not benefit from any surplus in taxes it collects.

      **F.**    ***Skatteforvaltningen* Acts As A Tax Collection Agent for Non-Government Entities**

      55.    *Skatteforvaltningen* also serves as a tax collection agent for non-government agencies or entities.

      56.    For example, pursuant to Provision 14 in the Local Income Tax Act (*kommuneskatteloven*), *Skatteforvaltningen* collects taxes to support the Church of Denmark directly from Danish citizens, referred to as the "Church Tax."  *See* Exhibit 26.

      57.    These revenues are used to fund the Church of Denmark in accordance with The Act Regulating the Economy of the State Church *(Lov om Folkekirkens 0konomi).  See* Exhibit 27.  These revenues do not belong to the Danish government or *Skatteforvaltningen*.

      58.    *Skatteforvaltningen* does not accrue any benefits or suffer any consequences of an increase or decrease in the funding it collects as part of the Church Tax.

      **G.**    **Authority to Bring Suit**

      59.    *Skatteforvaltningen* has authority under Danish law to use a variety of methods to pursue tax-related claims.  For example, *Skatteforvaltningen* is permitted under the Collection of Debt Act to impose a lien, to attach a taxpayer's income or salary, and to set-off a taxpayer's debt.  *See* Exhibit 28.

      60.    However, I am not aware of any legal authority that delegates the responsibility to *Skatteforvaltningen* to bring claims if the debt does not result from a tax obligation incurred by the defendant.

61.     1 am also not aware of any legal authority that would prohibit the Kingdom of Denmark from filing a suit in a U.S. court on its own behalf.

## II.     Response to Declaration of Mads Bryde Andersen

62.     On July 19, 2019, SKAT filed a declaration of Danish law signed by Mads Bryde Andersen on July 12, 2019.  In that declaration, Mr. Andersen stated, "I agree with the statements made in paragraphs 7 to 20 of the Pilgaard Declaration," "I also agree with the statements in paragraphs 21 to 27," and that "paragraphs 28 to 46 of the Pilgaard Declaration" were "also true and accurate."  Mr. Andersen went on to disagree with my conclusion that SKAT and the Ministry of Finance are separate legal entities distinct from the Kingdom of Denmark, relying heavily on Section 14 of the Danish constitution.  I disagree with Mr. Andersen, and respond to his argument in the following paragraphs.

63.     Mr. Andersen refers to the prerogative in section 14 of the Danish constitution in support of his argument that SKAT has standing to bring suit.  I will not opine on the ultimate question of U.S. law of whether or not SKAT has standing, but simply respond to the point of view of Mr. Andersen that section 14 determines that a minister (and a ministry) is not a separate legal entity but a part of the total government and legal entity.

64.     Mr. Andersen's underlying premise is that since section 14 of the Danish constitution awards the Prime Minister the right to determine the number of ministries and distribution of duties, they are always part of the total legal entity.

65.     In order to reach this conclusion, Mr. Andersen reads Danish constitution section 14, 2nd paragraph in a very literal, or textualist manner.  This section states that: "The King shall

appoint and dismiss the Prime Minister and the other Ministers.  He shall decide upon the number of Ministers and upon the distribution of the duties of government among them."[1]

66.     The concept of textualism should not be applied to the Danish constitution section 14, 2nd paragraph.  This is because that provision was not part of the Danish constitution of 1849.  The original Danish constitution of 1849 only contained the provisions that today correspond to the first, third, and fourth paragraphs of section 14 of the Danish constitution, which at the time, constituted section 19.

67.     The purpose of adding section 14, 2nd paragraph can be determined by reference to the context in which it was added.  That paragraph was added as part of an effort to revise the Danish constitution in order to form a common constitution with the duchies Schleswig and Holstein in 1855 (in the common constitution of 1855, section 11; in the common constitution of 1863, section 11).  Stated differently, the purpose of the provision was to harmonize Danish constitutional law, and that provision has subsequently been included in the Danish constitutions from 1866 (section 13) through the present day.  *See, e.g.*, Exhibit 29 (Henrik Zahle, Dansk Forfatningsret (Danish constitutional law)) at 232.

68.     Rather than adopting a textualist mode of interpretation, section 14, 2nd paragraph of the Danish constitution should be interpreted based on the changed constitutional reality.

69.     Indeed, the Danish government has changed dramatically since 1855.  Originally, section 14 of the Danish constitution formed the basis of when changes of government were to take place.  This question was determined by the sovereign until ground-breaking changes in 1901 introduced the parliamentary system.  Parliamentarism was later formalised in the Danish constitution of 1953 with introduction of section 15.

---

[1]     I am quoting from Mr. Andersen's translation, which appears in Paragraph 23 of his declaration.

70. That the contents of the Danish constitution's section 14, including 2nd paragraph, consequently should be considered in the context of historic developments is not in dispute. Mr. Andersen essentially concedes this point (at paragraph 23) when he agrees that today it is the Prime Minister who wields the powers that originally were the responsibility of "the King"— despite the fact that the paragraph continues to refer to "the King" even today.

71. Despite his willingness to re-define "the King" as "the Prime Minister," Mr. Andersen insists that the wording of the provision alone means that all the ministries are part of the total government and thus one total legal entity.

72. However, Mr. Andersen neglects to take into consideration that the government's prerogative pursuant to section 14 is not absolute. In fact, Parliament may dictate the distribution of duties in certain circumstances. Henrik Zahle was an expert in Danish constitutional law who served as a Professor of Law at the University of Copenhagen and a judge on the Eastern High Court and then the Supreme Court. In his treatise, "Dansk Forfatningsret," he writes:

> It is difficult to see any constitutional argument that the government would decide a distribution of duties that is contrary to the clearly expressed prerequisites of the Parliament for allocation of the powers that are included in the distribution of duties . . . .

73. In other words, the Parliament has the power to bind the government, and may transfer specific tasks to either one remit or one ministry with specific subject-matter powers as opposed to another.

74. Fully in line with this, it is assumed in constitutional law theory that ministers— because they are at the top of various independent authorities—in their personal positions are independent of each other. The consequence of this is that "the one cannot give the other

12

directions or in general exert influence over the activities of the one in question.  Such limits

even the Prime Minister must respect."  *See* Exhibit 29  at 126.

75.     Mr. Andersen's own appendices also support this interpretation of section 14, 2nd

paragraph of the Danish constitution.

76.     This is illustrated by paragraph 2.2.1 in the Danish version of Mr. Andersen's

enclosed Appendix B (Niels Fenger Administrative Law, p. 133), which states:

> A distribution based on the character of the task (the subject-matter of the case) is
> quite customary.  Such subject-matter allocation of powers is based on, among
> other things, prerequisites about the fact that certain authorities due to their
> composition, special knowledge and experience are especially well-suited to handle
> specific administration tasks; including making certain types of decisions.
>
> The division of tasks in the central administration – between ministries and their
> departments, between the central directorates and agencies as well as between
> various committees and boards, etc., and the rest of the central administration – is
> essentially an expression of a subject-matter distribution of powers.

77.     Similarly, page 311 of the Danish version of Mr. Andersen's Appendix C (Bent

Christensen, Administrative Law, Tasks Authority Organisation) states that doubt arises if:

> . . . there are specific grounds that the legislature or a parliamentary majority has
> attached or is attaching honest importance to that this exact task will be handled
> within this exact ministerial area. The grounds can appear from the preliminary
> draft of an act or even pronounced in a parliamentary resolution. What importance
> does such declarations have for the Prime Minister's discharge of the organisational
> power?
>
> The question is whether the declarations with any reasonable certainty can be said
> legally to limit the Prime Minister's organisational power. In the final analysis, the
> answer to some extent depends on how a minority government's constitutional
> position overall will be perceived as regards the parliament. However, in this exact
> area the parliament has recently taken as fact that declarations by the parliament do
> not legally limit the organisational power of the Prime Minister.

78.     In sum, Mr. Andersen is stretching further than reality allows.  He neglects to take into consideration that the contents of section 14, 2nd paragraph of the Danish constitution cannot be interpreted by resort to textualism.  He also neglects to take into consideration that the contents of the provision must be regarded in the context of the (changed) constitutional reality of which the provision is part.

79.     As I have explained, the Danish administration is divided into *separate* authorities with distinct powers in relation to their subject-matter, and it is not one total legal entity.  This is also reflected in the fact that different ministries bring lawsuits in their own names.  Indeed, Mr. Andersen acknowledges that litigation involving different branches and agencies of the Danish government always involves the relevant branch or agency as a party.  In Paragraph 48, he says that "it is generally recognized in Danish law that public agencies act in their own name in cases where their decisions are being questioned," and "you will not find cases of such nature with 'The Kingdom of Denmark' appearing on the government side, either as plaintiff or defendant." This is consistent with my assertion that each agency is not the same legal entity as the Kingdom of Denmark.

80.     Moreover, lawsuits brought by different ministries sometimes have been dismissed for lack of standing.  *See, e.g.*, UfR 2009.58 Ø (dismissing lawsuit filed by Ministry of Employment against Labour Market Appeals Board for lack of standing). Exhibit 30. The fact that the doctrine of locus standi (standing) applies to ministries strongly supports the conclusion that those ministries are separate institutions and not a single legal entity.

81.     In a final section of his declaration (at paragraphs 44-51), Mr. Andersen discusses how ministries appear before Danish courts of law.  I note that his discussion only examines cases in which the Danish government is a *defendant*.  For example, he refers in paragraph 51 to

"cases *against the Danish government*." Nowhere in this section of his report does he discuss the circumstance in which the Danish government or any of its ministries is a *plaintiff*. Accordingly, the extended discussion has little bearing on the relevant question here.

82.     Nevertheless, to the extent Mr. Andersen intends his discussion to support his conclusion that the Danish state is a unitary legal entity, the analysis falls short. Page 6 of Appendix D to his report states that, "The question concerning which authority can be sued on behalf of the government must as so far be decided based on the general administrative law principles. In general, a lawsuit can be filed against the administrative authority that has the capacity and powers to make decisions in the matter involved in the case." (my emphasis). Thus, Mr. Andersen confirms that administrative agencies (or ministries) may be sued, which only corroborates the conclusion that they are independent legal entities.

## III.    SKAT's Ability To Pursue Claims Against Taxpayers In Denmark

83.     SKAT is able to assert legal claims against taxpayers—including foreign taxpayers—in Denmark.

84.     For example, where SKAT has made a decision to pay out a tax refund and subsequently decides to recall that decision, SKAT can pursue its claim by way of the Danish civil courts. A clear example of this can be found in SKAT's lawsuit against Canada's Health Care of Ontario Pension Plan (HOOPP) and nine foreign banks. In that case, the Danish Tax Agency is seeking to recover 900 million DKK worth of dividend tax that SKAT paid out between 2011 to 2014.

85.     Even if the basis of SKAT's claim is "fraud," it can make a decision concerning the tax assessment against a [foreign] taxpayer and pursue that claim through the Danish legal system.

### A.    The Tax Authorities' option to pursue a claim as a claim for compensation

15

86.     The Danish tax authorities can bring an action claiming compensation (damages) against a taxpayer, including a foreign taxpayer.  This is set out in SKM2018.517.DEP, which provides Guidelines for the Ministry of Taxation's legal proceeding.  Section 1.1 of the Guidelines provides that, "It is a basic principle of the Ministry of Taxation's conduct of litigation that taxpayers are not unnecessarily dragged through litigation."  Section 8.1.1 of the Guidelines states that if SKAT wishes to bring a claim for compensation (damages), it should carefully consider the question with the legal counsel to the Danish Government (Kammeradvokaten). *See* Exhibit 31.

87.     In order to bring a lawsuit in Denmark, three requirements must be met.  *First*, the plaintiff must have locus standi in pursuing the case.  *Second*, venue for the claim must be proper in Denmark.  *Third*, the limitation period for the claim must not have run out.

### 1.     Locus standi

88.     In order to bring a case before the courts there is a requirement that the plaintiff has locus standi.  This general rule applies even when a public authority is bringing a case to court.  In a case brought by the Danish Tax Administration, it is thus a requirement that the Danish Tax Administration has sufficient interest in obtaining a judgment by a court of law.

89.     This also appears from literature where the following is quoted in the book "Forvaltningsret" (Administrative law) by Niels Fenger on page 904 under the heading "Særligt om myndigheder som sagsøger" (Specifically about authorities as the plaintiff):  "Also in relation to disputes with private parties an authority can of course have legal interest in the same way as if the authority were a private entity." *See* Exhibit 32.

90.     In order for a plaintiff to be deemed to have locus standi, it is a prerequisite that a number of conditions are met: the plaintiff's claim has to be legal and must pertain to issues that

can be adjudicated by the courts; the claim has to be current; and the plaintiff has to have a specific interest in the case.

91.     There is no doubt that the Danish Tax Administration would have locus standi to bring a compensation claim against a taxpayer (including a foreign pension plan) to recover an erroneously paid refund of dividend tax, as the claim is legal, can be adjudicated, and is current and specific.  Again, SKAT's pending lawsuit in Denmark against a Canadian pension plan (HOOPP) firmly supports this conclusion.

### 2.     Venue/territorial jurisdiction

92.     In addition to the fact that the Danish Tax Administration has to have locus standi, the Danish courts must have venue, which relates to the specific court of law before which the case can be brought.  If there is no court that can process the case, there is no venue, and the case cannot be brought in Denmark.

93.     The rules on venue/territorial jurisdiction are included in the Danish Administration of Justice Act and in the Brussels Regulation I (called DF), which is an EU regulation.  The DF governs venue in cases involving parties from other EU countries.

94.     In cases where the defendant is not resident in Denmark or an EU/EFTA country, the issue of venue is dictated by Section 246 of the Danish Administration of Justice Act, which provides:

> Cases against individuals, companies, associations, private institutions and other unions who are not located in Denmark, can be brought in any court of this country that according to the provisions in sections 237, 238 (2), 241, 242, 243 and 245 can be regarded as having venue in the case . . . .

Exhibit 33, at Section 246.

95.     The group of individuals that may be covered by section 246 are natural persons or legal entities that have their head office outside the EU/EFTA and that neither have domicile

or their main operations anywhere in the EU nor an EFTA country, cf. 'Den Civile Retspleje' (Civil Procedure) by Ulrik Rammeskow Bang-Pedersen et al., 4th ed. at 238-239. Exhibit 34.

96.     The Danish Administration of Justice Act section 246 list a number of primary venues and the plaintiff can choose freely between these primary venues.  If there is no primary venue for the defendant, the plaintiff can instead choose to bring the case at an alternative venue. Exhibit 33, at Section 246.

97.     If there is neither a primary venue nor an alternative venue for the plaintiff's claim, the case cannot be initiated in Denmark.

98.     The relevant primary venue in compensation cases is special venue based on harmful event.  Section 243 of the Danish Administration of Justice Act provides:

> Cases demanding a punishment, compensation or rehabilitation in connection with violation of rights can be initiated at the location where the violation of rights has occurred.

> Exhibit 33, at Section 243.

The provision covers a claim for compensation without a contract.  *See, e.g.*, UfR 1958.136 V (Exhibit 35); *see also* Exhibit 34 at 214.

99.     In short, if SKAT claimed it was owed money by a foreign pension plan, it would have venue to file a compensation case against a US pension plan in Denmark based on Section 243 of the Danish Administration of Justice Act, which provides for special venue based on harmful event. *See* Exhibit 33, at Section 243.

### 3.     Limitation period

100.     In addition to the venue requirement for the claim in this country, the claim cannot be barred by the statute of limitations.

101.     In general, the Danish Limitation Act provides in Section 3 that "the limitation period is three years," unless other provisions apply.  I understand that Professor Ørgaard

18

describes the statute of limitations in a separate declaration, and therefore will not expand on that subject here.

### 4. How to file a compensation lawsuit

102.    If SKAT had wanted to file a lawsuit for compensation against a US pension plan, that would be a civil action and the case would have to be filed at city court level as the court of first instance.  Danish Administration of Justice Act Section 224 states:

> Civil proceedings will be heard at the court of first instance at the city court unless otherwise dictated in this or other legislation.

Exhibit 33, at Section 224.

103.    The rule is mandatory and the parties thus cannot agree to have the case heard by another court of law unless otherwise expressly provided for in the legislation.

104.    Under certain conditions, the city court may choose, however, to refer a case to the High Court as the court of first instance pursuant to Section 226 of the Danish Administration of Justice Act.  In relevant part, that provision states the following:

> Upon request from one party, the City Court may refer a case to be heard at the High Court if the case is of general public importance and has general importance for the application of law and the development of law or significant societal reach in general.
>
> […]
>
> (5) The High Court ensures at their initiative that the conditions for referral under (1) are met.  If the conditions are not met, the High Court will decline to hear the case as the court of first instance and will send the case to the City Court for continued processing.  The High Court decision will be made by court ruling.

Exhibit 33, at Section 226.

### 5. The consequences – the case where The Danish Tax Administration wins a compensation claim in Denmark

105.    In case the Danish Tax Administration should obtain a judgment where the foreign pension plan with domicile in the US is ordered to pay a compensation amount to the

19

Danish Tax Administration, the judgment will be final and conclusive between the parties. SKAT could obtain a judgment in the full amount of the reclaims that were wrongfully paid.

106.    That the judgment becomes final and conclusive between the parties entails both a negative material legal force and a positive material legal force.  The negative material legal force means that no new lawsuit can be filed between the same parties about the same issues subject to the judgment.  The negative legal force of the judgment thus would require dismissal of an identical case.  The positive material legal force means that the judgment in future cases should be taken as fact without further adjudication between the parties (res judicata).

107.    The legal force comes into effect when the judgment in question no longer can be appealed or reopened without permission and the judgment will at that time achieve formal legal force and is thus in general final and conclusive.

108.    For a judgment handed down by the court of first instance (in general the City Court), the judgment will have legal force when the ordinary appeal deadline has expired which is four weeks from when the ruling was handed down, cf. the Danish Administration of Justice Act section 372(1), and when none of the parties have appealed the judgment. *See* Exhibit 33, at Section 372(1). For a judgment handed down by the court of second instance (the High Court), the judgment has legal force from the time the ruling is handed down as the judgment can be appealed only upon permission from the Appeals Permission Board.

109.    If a Danish court were to order a US pension plan to pay a compensation amount to the Danish Tax Administration, the judgment will have legal force according to the rules above, and can be enforced.

## IV.    Dividend Taxation in Denmark

### A.    Dividend Withholding Tax

110. The Danish system of withholding tax is governed by the *Kildeskatteloven* (Danish Withholding Tax Act) ("WHT Act"). The WHT Act provides for both the charge of withholding tax and the refund of withholding tax collected in excess of what is ultimately due under Danish tax law. *See* Exhibit 36 (WHT Act).

111. A withholding tax liability arises in respect of dividends by section 65 of the WHT Act, which in its first subsection provides as follows (the version LBK nr. 1403 af 07/12/2010 applicable from 2010 to 2016) (my emphasis added):

> In connection with any adoption or decision on the payment or crediting of dividends on shares or parts in companies or associations etc. covered by section 1, subsection 1 number 1, 2, 2 e, 2 h and 4 of the Corporation Tax Act, the company or association etc. in question must withhold 28 per cent of the total dividend, unless otherwise stated in subsection 4 or follows from subsections 5-8. A withholding of 28% must also be made on the total payment or crediting in connection with a repurchase of the shares by the company, if the shares are not listed on a stock exchange pursuant to Section 16 B subsection 1 of the Tax Assessment Act, unless stated otherwise in Subsection 6. Dividends include all amounts which the company distributes to shareholders or partners, with the exception of shares granted to existing shareholders as a result of a conversion of profit to share capital and the distribution of liquidation proceeds made during the calendar year during which the company is finally dissolved. Cf however Section 16 A Subsection 3 nr 1 of the Tax Assessment Tax. The undistributed portion of the minimum distribution under Section 16 C subsection 2 or 13 of the Tax Assessment Act is also considered a dividend. The provision in Section 46 subsection 3 is applied accordingly. The amount withheld is called "dividend tax."

> Exhibit 36, at Section 65.

112. The withholding tax rate of 28% in subsection 1 was reduced to 27% as of January 1, 2012.

113. Companies must remit to SKAT the dividend withholding tax liability within one month after the decision to distribute the dividends. This follows from Section 66(1) of the Withholding Tax Act which states as follows:

> Dividend withholding tax is due for payment as soon as the decision has been made to distribute the dividend and must be paid to the Treasury no later than the

21

following month, which is the same time that the income tax and solidary tax have to be paid.

Exhibit 36, at Section 66(1).

114.    The Minister of Taxation is authorized pursuant to Section 65(4) of the WHT Act to prescribe regulations establishing exemptions from this general WHT obligation when the recipient of the dividend is not subject to tax.  The Minister of Taxation has exercised this authority and enacted exemptions from the WHT liability in respect of certain dividend recipients which are presented in Chapter 9 of the WHT Act. *See* Exhibit 36, at Section 65(4).

115.    According to Section 31 of the WHT Act, no withholding tax shall be levied and charged when the recipient is entitled to receive the dividend without any taxation according to (among other things) section 2, subsection 1, litra c of the Corporate Tax Act ("*Selskabsskatteloven*").  *See* Exhibit 36, at Section 31; *see also* Exhibit 37 (Corporate Tax Act). This Section 31 of the WHT Act was subsequently included in Section 65 of the WHT Act. Pursuant to section 2, subsection 1, litra c of the Corporate Tax Act, foreign recipients of dividends from Denmark are, as a general rule, subject to a limited tax liability in Denmark on dividends received.  The tax rate applicable to this limited tax liability has since 2012 been 27%, cf. section 2, subsection 3, 2nd sentence. *See* Exhibit 37.

116.    According to Section 69 of the WHT Act, the withholding and payment of correct withholding tax to the tax authorities is the obligation of the company paying the dividend.  The company shall deduct the appropriate withholding tax amount in respect of the dividend payment from the gross dividend amount, and then pay to the dividend recipient the net amount.  The recipient of the net dividend is not liable for any withholding tax deduction (or payment).  In the case where the company has not deducted the correct amount (and thus paid too much to the

recipient) it is the payor (i.e. the company) that is liable for the payment of the correct amount of withholding tax under Section 69 of the WHT Act. *See* Exhibit 36, at Section 69.

117.    The Danish case law regarding missing payments of the withheld amounts confirms that as a point of departure the ordinary recipient of the net dividend is not liable for the missing payment of the withholding tax.  The Supreme Court has allowed SKAT to collect unpaid withholding tax directly from an individual dividend recipient only in extraordinary circumstances.  For example, in the case SKM2013.294.HR, the recipient of the net dividend was also the owner and director of the company that issued the dividend and knew while disbursing the dividend that the company would not be able to pay the withholding tax.  Thus, the individual was held liable for the withholding tax.  But where a recipient of a dividend is not also the owner of the company that issued the dividend (and failed to pay withholding tax), the recipient of a dividend payment should not be liable to SKAT for underpaid withholding tax. *See* Exhibit 38 (SKM2013.294.HR).

### B.    The US-Denmark Double Taxation Treaty

118.    Certain foreign recipients of dividends are able to obtain a complete or partial refund of Danish dividend taxes withheld from their dividend payments.  A foreign shareholder who has received a dividend payment from which the 27% withholding tax has been deducted may apply for a refund of the withholding tax based on an applicable double taxation treaty signed by Denmark or pursuant to EU directives.

119.    Denmark and the United States have entered into a Tax Treaty against double taxation that went into effect on January 1, 2001. *See* Exhibit 39.  In May 2006, the countries entered into a Protocol that amended certain portions of the Treaty, including Article 10 ("Dividends") and Article 22 ("Limitation of Benefits"). *See* Exhibit 40

120.    Pursuant to Article 10 of the US-Denmark Treaty as amended by the 2006 Protocol, U.S. residents who beneficially own dividends issued by Danish companies can under no circumstances be taxed by SKAT at a rate of more than 15% of the gross amount of the dividend.  In addition, certain U.S. shareholders can apply to Denmark for a refund of the 27% tax on dividends.

121.    In relevant part, the Treaty provides (with my emphasis added):

1.  Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so far charged shall not exceed:

…

b) 15 percent of the gross amount of the dividends in all other cases.

…

3. Notwithstanding the provisions of paragraph 2, such dividends shall not be taxed in the Contracting State of which the company paying the dividends is resident if the beneficial owner is:

…

…

c) a <u>pension fund</u>, which is described in subparagraph e) of paragraph 2 of Article 22 (Limitation of Benefits), that is a resident of the other Contracting State, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

5. The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payor is a resident.

122.    Paragraph 2(e) of Article 22 provides:

2. A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

24

e) a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State.

123.    In sum, Paragraph 2 of Article 10 of the Treaty provides that where the beneficial owner of dividends issued by a Danish company is a resident of the United States, the maximum tax Denmark can impose is 15% of the gross dividend payment.[2]  Paragraph 3 of Article 10 of the Treaty provides for exclusive residence-country taxation (i.e., an elimination of dividend tax) with respect to dividends beneficially owned by, among others, US resident pension funds.  The Technical Explanation to the Treaty explains that this is:

> necessary because pension funds normally do not pay tax (either through a general exemption or because reserves for future pension liabilities effectively offset all of the fund's income), and therefore cannot benefit from a foreign tax credit. Moreover, distributions from a pension fund generally do not maintain the character of the underlying income, so the beneficiaries of the pension are not in a position to claim a foreign tax credit when they finally receive the pension, in many cases years after the withholding tax has been paid.  Accordingly, in the absence of this rule, the dividends would almost certainly be subject to unrelieved double taxation.

Exhibit 41.[3]

124.    The comments to Article II paragraph 2 of the Technical Explanation state that the benefits of a reduced tax rate:

> may be granted at the time of payment by means of a reduced rate of withholding at source.  It is also consistent with the paragraph for tax to be withheld at the time of payment at full statutory rates, and the treaty benefit to be granted by means of a subsequent refund so long as such procedures are applied in a reasonable manner.

---

[2]    The same prohibition appears in the U.K.-Denmark Double Tax Treaty, such that SKAT cannot impose a tax greater than 15% of the gross dividend amount where the dividend is beneficially owned by a U.K. resident.
[3]    Although published by the U.S. Department of Treasury, the Technical Explanation is considered to be an official guide to the Treaty in both the United States and in Denmark, and SKAT refers to it in its Legal Guide.  *See, e.g.,* section 2014-C.F.9.2.20.5.1 (Exhibit 42).  Furthermore, the Danish Tax Agency and the Danish Tax Council refer to it in the settlement of concrete cases, e.g., SKM2019.113.SR (Exhibit 43).

125.     The exemption from dividend tax for certain US pension funds has no effect on the dividend-paying company's liability under section 65 of the Withholding Tax Act to withhold 27 percent of dividend tax.  The Danish company must still withhold and pay taxes on dividends owned by US pension funds.

126.     The US Denmark Tax Treaty does not include the so-called "Sole or Main Purpose" Test, which would otherwise limit access to treaty protection.  This is a notable difference between the Treaty and the OECD model convention (article 29(9)) and other tax treaties concluded by Denmark. *See* Exhibit 44 (OECD model convention), at Article 29(9).

127.     Instead, the US-Denmark Tax Treaty contains in Article 22 a different "Limitation of Benefits" clause by setting out objective criteria which, if satisfied, mean that a person is entitled to the benefits of the Treaty.  There is no subjective test designed to evaluate the purpose of a transaction. *See* Exhibit 39, at Article 22.

128.     This is clear from the US Treasury Department's Technical Explanation of the 2006 Protocol Amending the Treaty, which states that Article 22 "does not rely on a determination of purpose or intention, but instead sets forth a series of objective tests.  A resident of a Contracting State that satisfies one of the tests will receive benefits regardless of its motivation in choosing its particular business structure." *See* Exhibit 41.

129.     Double Tax Treaties to which Denmark is a signatory and which have been ratified and published in the Law Gazette C (Lovtidende C) are (and were at all relevant times) part of Danish domestic law and can therefore be immediately and directly invoked before the tax authorities and the courts by those who are eligible according to their criteria.  This is confirmed by Chapter C.F.9.1 of SKAT's Legal Guide. *See* Exhibit 45.

26

130.    Articles 10 and 22 of the Treaty (quoted above) became incorporated into Danish domestic law by Act no 1574 dated 20 December 2006.  The effective date of the Act is 28 December 2007, and the article became effective for withholding taxes as from 1 February 2008.  From that date onwards, applicants that fulfilled the criteria set out in these Articles were entitled to withholding tax refunds.

### C.    SKAT's Administration Of Dividend Withholding Tax

131.    During the relevant period (2012-2015), there were two alternative systems in place in Denmark to obtain a refund of dividend withholding tax.  The first is referred to as the "Bank Scheme," in which certain Danish banks were authorized to seek refunds of dividend tax for their customers directly from SKAT, provided that the banks furnished information confirming that their customers held the Danish shares and/or dividends.  The second is referred to as the "Form Scheme," in which taxpayers could submit an application form for recovery of withholding taxes directly to SKAT.[4]  Both systems were based on administrative practice.  In 2015, SKAT abolished the Bank Scheme when it determined that it had no legal basis to delegate authority to verify the entitlement to withholding tax refunds to banks.

132.    Foreign shareholders who did not have accounts at Danish banks (either directly or through sub custodians) were unable to seek refunds through the Bank Scheme, as the Bank Scheme was operated exclusively by Danske Bank, SEB, and Nordea (and, prior to its bankruptcy in 2011, Amagerbanken).  Instead, they had to apply for withholding tax refunds using the Form Scheme.  During the period 2012 – 2015, shareholders using the Form Scheme were required to submit a specific form provided by SKAT on its website.  SKAT provided these forms in multiple languages, including English.

---

[4]    In this context, the word "Scheme" is not pejorative, and should be understood as a reference to a method.

133.     Section C.F.8.2.2.10.3.2 of SKAT's Legal Guidelines from 16 July 2012 – 30

July 2015, stated the following:

> If a source country withholds tax on dividends at a higher rate than has been agreed
> in the double tax treaty, the excess tax payment may be claimed back.  Claiming
> back Danish dividend tax may take place within a 5-year deadline.  This deadline
> applies irrespective of whether the double tax treaty includes a provision with a
> shorter deadline than 5 years.  See section 67 A of the Withholding Tax Act.

> When applying for a refund of Danish dividend tax, the forms 06.002 (Switzerland),
> 06.005 (Germany) and 06.003 (all other countries) are to be used, which are
> available from www.skat.dk.

> Please fill out one form per Danish dividend-paying company.  The form is to be
> signed by the tax authorities of the country of residence which is to confirm that
> the recipient of the Danish dividends resides/has residence in the relevant country.

> Exhibit 46.

134.     Accordingly, SKAT instructed American investors to complete Form 06.003,

which is printed in the English language.[5]

135.     According to that form, the applicant had to confirm that the applicant sought the

reclaim "as beneficial owner" or "on behalf of the beneficial owner."  The application also had to

include a document called "dividend advice."

136.     It is worth briefly identifying certain items that SKAT did <u>not</u> require between

2012 and 2015 in connection with its administration of dividend withholding tax and its

determinations as to whether a recovery of withholding tax was due.

- It was not a requirement from the Danish Tax Authorities that dividend withholding
  taxes had actually been paid to the Danish tax authorities to entitle a claimant to a
  refund.

- It was not a requirement from the Danish Tax Authorities that the applicant trace the
  payment of any dividend from the issuer to the applicant.

---

[5]     Before SKAT adopted Form 06.003, applicants from the United States seeking refunds of Danish dividend
tax submitted Form 06.008.

- Danish tax law did not provide for any requirement that a holder of securities hold those securities for a minimum period of time in order to qualify for a refund of withholding tax.

- Danish tax law did not provide that an agreed sale must be settled in order to qualify for a dividend withholding tax refund.

- There was also no limit to the amount of financing an investor could use to acquire shares; an investor could purchase stock using entirely borrowed funds and still be entitled to any refund of dividend withholding tax associated with the shares.

137.    In addition, between 2012 and 2015, SKAT did not require that applicants seeking dividend withholding tax reclaims disclose:

- How the share acquisition had been funded;

- Whether the applicant had hedged its acquisition;

- The price paid by the applicant for the share acquisition;

- The settlement date of the share acquisition;

- Whether a custodian held the shares that were the subject of the application directly or through a sub-custodian;

- Whether the applicant had acquired shares borrowed under a stock loan agreement;

- Whether the applicant was registered on the books and records of VP Securities as the owner of the shares that were the subject of the application;

- The commercial purpose of the applicant's share acquisition;

- The date on which the shares were sold, if applicable; or

- The applicant's contractual terms with its broker.

138.    After 2015, the Danish Tax Agency imposed new requirements to obtain refunds of dividend withholding tax.  The current version of its website now sets forth five "requirements" to obtaining a refund, and describes extensive documentation applicants must submit in order to support their claims.  *See* Ex. 84.  The requirements are stated in the following terms:

Requirement 1

The shareholder or the shareholder's agent should submit a claim for refund of Danish dividend tax by means of our online claim form. Representatives who need to submit claims for multiple shareholders may use our special bulk claim submission format. Please see 'Format for bulk claim submission' below.

Requirement 2

The shareholder should be subject to limited tax liability in Denmark or not liable to pay tax in Denmark.

Requirement 3

Danish dividend tax must have been withheld on the dividend for which a refund of dividend tax is claimed.

Requirement 4

The shareholder was the beneficial owner of the shares when the dividend distribution was approved.

Requirement 5

The withheld Danish tax must exceed the final tax payable according to the double taxation agreement, the parent-subsidiary directive or current Danish law.

Please make sure to document that you comply with all five requirements when you submit your claim. Please see 'Documentation requirements' below for further information and note that the documentation should be attached to the online claim form.

*See* Ex. 84.

139.   The website goes on to provide "examples of how requirements 3 and 4 can be documented."  This includes the following:

Dividend voucher

The documentation must state that Danish dividend tax has been withheld.  You can see this on a voucher or dividend statement issued by the shareholder's depository bank, for example.  This statement will most often include the date when the dividend distribution was approved.

Statement of account

You need to document that the dividend has been deposited into the account. Attach a copy of the shareholder's statement of account, for example, possibly along with a swift confirmation or screen print from the bank system.

If the dividend has been transferred via several banks, you need to submit documentation for all parts of the transfer.

Custody account statement

Attach a custody account statement to give an overview of the shareholder's shareholding at the time when the dividend distribution was approved so that the number of shares at that time corresponds to the number of shares for which refund of Danish dividend tax is claimed.

Moreover, the custody account statement must also state any movement in the shareholding for the period six months before the dividend distribution and until six months after the dividend distribution. If you make a claim within six months after the time of dividend distribution, the statement must instead show movements up until the time when the claim was made.

Purchase voucher

Documentation is required if the shareholder has bought or sold shares within a period of six months before and after the time when the dividend distribution was approved. Such documentation could be proof of trade, receipt or a SWIFT confirmation. If you make a claim within six months after the time the dividend distribution was approved, you must attach documentation for purchases and sales up until the time the claim was made.

Power of attorney

If you make the claim as an agent, you need a power of attorney signed by the shareholder. If there are more representatives between you and the shareholder, you need a signed power of attorney from all representatives. See example of a power of attorney form 02.043.

Share lending

The claim must state whether the shares were borrowed from or lent to others at the time when the dividend distribution was approved.

*See* Ex. 84.

140. Most of these documentation requirements did not exist between 2012-2015.

**D.    Additional Danish Law Regarding The Evaluation Of Reclaim Applications**

31

141.    In June 2012, the Danish parliament enacted Section 69B of the Withholding Tax

Act ("*kildeskatteloven*") which provided for certain procedural requirements for dividend

withholding tax reclaims.  Among other things, Section 69B extended the period of time within

which SKAT had to pay out reclaims from 30 days to six months.  The statute says:

> 1. If a person who is liable to taxation pursuant to section 2 hereof or section 2 of
> the Corporation Tax Act has received dividends, royalties or interest on which
> withholding tax has been levied pursuant to sections 65-65D which exceeds the
> final tax due under a double taxation treaty . . . the amount must be repaid within
> six months from the receipt by the Customs and Tax Administration of an
> application for repayment.  If the repayment happens after this point in time, the
> taxpayer is entitled to interest according to the Act on the Collection of Direct and
> Indirect Taxes ("Opkrævningsloven") section 7 II, increased by 0,4 percentage
> points per month which has started.

> 2. If, due to the recipient's circumstances, the Customs and Tax Administration is
> unable to check whether the conditions for repayment of withholding tax have been
> fulfilled, the limitation period for the payment pursuant to para. 1 is suspended until
> the circumstances of the recipients no longer obstruct control.

> 3. If the Customs and Tax Administration is of the opinion that a repayment on the
> basis of the present facts would include a likely risk of losses, then the
> Administration can require collateral [from] the recipient.  The Customs and Tax
> Administration can only require collateral if the withholding claim is subject to a
> dispute which has not been finally decided by an administrative body or the
> ordinary courts.

Exhibit 36, at Section 69B.

142.    Section 69B was added to the Withholding Tax Act for the purpose of granting

the tax authorities sufficient time to verify the accuracy of withholding tax refund applications.

As the report of the Fiscal Commission states:

143.    The excess amount will be recovered at the earliest after 6 months, the tax

authorities being given 6 months to process the request for repayment.  This period has been

chosen in view of the complexity of many withholding tax cases.  In order to assess whether the

taxpayer requesting the refund is in fact the one entitled to receive the excess amount, in-depth

investigations often need to be carried out, for example into the group structure and the

overriding ownership structure. The 6-month deadline follows the recommendations of the Commission in "Recommendation on withholding tax relief procedures C(2009)7924 of October 19, 2009."Before the enactment of Section 69B, SKAT was obligated to pay interest on any amount not refunded within 30 days of the date of the application. *See* Legal Guide A.A.12.3 (Exhibit 47). The effect of the new Section 69B was to extend this period so that SKAT had six months in which to evaluate a reclaim application before any interest would become due. The applicable interest rate was the rate of Section 5 of the Interest Act which, until March 1, 2013, amounted to the rate of the Danish National Bank plus 7%.

144.    SKAT's ability to investigate reclaim applications was further enhanced by the possibility of the tax authorities to interrupt the statute of limitations by submitting further inquiries or requests for documentation to the applicants. *See* Exhibit 36, at Section 69B, second paragraph. In essence, SKAT was granted an unlimited period of time to properly investigate whether the applicant of a withholding tax refund was legally entitled to the refund before paying it out.

145.    In circumstances where an applicant had submitted all requested documentation and information, and SKAT was still not fully convinced to approve the refund of withholding tax to a person entitled to such a payment, the third paragraph of Section 69B introduced the option for SKAT to require the applicant to post collateral before refunding the withholding tax. This would allow SKAT to avoid paying any interest on withholding tax due during administrative procedures at the Tax Tribunal and any subsequent judicial proceedings before the ordinary courts.

## V.    Beneficial Ownership & Danish Tax Law

146.    The US Denmark Tax Treaty does not provide any definition of beneficial ownership. The Technical Explanation of the 2006 Protocol provides:

> The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. Thus, if a dividend paid by a corporation that is a resident of one of the States (as determined under Article 4 (Residence)) is received by a nominee or agent that is a resident of other State on behalf of a person that is not a resident of that other State, the dividend is not entitled to the benefits of this Article. However, a dividend received by a nominee on behalf of a resident of that other State would be entitled to benefits. These interpretations are confirmed by paragraph 12 of the Commentary to Article 10 of the OECD Model.

Exhibit 40.

Accordingly, the meaning of beneficial owner must be understood by reference to the domestic law of the country imposing the tax. In the present case, that Denmark is the country imposing tax, so beneficial ownership for purposes of the Treaty refers to Danish tax law. I therefore turn to a discussion of Danish tax law relating to ownership of securities.

### A. All Listed Shares Are Dematerialized

147.   The capital ownership of a Danish limited liability company is represented by shares (Section 47 of the Danish Companies Act "*Selskabsloven*")[6]. The shares are generally freely transferable except when otherwise provided for by law or by the company's articles of association. Shares can be issued either as registered shares in the name of the owner or as bearer shares. Exhibit 48 (Danish Companies Act), at Section 48.

148.   Historically, shares were issued in physical form and took the form of certificates. Beginning in 1988, Law nr 433 of 18 July 1988[7] on joint stock companies enabled Danish companies to issue shares in electronic form (Section 21). Today, all listed Danish shares are dematerialized, and all those which were initially issued in paper form have been converted so that no physical share certificates are or can be issued. *See* Exhibit 48, at Section 64(1).

---

[6] The Companies Act as applicable from April 11, 2011 (introduced by LBK 322) to April 28, 2015 (LBK 610)
[7] https://www.retsinformation.dk/eli/lta/1988/433

149.     Share ownership is now electronically recorded in book entry form by a Danish Central Securities Depository (CSD).

150.     The legal consequences of the book-entry of securities on a custody account were, until the entry into force of the Danish Capital Market Act on January 3, 2018, regulated in Chapter 22 (Section 66 to 75) of the Securities Trading Act (Exhibit 49).

151.     This dematerialization of Danish listed shares in 1988 did not lead to any change in when a buyer obtains ownership of a security, which, as explained below, is on the trade date. The consequence of dematerialization of Danish shares is that the book entry reflecting the purchase of a security constitutes the evidence of the ownership position.

152.     The process of dematerialization changed the content of the share ownership rights from an entitlement to hold a physical share certificate to a claim against the CSD for registration as the shareholder in the records of the CSD.

153.     One right attached to share ownership is the right to have the share ownership registered in a custody account.  Section 66 of the Securities Trading Act protects registered owners of dematerialized against competing claims of any good faith third party buyers.  The recording of a share in the custody account thus only serves the protection of an already acquired ownership right.  Registration is not a precondition to ownership as such. *See* Exhibit 49, at Section 66.

154.     The only requirement to create the claim for registration of the share on the custody account of the buyer is that the buyer obtain ownership of the share.  As described in more detail below, ownership under Danish law is acquired by virtue of entering into a legally binding contract to purchase the share.

**B.      Ownership of Shares Is Acquired On Trade Date**

35

155.     It is a fundamental principle of Danish law, including Danish tax law, that ownership of a given asset is obtained when a final and binding and unconditional agreement between the parties has been validly concluded.  This principle also applies to the acquisition of shares.

156.     Ownership of Danish shares is therefore transferred at the time of a final and binding agreement between a party to sell a share to a party wishing to purchase the share.  This is confirmed by SKAT's Legal Guide, which states:

> A share has been purchased or sold on the date on which a final and binding agreement on purchase or sale is in place.

SKAT Legal Guide C.B.2.1.6.1.[8] (Exhibit 50).

157.     Ownership is transferred on the date on which the parties enter into a legally binding agreement, which is generally called the "trade date."  Delivery of the share as part of the transaction settlement process is not required for the transfer of ownership.  For example, an investor who purchases shares in the morning and sells them in the afternoon is deemed to be the owner (including the beneficial owner) of those shares in the period of time between the transactions and will be liable to SKAT for any tax owed on a gain resulting from the sale, even though the transactions will not have settled until several days later.  To take another example, an investor who enters into an agreement to buy shares before the "ex-dividend date" is the owner of the shares on that date, even if the transaction does not settle until after that date.

158.     As support for this basic proposition, SKAT's Legal Guide refers to a series of judicial decisions and administrative guidance, which I summarize below.  In particular, the

---

[8]     SKAT publishes the Legal Guide on its website, and updates the Legal Guide twice each year.  In the Legal Guide, SKAT provides its summary of Danish tax law and citation to relevant case law that bear on SKAT's conclusions.  The Legal Guide does not itself have the force of law.  However, the Eastern High Court of Copenhagen has ruled that taxpayers, as a main rule, are entitled to rely on and conform themselves to the Legal Guide.  TfS 1994.295 O (Exhibit 51).  The court reasoned that the Legal Guide was supposed to correspond to the tax authority practice which cannot simply be deviated from.

Legal Guide refers to three Supreme Court judgments (SKM2011.533.HR; SKM2005.490.HR
and SKM2001.126.HR), Exhibits 52, 53, 54; two City Court judgments (SKM2010.259BR;
SKM2008.825.BR), Exhibits 55, 56; one decision of the Tax Tribunal (SKM2002.399.VLR),
Exhibit 57; and three binding answers of the Danish Tax Council ("Skatterådet")
(SKM2008.831.S; SKM2008.803SR; SKM2008.759.SR), Exhibits 58, 59, 60, which all address
questions of when a share is considered purchased and/or sold under Danish tax law. All three
Supreme Court Judgments confirm that transfer of ownership of shares occurs at the point in
time when the share purchase agreement is concluded.

159. The Danish Supreme Court confirmed in **SKM2001.126HR** that the point in time
when shares were purchased and ownership was transferred was the moment of the signature of
the broker confirmation ("fondsnota"). *See* Exhibit 54.

160. The decision of the Danish Supreme Court in **SKM2005.490.HR** concerned
option rights. Since the Court in the light of the facts of the case considered it unlikely that the
option rights would not be exercised, the ownership was deemed transferred at the time when the
option agreement was signed. The likelihood of the options being exercised was the deciding
factor. *See* Exhibit 53.

161. The decision **SKM2011.533.HR** of the Danish Supreme Court concerned another
case of transfer of a part of the shares held by a company which at the same time entered into an
option agreement to transfer the remaining shares held by the company. The Supreme Court
again determined that entry into the option agreement was sufficient to consider the shares
transferred for Danish tax law purposes. *See* Exhibit 52.

162. In **SKM2008.825.BR**, the City Court had to decide the question of when a final
and binding agreement was entered into in a situation where the payment had to take place in

37

two installments payable in two different fiscal years and the shares were delivered to the account of the purchaser upon receipt of the second payment. The Court came to the conclusion that the ownership of the shares was transferred when the offer to purchase the shares was accepted. Delivery of the shares was not a precondition to finalize the transfer of ownership. *See* Exhibit 56.

163. In **SKM2010.259.BR**, the City Court had to decide on a case of a share transfer agreement in which the purchaser had the right to pay the purchase price in kind (delivery of a specific amount of shares of a specific company) or in cash. One year after the conclusion of this share transfer agreement, the purchaser decided to settle the purchase price in kind by delivery of the agreed number of the specific shares. The court came to the conclusion that the shares must be considered as transferred to the purchaser for tax purposes at the time of the entry into the agreement and not at the time of the settlement of the purchase price. *See* Exhibit 55.

164. The agreement to purchase shares must, however, be final and binding in order to transfer ownership. In **SKM2002.399.VLR**, the High Court decided that an agreement was not final and binding until 1996 when additional terms were agreed upon. In this regard it was deemed relevant that the seller in 1995 had sent a letter to the buyer confirming that he did not consider himself bound by the initial agreement. *See* Exhibit 57.

165. The SKAT Legal Guide also referred to administrative guidelines from the Danish Tax Council ("Skatterådet"). In 2008, the Danish Tax Council considered, on three occasions, the point in time when ownership of Danish shares is to be considered transferred. This was an issue because of the entry into force of an amendment to the Danish Capital Gains Tax Act. The introduction of new tax exemption rules made it imperative to know if a purchase or sale was realized prior to or after entry into force of the new rules (on January 1), especially in

cases when the purchase agreement was concluded prior to the year end, but settlement only occurred after year end.

166.    The binding answer of the Tax Council provided in **SKM2008.759.SR** concerned an option agreement which included both a right to purchase and to sell shares.  The Council confirmed that the entry into the option does not constitute a transfer of ownership.  The Tax Council confirmed that the shares were only transferred when the option right was exercised.  Because it was uncertain that the option would be exercised, no binding agreement to transfer ownership had been entered into. *See* Exhibit 60.

167.    The Tax Council was in **SKM2008.803.SR** again asked to give its opinion on option rights and confirmed the position that the transfer of ownership required the exercise of the option, since the Tax Council in the light of the facts of the case was not sure that the option right would ever be exercised.  Consequently, the option right agreement did not in itself constitute a binding agreement for transfer of ownership. *See* Exhibit 59.

168.    Finally, the Tax Council confirmed in **SKM2008.831.SR** that it is the trade date which is decisive to determine the point in time when shares are purchased or sold.  The Council confirmed that the settlement date (described as the value date in Danish) was irrelevant when ascertaining the time of the transfer of ownership.  The Council also confirmed that the simple placement of an order is not yet sufficient for the transfer of ownership.  The order must be matched (i.e. executed), which happens on the trade date instantly before transfer of ownership occurs.[9] *See* Exhibit 58.

---

[9]      In SMK2008.831 SR, the Council stated: "An order cannot be equated with a purchase . . .  It is the trading date that must be taken into account at the time of determination for the purchase or sale of shares.  The value date is thus not crucial.  [...]  This applies regardless of the date of the denomination until 4.1.2006 and regardless of the fact that the shares were not included in the author's repository as of 31.12.2005." *See* Exhibit 58.

169.     The Danish Parliament has also addressed the question of the time ownership of a dematerialized share is transferred.  In 2005, when the Danish Capital Gains Tax Act ("*Aktieavancebeskatningeloven*") was amended, the preparatory works addressed in its comments to section 23(1) of the law number L 78 of 16 November 2005 the possibility of a share transaction where the trade date would be prior to the entry into force of the new law but settlement was after the law went into effect.  The comments provide:

> The decisive factor in determining the date of the transfer is when there is a final and binding agreement on the relinquishment.  For shares traded on the stock exchange, the date of the stock exchange statement (the trade date) will be used.
>
> In addition, the determination of the date of acquisition may be important, for example in connection with new legislation.  Here too, it is crucial when there is a final and binding agreement on the acquisition.  For shares traded at the stock exchange, the date of the stock exchange note (the trade date reflected on a trade confirmation) will be used.[10]

Exhibit 62.

170.     SKAT integrated these preparatory works into its Legal Guide.  Chapter C.B.2.1.7.2. of the Legal Guide addresses the point from which a taxpayer is taxable on capital gains.  The section confirms for all kinds of assets that a taxpayer is considered as having acquired an asset on the date when he has entered into a final and legally binding purchase agreement.  Chapter C.B. 2.1.7.2. states that "for listed shares the date on the sales note (the trade date) is considered as the date when a taxpayer has entered into a final and legally binding acquisition agreement." *See* Exhibit 63.

## C.     Danish Cases Addressing "Beneficial Ownership"

171.     Until relatively recently, beneficial ownership was not a concept recognized under Danish law.  There were no Danish judicial decisions interpreting the phrase until the mid-2000s.

---

[10]     The same is true if the shares are traded on the over-the-counter (OTC) market.

And although there was a Danish legal concept of "rette indkomstmodtager" (genuine recipient of income), that is not the equivalent of "beneficial owner." *See* SKM2011.57.LSR (Exhibit 64). During the period 2012 – 2015, the meaning of "beneficial ownership" under Danish law was uncertain and unsettled. The meaning of "beneficial ownership" under Danish law remains unsettled even today, and significant Supreme Court decisions relating to beneficial ownership have been decided only in the past few years.

172.     To the extent Danish courts had occasion to examine beneficial ownership before 2016, it was often in the context of "conduit companies." I am not aware of any decision before 2016 in which a Danish court discussed beneficial ownership in the context of purchases of securities from stock borrowers, or purchases that relied on third-party funding, or securities transactions with extended settlement terms or that failed to settle altogether, or cases involving trading that was either alleged to be circular or fictitious.

173.     An overview of the limited Danish case law that addressed the subject of "beneficial ownership" before 2016 follows.

174.     The first prominent Danish beneficial ownership case was the case SKM 2010.268.LSR (the "ISS case 1") in which the taxpayer prevailed. *See* Exhibit 65. This decision of the Tax Tribunal was confirmed by the Eastern High Court verdict of 20 December 2011 (SKM2012.121.ØLR). *See* Exhibit 66.

175.     In that case, the Eastern High Court used the opportunity to clarify the meaning of "beneficial owner." SKM2012.121.ØLR (Exhibit 66). The High Court stated that the meaning of the term must be in accordance with the international understanding of the term. Consequently, the term "beneficial owner" is not to be interpreted according to domestic law, and is not the same as the principle of the proper person ("Rette indkomstmodtager"). Rather,

41

the meaning of the term should be assessed according to the OECD Model Tax Conventions and the 1977 and 2003 comments to the OECD Model Tax Convention, as they express the international meaning of the term. Furthermore, the High Court also referenced the UK decision in *Indofood International Finance Ltd. v. JP Morgan Chase Bank N.A. London Branch*, which shows that Danish courts may refer to relevant international case law to clarify the meaning of "beneficial ownership." After it clarified the meaning of the term, the Eastern High Court assessed who was the beneficial owner of a disbursed dividend; either the Danish company or its parent company in Luxembourg. The court was of the opinion that assessment of who is "beneficial owner" is a transaction-specific assessment and has the purpose of determining who has the right of disposal of the distributed dividends. Focusing on the economic realities of the transaction, the High Court concluded that the parent company was the beneficial owner of the dividends because the dividends were not disbursed to investors in the parent company but recirculated as a loan to the Danish company. In its published comments to the judgment (SKM2012.100.SKAT), the Ministry of Taxation has agreed that the parent company was not a conduit company. *See* Exhibit 67.

176. The taxpayer also prevailed at the Tax Tribunal in the case SKM2010.729 LSR. There, the Luxembourg company receiving an interest payment from its Danish subsidiary was considered the beneficial owner, in spite of not having any real substance in Luxembourg, and where the Luxembourg company did not forward the interest payment to its parent company. The Tax Tribunal applied the interpretation of beneficial ownership as defined by the EU directives to the interpretation of beneficial ownership under the Tax Treaty between Denmark and Luxembourg. *See* Exhibit 68.

177.    By contrast, where dividends paid to a Cyprus company were then passed on to its Bermudian parent company, the Danish National Tax Tribunal found in the case SKM2012.26.LSR (decision of 16 December 2011) that the Cypriot company was not the beneficial owner of the dividends in relation to article 10 of the double tax treaty between Denmark and Cyprus.  The Cypriot company, which had been established just before the acquisition of the shares in the Danish company, in the relevant years had no facilities or staff of its own and had only very limited operating expenses. *See* Exhibit 69.

178.    The Eastern High Court decided in the case SKM.2015.397.ØLR (Eastern High Court verdict of 13 March 2015) that a Luxembourg company which did not account for the receipt of the dividend in its financial statements, and did not receive the dividend into an account in the name company's own name, was not the beneficial owner.  *See* Exhibit 70.  The Danish tax authorities found that the ultimate parent company in Cayman Islands was to be "beneficial owner/genuine recipient of income" of the dividends.  The dividends were considered as "entirely bypassing" the Luxembourg company.  The dividends did not appear in the parent company's financial statements.  The National Tax Tribunal took the view that the subsidiary distributed the dividends to a party other than the parent company, and that the Danish subsidiary was therefore not exempt from withholding dividend tax, *see* Exhibit 36, section 65, subsection 4 of the Withholding Tax Act; *see also* Exhibit 37, section 2, subsection 1, letter c of the Corporation Tax Act.  The Danish subsidiary was furthermore liable to pay the withheld tax, see section 69, subsection 1 of the Withholding Tax Act. *See* Exhibit 36, at section 69, subsection 1.

### D.    OECD Commentary Regarding Beneficial Ownership

179.    Because the Danish case law on the subject of beneficial ownership was entirely undeveloped, Danish courts construing the meaning of the phrase "beneficial ownership" have

consulted the OECD Model Convention and the Commentaries thereto when interpreting that phrase.

180.    The OECD's Model Double Tax Convention contains a beneficial ownership clause that requires the company receiving a dividend be the beneficial owner thereof in order to receive the benefits of the convention.

181.    Treaties entered into by OECD Member States are generally influenced by the provisions of the OECD Model Convention.  The commentaries to the articles in the OECD Model can influence the way such tax treaties are interpreted.  The commentaries and some articles in the Model are updated from time to time, and were updated in 2010, 2014, and 2017.

182.    It is a debatable point under international tax principles as to the degree to which, in interpreting a treaty, regard should be had to OECD guidance (reflected in a change in the Commentaries to the OECD Model) that comes into existence after a tax treaty has been signed.[11]  The US-Denmark treaty entered into force in 2000 and was amended in 2006.  Some of the OECD guidance in relation to the beneficial ownership test was not issued until 2014. However, as discussed above, the High Court clarified this discussion in SKM2012.121 Ø.  *See* Exhibit 66. The High Court stated that Denmark follows a dynamic and international approach when applying the term beneficial ownership.  For this reason, Denmark also uses amendments to the OECD comments even when interpreting older treaties.  Older examples of this can also be identified in case law, e.g. the Supreme Court's judgments in TfS 1993,7 H (Exhibit 71) and SKM2003.62.HR (Exhibit 72), which applied OECD commentary issued *after* the Double Taxation Agreement had entered into force.

---

[11]    The matter is often debated by reference to the distinction between matters that merely clarify and those which change the meaning of treaty provisions. The nature of the 2014 changes to the OECD Model Commentary to Article 10 for the purposes of this distinction is itself open to debate.

183.     The commentary to article 10, paragraph 2 of the 2010 model convention states:

12. The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid ... to a resident" as they are used in paragraph 1 of the Article.  It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was immediately received by a resident of a State with which the State of source had concluded a convention.  The term "beneficial owner" is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

12.1. Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State.  The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence.

It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies" concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

12.2. Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 to clarify this point, which has been the consistent position of all member countries).  States which wish to make this more explicit are free to do so during bilateral negotiations."

Exhibit 73.

184.     The commentary to article 10, paragraph 2 of the 2014 model convention from 15

July 2014 states:

12. The requirement of beneficial ownership was introduced in paragraph 2 of Article 10 to clarify the meaning of the words "paid … to a resident" as they are used in paragraph 1 of the Article. It makes plain that the State of source is not obliged to give up taxing rights over dividend income merely because that income was paid direct to a resident of a State with which the State of source had concluded a convention.

12.1. Since the term "beneficial owner" was added to address potential difficulties arising from the use of the words "paid to … a resident" in paragraph 1, it was intended to be interpreted in this context and not to refer to any technical meaning that it could have had under the domestic law of a specific country (in fact, when it was added to the paragraph, the term did not have a precise meaning in the law of many countries). The term "beneficial owner" is therefore not used in a narrow technical sense (such as the meaning that it has under the trust law of many common law countries) rather, it should be understood in its context, in particular in relation to the words "paid … to a resident", and in light of the object and purposes of the Convention, including avoiding double taxation and the prevention of fiscal evasion and avoidance.

12.2. Where an item of income is paid to a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption merely on account of the status of the direct recipient of the income as a resident of the other Contracting State. The direct recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence.

12.3. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned.

For these reasons, the report from the Committee on Fiscal Affairs entitled "Double Taxation Conventions and the Use of Conduit Companies" concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.

12.4. In these various examples (agent, nominee, conduit company acting as a fiduciary or administrator), the direct recipient of the dividend is not the "beneficial owner" because that recipient's right to use and enjoy the dividend is constrained by a contractual or legal obligation to pass on the payment received to another person. Such an obligation will normally derive from relevant legal documents but may also be found to exist on the basis of facts and circumstances showing that, in substance, the recipient clearly does not have the right to use and enjoy the dividend

unconstrained by a contractual or legal obligation to pass on the payment received to another person. This type of obligation would not include contractual or legal obligations that are not dependent on the receipt of the payment by the direct recipient such as an obligation that is not dependent on the receipt of the payment and which the direct recipient has as a debtor or as a party to financial transactions, or typical distribution obligations of pension schemes and of collective investment vehicles entitled to treaty benefits under the principles of paragraphs 6.8 to 6.34 of the Commentary on Article 1. Where the recipient of a dividend does have the right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass on the payment received to another person, the recipient is the "beneficial owner" of that dividend. It should also be noted that Article 10 refers to the beneficial owner of a dividend as opposed to the owner of the shares, which may be different in some cases.

12.5. The fact that the recipient of a dividend is considered to be the beneficial owner of that dividend does not mean, however, that the limitation of tax provided for by paragraph 2 must automatically be granted. This limitation of tax should not be granted in cases of abuse of this provision (see also paragraphs 17 and 22 below). As explained in the section on "Improper use of the Convention" in the Commentary on Article 1, there are many ways of addressing conduit company and, more generally, treaty shopping situations. These include specific anti-abuse provisions in treaties, general anti-abuse rules and substance-over-form or economic substance approaches. Whilst the concept of "beneficial owner" deals with some forms of tax avoidance (i.e. those involving the interposition of a recipient who is obliged to pass on the dividend to someone else), it does not deal with other cases of treaty shopping and must not, therefore, be considered as restricting in any way the application of other approaches to addressing such cases.

12.6. The above explanations concerning the meaning of "beneficial owner" make it clear that the meaning given to this term in the context of the Article must be distinguished from the different meaning that has been given to that term in the context of other instruments that concern the determination of the persons (typically the individuals) that exercise ultimate control over entities or assets. That different meaning of "beneficial owner" cannot be applied in the context of the Article. Indeed, that meaning, which refers to natural persons (i.e. individuals), cannot be reconciled with the express wording of subparagraph 2 a), which refers to the situation where a company is the beneficial owner of a dividend. In the context of Article 10, the term "beneficial owner" is intended to address difficulties arising from the use of the words "paid to" in relation to dividends rather than difficulties related to the ownership of the shares of the company paying these dividends. For that reason, it would be inappropriate, in the context of that Article, to consider a meaning developed in order to refer to the individuals who exercise ultimate effective control over a legal person or arrangement.

12.8. Subject to other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the

beneficiary and the payer but the beneficial owner is a resident of the other Contracting State (the text of the Model was amended in 1995 and in 2014 to clarify this point), which has been the consistent position of all member countries."

Exhibit 74.

## VI. Dividends

185.　As I previously stated, in order to obtain a reclaim of dividend withholding tax under the US Denmark Treaty, the applicant must be "the beneficial owner of the dividends." In the preceding section, I discussed the concepts of ownership for purposes of Danish tax law. I now turn to the question of what it means to be a "dividend."

186.　Distributions to shareholders can be made according to Chapter 11 of the Companies Act. Section 179 (1) provides for the 4 possible distribution scenarios:

> (1)　Ordinary dividends (Section 180)
>
> (2)　Extraordinary dividends (Section 182 and 183)
>
> (3)　Distributions made in relation with a decrease of the share capital (Sections 185 – 193)
>
> (4)　Distributions of liquidation proceeds as described in Chapter 14 of the Companies Act relating to liquidation of joint stock companies.

Exhibit 48, at Section 179(1).

187.　Ordinary dividends are authorized by a resolution of the shareholders at the annual general meeting (AGM) (Section 180 Companies Act). *See* Exhibit 48.

188.　A buyer who buys a share on or before the date of the Annual General Meeting at which shareholders resolve to distribute dividends is entitled to the dividends. The "ex-dividend date" in such circumstances, i.e., the date upon which the buyer will not be entitled to a dividend, is the day after the date of the Annual General Meeting. To the extent a company issues an extraordinary dividend (such as a "special" or "interim" dividend not declared at the Annual General Meeting), the company issuing the dividend typically sets the "ex-dividend date." Any

48

buyer who buys a share before the "ex-dividend date" will be entitled to the dividend. Section 19 of the Danish Sale of Goods Act provides: "A contract for the acquisition of a share shall include any dividend that has not fallen due for payment at the time of the conclusion of the contract." In other words, the buyer of a share is entitled to the dividend on the trade date. At the time of the book entry reflecting the purchase of shares, for purposes of Danish tax law, the buyer is also the beneficial owner of any dividends associated with those shares. *See* Exhibit 75, at Section 19.

189.    One need not be registered as the owner of the share to be entitled to the dividend. This follows from Section 49(a) of the Companies Act, which provides:

> No purchaser of a registered share may exercise the rights conferred on that purchaser as a shareholder unless and until the purchaser has been registered in the register of shareholders or has given notice of his acquisition of the shares to the company and established good title to them.  However, this does not apply to the right to receive dividends and other distributions, or to the right to subscribe for new shares issued in connection with a capital increase.

Exhibit 48, at Section 49(a).

190.    The US Denmark Tax Treaty includes an express definition of "dividends." Article 10(5) defines the term "dividends" as "income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation as income from shares by the laws of the State of which the payor is a resident."[12] *See* Exhibit 39.

191.    The Technical Explanation of the 2006 Protocol explains that "dividends" is to be construed broadly. It states:

> Paragraph 5 defines the term "dividends" broadly and flexibly. The definition is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the state of source, including types of arrangements that might be developed in the future. The term includes income from shares, or other corporate rights that are not treated as debt under the law of

---

[12] The OECD Model Convention supplies a different definition of a "dividend." *See* Exhibit 44, OECD Model Convention, Article 10(3).

the source State, that participate in the profits of the company. The term also includes income that is subjected to the same tax treatment as income from shares by the law of the State of source. Thus, a constructive dividend that results from a non-arm's length transaction between a corporation and a related party is a dividend.

Exhibit 41.

192.     Circular 1996-04-17 confirms at points 9.1 and 9.1.1 that in the opinion of the tax authorities, "no account shall be taken to the name or the form in which the distribution takes place" when determining whether a particular payment is a dividend. *See* Exhibit 76.

193.     Older Danish case law also contributes to the definition of dividends. Furthermore, case law concerning dividend compensation payments indicates that they are treated the same way as dividends paid directly by a company if the recipient of the dividend compensation payments is deemed to have acquired ownership of both the stock and the dividend.

194.     In **TfS 2001.146.LR**, the Tax Tribunal first considered the situation in which a borrower of shares received a dividend and made a dividend compensation payment to the lender. In that case, the Tribunal concluded that the dividend payment received by the borrower was taxable as dividend income, and the dividend compensation payment to the lender should be taxed as ordinary income to the lender. Subsequent decisions by Danish courts reached different conclusions. *See* Exhibit 77.

195.     In **SKM 2004.51.LSR**, the Tax Tribunal found that the borrower was not to be treated as the owner of the stocks or the dividend for tax purposes. The deciding factor was that the dividend compensation payment and the right of ownership of the stock still belonged to the lender of the stock. Consequently, the dividend compensation payment was to be taxed as dividends in the hands of the lender. *See* Exhibit 78.

196.     In **TfS 2004.152**, the Tax Tribunal found that how dividends and compensation payments are treated under stock lending arrangements depends on how the borrower disposes of the borrowed shares during the loan period.  The Tax Tribunal confirmed that if the borrower has not sold the borrowed shares, and has received dividends for which he must compensate the lender, the lender is taxed on the dividend income, and the borrower is not.  It did not explain the tax treatment of dividend compensation payments made to the buyer of shares from a stock borrower. *See* Exhibit 79.

197.     In **SKM2009.65.SR**, the Tax Council had another opportunity to decide the question of who dividend tax should be attributed to when the stock borrower (who did not resell the shares to a third party) has agreed to pay the stock lender dividend compensation.  The Tax Council referred to the Tax Tribunal decision in SKM2004.51.LSR and stated that the stock lender will be subject to dividend tax in relation to the dividend compensation payments.  This was the case even though, as a matter of securities law under the standard form ISLA terms, the borrower was the legal owner of the shares.  Nor did it matter whether the borrower actually received a dividend payment from the Company. *See* Exhibit 80.

198.     Similarly, in **SKM2010.266.SR**, another decision of the National Tax Council, the board ruled that payments received by a lender in a stock loan agreement based upon the ISLA agreement as compensation for dividends from shares on loan are taxable as dividends for the lender. *See* Exhibit 81.

199.     Danish courts have also considered the question of who owns a dividend when a purchaser of shares has agreed to pay dividends back to the seller.  The Danish Tax council held in its decision of 15 November 2016 (**SKM2016.615.SR**) that the current owners of shares at the time of the distribution of a dividend would be taxable on such dividends and be entitled to any

51

eventual withholding tax refund even in a case where they, as part of the purchase price, had

agreed to forward the dividends received to the seller. *See* Exhibit 82.

200.    This decision was confirmed by the Danish Supreme Court in its ruling dated 12

March 2020 (**BS-31096/2019-HJR**), which came to the conclusion that a contractual obligation

of the owner of shares (and direct recipient of a dividend from a Danish company) to forward the

dividend payment to a third party (the seller of the shares) does not disqualify the dividend

recipient as being the owner of the dividend.  The Supreme Court ruled that a shareholder cannot

release himself from the obligation to pay withholding tax by entering into a contractual

arrangement that transfers the entitlement to the dividend to another person.  Thus, the Danish

Supreme Court confirmed that the shareholder remains the owner of the dividend. *See* Exhibit

83.

201.    SKAT has published guidance relating to the question of which party is the

beneficial owner of dividends in the context of securities lending agreements.  Updates to its

website after 2015 state the following:

> "In a share lending agreement between a lender and a borrower, the lender will
> thus remain the beneficial owner of dividends for tax purposes.  Therefore, it is
> solely the party who is considered the beneficial owner of dividends for tax
> purposes who is entitled to claim a refund of dividend tax."

> "The lender remains the beneficial owner of dividends and the actual shareholder
> even after he has lent the shares.  A person is the actual shareholder if he owned
> the shares at the time the dividend payment was declared, meaning that he owned
> the shares on the vesting date."

> "If the borrower resells the shares to a third party, the lender will not be charged
> tax on disposal of shares.  However, the third party becomes the temporary
> beneficial owner of dividends.  Thus, the third party is taxed on the dividends and
> the third party is also entitled to receive a possible refund of dividend tax if too
> much dividend tax has been withheld."

*See* Ex. 84.

202.     These cases and guidance make the following clear.  First, the source of a dividend payment is not decisive on the question of whether a payment is or is not a "dividend." Second, if there is a binding agreement on the transfer of the right to ownership of shares, dividend compensation payments are treated the same way as dividends paid directly by a company.  Third, when an owner of shares receives a dividend compensation payment, the owner is considered to have received a dividend for the purpose of Danish tax law.

203.     As I discussed above, the Technical Explanation to the 2006 Protocol stated, "The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State." *See* Exhibit 41. Under Danish tax law, dividend income often is and certainly can be attributable for tax purposes to a party who receives a dividend payment, including a dividend compensation payment.  Moreover, when an owner of shares receives a dividend compensation payment, that dividend income is attributable to the owner for tax purposes under Danish tax law.

## VII.     Danish Law On Securities Settlement

204.     On May 19, 1998, the European Parliament and Council of the European Union issued Directive 98/26/EC on settlement finality in payment and securities settlement systems (hereinafter "Settlement Directive").  Exhibit 61.

205.     The Settlement Directive recognizes the use of net settlement.  It addresses "Netting and Transfer Orders" in Article 3.   There, it provides that "[t]ransfer orders and netting

shall be legally enforceable and binding on third parties even in the event of insolvency proceedings against a participant[.]"[13]  Art. 3(1).

206.    Effective May 1, 2000, the Settlement Directive was implemented in Denmark with amendments to the Securities Trading Act ("værdipapirhandelsloven").  Article 3's provisions on netting had previously been incorporated into Danish law in section 57 of the Securities Trading Act.  Ex. 85.  Today, those provisions can be found in section 163 of the Danish Law on Capital Markets ("kapitalmarkedsloven").  Ex. 86.

207.    Since the 1990s, custodians in Denmark may engage in net settlement.

208.    Regulation EU No. 909/2014 of the European Parliament and Council of the European Union defines "settlement internaliser" as "any institution, including one authorised in accordance with Directive 2013/36/EU or with Directive 2014/65/EU, which executes transfer orders on behalf of clients or on its own account other than through a securities settlement system."  Art. 2(11).

* * *

Pursuant to 28 U.S.C. § 1746(1) the undersigned Kasper Bech Pilgaard, state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[13] The Settlement Directive defines "transfer orders" to include "any instruction by a participant to place at the disposal of a recipient an amount of money by means of a book entry on the accounts of a credit institution, a central bank, a central counterparty or a settlement agent, or any instruction which results in the assumption or discharge of a payment obligation as defined by the rules of the system, or an instruction by a participant to transfer the title to, or interest in, a security or securities by means of a book entry on a register, or otherwise."  Art. 2(i).

Executed on April 27, 2022

Kasper Bech Pilgaard
Copenhagen, Denmark