# Exhibit 14

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTERFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:  All cases. | MASTER DOCKET<br><br>18-md-2865 (LAK)<br><br>**Oral Argument Requested** |

## DEFENDANTS' AND THIRD-PARTY DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    The Revenue Rule Bars SKAT's Claims ............................................................1

    A.    To Decide The Motions For Summary Judgment, The Court Must Adopt And Enforce A Definition Of Beneficial Ownership Under Danish Tax Law ...............2

    B.    SKAT Seeks To Enforce Danish Tax Law ..............................................................4

    C.    SKAT Fails To Address The Significant Separation Of Powers And Sovereignty Concerns That This Case Raises ...........................................................5

    D.    SKAT's Reliance On Recent Proceedings Before The Danish National Tax Tribunal Reinforces Why The Revenue Rule Applies ...........................................9

    E.    SKAT Is Collaterally Estopped From Litigating The Revenue Rule Question With Respect To The ED&F Bellwethers ..................................................10

II.    Undisputed Facts Show Defendants Were Beneficial Owners Entitled To Refunds ........13

    A.    SKAT Improperly Disputes Indisputable Facts ....................................................13

    B.    Defendants Were Beneficial Owners .....................................................................15

III.    SKAT Cannot Prove That Defendants Made Any Actionable False Statement ................20

    A.    Defendants' Statements Regarding Beneficial Ownership And Entitlement To Refunds Are Inactionable Legal Conclusions .........................................................21

    B.    Defendants' Legal Statements Were, At A Minimum, Objectively Reasonable ...23

    C.    Even If The Challenged Statements Were Actionable, SKAT Cannot Prove That They Were False ...........................................................................................25

    D.    SKAT's Arguments As To Falsity Of The ED&F Bellwether Plan Applications Rely On Inadmissible Testimony And Documents .................................................29

IV.    SKAT Cannot Show That The Refunds Belong To It ......................................................32

V.    SKAT's Claims Are Time-Barred ...................................................................................33

    A.    Denmark's Three-Year Statute Of Limitations Bars SKAT's Claims ..................33

    B.    SKAT's New York Law Unjust Enrichment Claims Are Barred By The Three-Year New York Statute Of Limitations ..................................................................36

VI.    SKAT's Other Arguments Should Be Rejected ...............................................................36

    A.    SKAT's Restitution Claims Are Equitable ...........................................................36

    B.    SKAT Made No Mistake .......................................................................................37

    C.    SKAT Cannot Show Reasonable Reliance ............................................................37

    D.    SKAT Cannot Establish Scienter ..........................................................................38

    E.    SKAT's Aiding And Abetting Claims Fail Under Utah Law ................................40

    F.    N.Y. Law Applies To Claims Against The N.Y. Bellwether Defendants ............42

    G.    The DNTT Proceedings Have No Preclusive Effect .............................................44

i

VII.     Summary Judgment Should Enter On SKAT's "Restitution Claims"................................45

VIII.    Altbach Is Entitled To Summary Judgment......................................................................46

      A.     The Fraud Claim Should Be Dismissed..................................................................46

      B.     The Aiding and Abetting Claim Must Be Dismissed .............................................48

      C.     The Negligent Misrepresentation Claim Must Be Dismissed................................50

CONCLUSION.............................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 West 115th Street Corp. v. 600 West 115th Street Condominium*,
   180 A.D.2d 598 (1st Dep't 1992) ...........................................................24

*Adams v. Resolution Trust Corp.*,
   927 F.2d 348 (8th Cir. 1991) .................................................................27

*AHW Investment Partnership v. Citigroup, Inc.*,
   980 F. Supp. 2d 510 (S.D.N.Y. 2013), *aff'd*, 661 F. App'x 2 (2d Cir. 2016).........43

*AIU Insurance Co. v. Deajess Medical Imaging, P.C.*,
   24 Misc. 3d 161 (N.Y. Sup. Ct. 2009) ...............................................26, 27

*Alvarez v. All Star Boxing, Inc.*,
   258 So. 3d 508 (Fla. Dist. Ct. App. 2018) ...............................................45

*Athene Life & Annuity Co. v. American General Life Insurance Co.*,
   2020 WL 2521557 (Del. Super. Ct. May 18, 2020) .....................................47

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
   268 F.3d 103 (2d Cir. 2001)...............................................................6, 8

*Auqui v. Seven Thirty One Ltd. Partnership*,
   22 N.Y.3d 246 (2013) .......................................................................44

*Baity v. Kralik*,
   51 F. Supp. 3d 414 (S.D.N.Y. 2014)......................................................14

*Bascunan v. Elsaca*,
   2021 WL 3540315 (S.D.N.Y. Aug. 11, 2021) ...........................................36

*Berdeaux v. OneCoin, Ltd.*,
   561 F. Supp. 3d 379 (S.D.N.Y. 2021)....................................................42

*Blue Ridge Investments, LLC v. Republic of Argentina*,
   902 F. Supp. 2d 367 (S.D.N.Y. 2012), *aff'd*, 735 F.3d 72 (2d Cir. 2013) .............26

*CadleRock Joint Venture, L.P. v. Royal Indemnity Co.*,
   2012 WL 511570 (N.D. Ohio Feb. 15, 2012)............................................42

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
   528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd* 354 F. App'x 496 (2d Cir. 2009)........49

*Century Senior Services v. Consumer Health Benefit Ass'n, Inc.*,
 770 F. Supp. 2d 1261 (S.D. Fla. 2011) ...................................................................46

*China Shipping Container Lines Co. v. Big Port Service DMCC*,
 2019 WL 9362547 (S.D.N.Y. Jan. 15, 2019) .........................................................11

*City of Almaty v. Sater*,
 503 F. Supp. 3d 51 (S.D.N.Y. 2020)...............................................................36, 46

*Cobb v. Pozzi*,
 363 F.3d 89 (2d Cir. 2004)...............................................................................44

*Collins v. Sandy City Board of Adjustment*,
 16 P.3d 1251 (Utah Ct. App. 2000) ...................................................................12

*Cook v. Aagard*,
 547 F. App'x 857 (10th Cir. 2013) ....................................................................13

*Coroles v. Sabey*,
 79 P.3d 974 (Utah App. Ct. 2003) ....................................................................41

*Cromer Finance Ltd. v. Berger*,
 137 F. Supp. 2d 452 (S.D.N.Y. 2001).................................................................43

*Cucchiaro v. Cucchiaro*,
 165 Misc. 2d 134 (N.Y. Sup. Ct. 1995) ..............................................................21

*DirecTV, Inc. v. Lewis*,
 2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005) .......................................................22

*Douglas v. York County*,
 433 F.3d 143 (1st Cir. 2005)............................................................................41

*Elbit Systems, Ltd. v. Credit Suisse Group*,
 917 F. Supp. 2d 217 (S.D.N.Y. 2013).................................................................49

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,
 165 F. Supp. 2d 615 (S.D.N.Y. 2001).................................................................38

*Federal Trade Commission v. Vyera Pharmaceuticals, LLC*,
 2021 WL 5300019 (S.D.N.Y. Nov. 15, 2021)...............................................29, 30

*Frandsen v. Westinghouse Corp.*,
 46 F.3d 975 (10th Cir. 1995) ...........................................................................11

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
 479 F. Supp. 2d 349 (S.D.N.Y 2007)...........................................................48, 49

*George Backer Management Corp. v. Acme Quilting Co.*,
46 N.Y.2d 211 (1978) ..........................................................................................21

*Goldstick v. The Hartford, Inc.*,
2002 WL 1906029 (S.D.N.Y. Aug. 19, 2002) ......................................................14

*Gordon & Breach Science Publishers S.A. v. American Institute of Physics*,
905 F. Supp. 169 (S.D.N.Y. 1995) ......................................................................44

*Gudmundson v. Del Ozone*,
232 P.3d 1059 (Utah 2010) ..................................................................................13

*Hagood v. Sonoma County Water Agency*,
81 F.3d 1465 (9th Cir. 1996) .........................................................................23, 24

*Hansen v. Native American Refinery Co.*,
2010 WL 1949749 (D. Utah May 14, 2010)..........................................................39

*Harig v. City of Buffalo*,
2021 WL 5822189 (W.D.N.Y. Dec. 8, 2021) ......................................................31

*Holborn Corp. v. Sawgrass Mutual Insurance Co.*,
304 F. Supp. 3d 392 (S.D.N.Y. 2018) .................................................................43

*Holtz v. Rockefeller & Co.*,
258 F.3d 62 (2d Cir. 2001)...................................................................................14

*In re AXA Equitable Life Insurance Co. COI Litigation*,
2022 WL 976266 (S.D.N.Y. Mar. 31, 2022) ......................................................43

*In re Estrategias en Valores, S.A.*,
628 B.R. 722 (Bankr. S.D. Fla. 2021)..................................................................42

*In re Foxmeyer Corp.*,
290 B.R. 229 (Bankr. D. Del. 2003) ....................................................................47

*In re RFC & RESCAP Liquidating Trust Action*,
2020 WL 504661 (D. Minn. Jan. 31, 2020)..........................................................30

*In re SKAT Tax Refund Scheme Litigation*,
356 F. Supp. 3d 300 (S.D.N.Y. 2019).........................................................1, 4, 11

*Insolia v. Philip Morris Inc.*,
216 F.3d 596 (7th Cir. 2000) ...............................................................................41

*Jensen ex rel. Jensen v. Cunningham*,
250 P.3d 465 (Utah 2011).....................................................................................12

*Jurgensen v. Felix Storch, Inc.*,
   2012 WL 2354247 (S.D.N.Y. June 14, 2012) .......................................................50

*Kashef v. BNP Paribas SA*,
   442 F. Supp. 3d 809 (S.D.N.Y. 2020).................................................................44

*Kuhar v. Thompson Manufacturing Inc.*,
   506 P.3d 1200 (Utah 2022)........................................................................12, 13

*L-3 Communications Corp. v. OSI Systems, Inc.*,
   2006 WL 988143 (S.D.N.Y. Apr. 13, 2006)..........................................................29

*Legurnic v. Ciccone*,
   63 F. Supp. 3d 241 (E.D.N.Y. 2014) ..................................................................45

*Lennon v. Miller*,
   66 F.3d 416 (2d Cir. 1995)...............................................................................24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   739 F.3d 45 (2d Cir. 2013)...............................................................................43

*Macris & Assocs., Inc. v. Neways, Inc.*,
   16 P.3d 1214 (Utah 2000)................................................................................11

*Mugavero v. Arms Acres, Inc.*,
   680 F. Supp. 2d 544 (S.D.N.Y. 2010)................................................................45

*National Conversion Corp. v. Cedar Building Corp.*,
   23 N.Y.2d 621 (1969) ................................................................................21, 22

*Nolan v. Sam Fox Publishing Co.*,
   499 F.2d 1394 (2d Cir. 1974)...........................................................................49

*Novartis Pharmaceuticals Corp. v. Handa Neuroscience, LLC*,
   2022 WL 610771 (D. Del. Mar. 1, 2022) .............................................................47

*OneWest Bank, N.A. v. Guerrero*,
   2018 WL 2727891 (S.D.N.Y. June 6, 2018) ........................................................29

*Ostler v. Retirement Board*,
   400 P.3d 1099 (Utah Ct. App. 2017) .............................................................11, 12

*Pace v. Air & Liquid System Corp.*,
   171 F. Supp. 3d 254 (S.D.N.Y. 2016).................................................................29

*Parsons v. Honeywell, Inc.*,
   929 F.2d 901 (2d Cir. 1991).............................................................................30

*Pasquantino v. United States*,
 544 U.S. 349, 125 S. Ct. 1766 (2005) ...............................................................12

*Pereira v. United Jersey Bank, N.A.*,
 201 B.R. 644 (S.D.N.Y. 1996) ..........................................................................43

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, Inc.*,
 898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013) ......................46

*Prince v. Bear River Mutual Insurance Co.*,
 56 P.3d 524 (Utah 2002) ..................................................................................39

*Rawson v. Conover*,
 20 P.3d 876 (Utah 2001) ...............................................................................38, 39

*Republic of Ecuador v. Philip Morris Cos.*,
 188 F. Supp. 2d 1359 (S.D. Fla. 2002), *aff'd sub nom. Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253 (11th Cir. 2003) ..........................................................7

*Roberts Real Estate, Inc. v. N.Y. State Dep't of State, Division of Licensing Services*,
 80 N.Y.2d 116 (1992) .......................................................................................49

*Robertson v. Campbell*,
 674 P.2d 1226 (Utah 1983) ...............................................................................12

*Ryan v. Hunton & Williams*,
 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) .....................................................48

*Scheiner v. Wallace*,
 832 F. Supp. 687 (S.D.N.Y. 1993) .....................................................................11

*Schering Corp. v. Pfizer, Inc.*,
 189 F.3d 218 (2d Cir. 1999) ..............................................................................31

*Searles v. First Fortis Life Insurance Co.*,
 98 F. Supp. 2d 456 (S.D.N.Y. 2000) ...............................................................29, 30

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
 248 F. Supp. 3d 428 (S.D.N.Y. 2017) .................................................................47

*Smythe v. Bish*,
 2016 WL 3647693 (N.D.N.Y. July 1, 2016) .......................................................13

*Societe Generale Energie Corp. v. N.Y. Marine & General Insurance Co.*,
 368 F. Supp. 2d 296 (S.D.N.Y. 2005) ................................................................29

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ...................................................................................37

*StrucSure Home Warranty, LLC v. Sulzbach*,
2021 WL 3516242 (S.D. Tex. Aug. 10, 2021) .........................................................27

*Swiss Watch Int'l v. Movado Group, Inc.*,
2001 WL 36270980 (S.D. Fla. June 21, 2001) .......................................................45

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010)...........................................................37

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)....................................................................................47

*Toretto v. Donnelley Financial Solutions, Inc.*,
2022 WL 348412 (S.D.N.Y. Feb. 4, 2022)..............................................................44

*U.S. ex rel. Finney v. Nextwave Telecom, Inc.*,
337 B.R. 479 (S.D.N.Y. 2006) ................................................................................24

*Union Carbide Corp. v. Montell N.V.*,
9 F. Supp. 2d 405 (S.D.N.Y. 1998) ..........................................................21, 22, 23, 24

*United States v. Harra*,
985 F.3d 196 (3d Cir. 2021)....................................................................................24

*United States v. Mejia*,
948 F. Supp. 2d 311 (S.D.N.Y. 2013)......................................................................31

*UST Private Equity Investments Fund, Inc. v. Salomon Smith Barney*,
733 N.Y.S.2d 385 (1st Dep't 2001) .........................................................................38

*Visiting Nurse Ass'n of Brooklyn v. Thompson*,
378 F. Supp. 2d 75 (E.D.N.Y. 2004) .......................................................................24

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*,
348 F. Supp. 2d 255 (S.D.N.Y. 2004)......................................................................48

*Waran v. Christie's Inc.*,
315 F. Supp. 3d 713 (S.D.N.Y. 2018)......................................................................50

*Wardley Better Homes & Gardens v. Cannon*,
61 P.3d 1009 (Utah 2002)........................................................................................49

*Wells Fargo Trust Co., N.A. v. Synergy Group Corp.*,
465 F. Supp. 3d 355 (S.D.N.Y. 2020), *aff'd*, 848 F. App'x 467 (2d Cir. 2021)....................23

viii

*Wenske v. Blue Bell Creameries, Inc.*,
2018 WL 5994971 (Del. Ch. Nov. 13, 2018) .......................................................47

*West v. Christensen*,
576 B.R. 223 (D. Utah 2017) ..............................................................................12

*Yukos Capital S.A.R.L. v. Feldman*,
2016 WL 183360 (S.D.N.Y. Jan. 11, 2016) .....................................................41, 42

**Docketed Cases**

*Skatteforvaltningen v. RJM Cap. Pension Plan & Richard Markowitz*,
No. 19 Civ. 1898 (S.D.N.Y.) ...............................................................................43

**Statutes, Codes & Regulations**

17 C.F.R. § 240.13d-3 ................................................................................................9

12 Del. C. § 3328(c) ................................................................................................47

26 U.S.C.
§ 401(a) ...............................................................................................................27, 28
§ 501(a) ...............................................................................................................27
§ 871(m) .............................................................................................................9, 18

U.C.C. § 8-501 ..........................................................................................................9

**Rules**

Fed. R. Civ. P.
30(b)(6) ..............................................................................................................29, 30, 40
56(c) ...................................................................................................................14
56(e) ...................................................................................................................29

Fed. R. Evid. 807 ................................................................................................30, 31

S.D.N.Y. Local Rule 56.1 ...................................................................................13, 14

**Other Authorities**

60A N.Y. Jur. 2d *Fraud and Deceit* § 49 ..............................................................21

*Convention Between the Government of the United States of America and the
Government of Japan for the Avoidance of Double Taxation and the
Prevention of Fiscal Evasion with Respect to Taxes on Income*, U.S.-Japan,
Nov. 6, 2003, S. Treaty Doc. No. 108-14,
https://home.treasury.gov/system/files/131/Treaty-Japan-11-6-2003.pdf ................6

*Denmark – Tax Treaty Documents*, IRS, https://www.irs.gov/businesses/international-businesses/denmark-tax-treaty-documents (last visited June 26, 2022) ...............................26

Dicey, Morris & Collins, The Conflict of Laws, R5-019 (15th ed.)..................................10, 11, 12

*Published net short positions*, Danish FSA, https://www.dfsa.dk/Rules-and-Practice/Short-selling/Published-net-short-positions (updated May 11, 2022).......................17

Restatement (Third) of Agency § 5.03, cmt. d(2) (2006) ...............................................................47

Restatement (Second) of Conflict of Laws §§ 145, 148 (1971) .....................................................42

*Tax Appeals Agency*, SKAT, https://www.skatteankestyrelsen.dk/servicemenu/english/ (last visited June 26, 2022) ......................................................................................................................................10

## I. The Revenue Rule Bars SKAT's Claims

SKAT would have the Court believe that this case is not about the recovery of tax revenues and that its claims are not "revenue claims" within the meaning of U.S. tax treaties. Discovery has shown that to be false. This is a tax case and, for purposes of Danish tax enforcement and administration, SKAT has treated the plans as taxpayers. Indeed, as recently as 2019, SKAT, in its own words, "decided to refund dividend tax" to U.S. pension plans that had applied for those refunds, "decided to cancel the previous decisions on dividend tax refunds," invited the plans to appeal to the Danish National Tax Tribunal, and told the pension plans it would "raise a claim for repayment" of supposedly incorrect tax refund payments. Dulberg Decl. (ECF No. 803) Ex. 99T. This case raises that claim, for recovery of tax refunds allegedly obtained through fraud. Accordingly, this case does not concern a "garden variety commercial fraud," but an alleged tax fraud. *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 308 (S.D.N.Y. 2019). If this Court considers this case further, it will enforce Danish tax law by deciding whether or not the plans were beneficial owners as a matter of Danish tax law.

The separation of powers concerns that animate application of the Revenue Rule are especially pronounced here, but SKAT ignores them. The political branches do not distinguish between situations in which an entity underpays tax, fraudulently or otherwise (tax evasion) or receives tax to which it is not entitled, fraudulently or otherwise (tax refunds). Indeed, a recent treaty makes especially clear that "a fraudulent claim for refund" is a "revenue claim" that falls under the collection assistance provisions of bilateral tax treaties. Bahnsen Decl. (ECF No. 808) Ex. 69 (Japanese Protocol) art. XIII. And nothing in any other tax treaty suggests that an entity must have been liable for tax in the first place for recovery of taxes to be deemed a revenue claim for treaty purposes. SKAT has no response to the expert opinion of Stephen Shay, a former senior international tax official in the U.S. Treasury, who has explained exactly why and how recognizing

1

SKAT's claims would vitiate the important U.S. interests that underlie the Revenue Rule.

### A. To Decide The Motions For Summary Judgment, The Court Must Adopt And Enforce A Definition Of Beneficial Ownership Under Danish Tax Law

The parties disagree about what "beneficial ownership" requires as a matter of Danish tax law. Defendants have explained that an owner of shares—as confirmed by the execution of a final and binding agreement to purchase them—who enters into an agreement to buy them before the ex-dividend date and is entitled to use and enjoy the dividends is the beneficial owner of dividends, eligible for any refund of withheld dividend tax under Danish tax law. *See* Defs.' Br. 19-20. Defendants argue that the plans did indeed own the shares before the ex-dividend date, were entitled to the dividends, and thus were beneficial owners under Danish tax law. *See id.* at 21-25. SKAT argues that Danish civil law requires holdings in shares that are segregated at a custodian or sub-custodian. *See* SKAT Opp. 19-20.

***Solo Bellwethers.*** Conflating principles of civil ownership, tax ownership, and beneficial ownership, SKAT says that because it has not located shares at any sub-custodian of a Solo Custodian, the Solo Bellwethers were not beneficial owners and so were not entitled to refunds. *See* SKAT Opp. 14-15. But SKAT reaches that conclusion based on evidence that would not be admissible (Defs.' Opp. 50-56); in any event, an absence of shares proves nothing because Danish tax law allows an investor to be the owner without having any shares (Pilgaard Reply Decl. ¶ 93) and custodians can internally net settle the trades of their clients to avoid having to fund the positions elsewhere (Defs.' Br. 23-24). Neither SKAT nor its experts accept the fact that tax laws and financial markets permit more beneficial owners of shares than there are actual shares outstanding. *See infra* § II.B.

The presence or absence of shares at a custodian or sub-custodian thus does not remove this case from the ambit of Danish tax law. SKAT's dispute with respect to the Solo Bellwether

2

Defendants boils down to whether Danish tax law requires a custodian or sub-custodian to hold shares for an investor to be a "beneficial owner" as SKAT used that term on Form 06.003. Defendants say no (*infra* § II.B); SKAT says yes (SKAT Opp. 19). To choose a side, the Court must decide what Denmark's tax laws require and apply that requirement to determine whether the plans were entitled to refunds. The Revenue Rule prevents the Court from engaging in that analysis of foreign tax law. SKAT does not meaningfully grapple with the dilemma or explain why the Court can properly engage in such analysis.

***ED&F Bellwethers.*** With respect to the ED&F Bellwethers, SKAT's approach is very different. This is because most of the ED&F Bellwether trades *indisputably* involved the actual purchase of actual shares bearing actual dividends on which actual tax was withheld. As to these trades, SKAT's contention is that ED&F, not the ED&F Bellwether Plans, was the "beneficial owner" of the dividends, on the theory that title to the underlying shares passed from the Plans to ED&F, by a kind of contractual legerdemain, upon receipt of the shares by ED&F. *See* SKAT Opp. 14-15, 22-23. SKAT not only misreads the contract language, but it reads the contracts in a manner completely at odds with the expectations and objectives of the contracting parties. Even if SKAT's reading were correct, its argument would require this Court to take the additional step of finding that, as a matter of Danish tax law, a contractual transfer of title to *shares* divested the ED&F Plans of beneficial ownership of *dividends* (notwithstanding that the Plans were credited with the full net dividend amounts), such that ED&F (and not the ED&F Bellwether Plans) was the operative taxpayer entitled to a withholding tax refund. Resolution of this dispute turns ultimately on what it means to be the beneficial owner of a dividend under Danish tax law, and such a determination by this Court is not permitted under the Revenue Rule.

As for the remaining ED&F trades—the so-called "Cum-Ex" trades—SKAT argues, on

3

the basis of inadmissible evidence, that shares purchased through MPT Dubai had "no dividend right attached," *see* SKAT Opp. 22, and SKAT offhandedly adds, based largely on analogy unsupported by any facts, that the "same is true" for shares *not* purchased through MPT Dubai. *See id*.[1] However, there is no dispute that, in connection with all of the "Cum-Ex" share purchases, payments were made to and received by the ED&F Bellwether Plans in the precise amounts of the dividends net of withholding tax. Accordingly, as SKAT acknowledges, the question as to these trades is whether such dividend payments, however construed, constitute "dividends under Danish law," *see id*., a question that can only be answered by reference to Danish tax law.

## B.     SKAT Seeks To Enforce Danish Tax Law

Rather than respond to Defendants' arguments (or Shay's conclusions), SKAT relies on this Court's motion to dismiss ruling as though it were the final word. But this Court was clear that discovery in this case would be vital. *See In re SKAT*, 356 F. Supp. 3d at 308. The record now demonstrates that in all the official dealings and interactions with the plans (even after SKAT's alleged discovery of tax fraud), SKAT and other agencies of the Ministry of Taxation considered the plans as taxpayers subject to Danish tax laws and regulations. The record also demonstrates that SKAT seeks to enforce Danish tax law and to recover tax revenue that it previously paid to the plans as refunds of dividend withholding tax.

*First*, even though this case is not about "tax evasion" *per se*, there is no reason that the Revenue Rule should not also apply here. *See In re SKAT*, 356 F. Supp. 3d at 311 n.42 (recognizing that Revenue Rule might apply beyond typical "tax evasion" case). SKAT is asking this Court to administer Denmark's dividend withholding tax system. Defendants have explained why SKAT's claims—which seek recovery for tax refund payments—do not logically (or legally) differ from

---

[1]     SKAT also relies on a *post-hoc* analysis of trade costs and volume performed by its expert, Graham Wade, whose opinions, reports and testimony the ED&F Bellwether Defendants have moved to strike. ECF No. 811.

4

claims based on tax evasion.  *See* Defs.' Br. 26.  Denmark's sovereign decisions to withhold

dividend tax at the source and to funnel tax reclaim applications through SKAT have necessitated

SKAT's involvement in this dispute and enforcement of Danish tax law.  *See id.* at 26-27 (citing

Bahnsen Decl. Ex. 8 (Shay Report) ¶¶ 21, 48-49).[2]  But for purposes of the Revenue Rule, there is

nothing to distinguish between claims to recover underpaid tax in a relief at source withholding

system (tax evasion) and claims to recover allegedly incorrect tax refunds in a tax reclaim

withholding system (as here).  *See id.* at 31 (citing Shay Report ¶¶ 18.2, 77).  Instead of responding

to those arguments, SKAT regurgitates the cases that Defendants have already conceded were

about tax evasion and claims that that is enough.  *See* SKAT Opp. 25-26.

*Second*, as SKAT admits, a judgment in its favor would require Defendants to reimburse

SKAT for lost tax revenues.  SKAT concedes that the money it seeks to recover is the tax revenue

of the Kingdom of Denmark.  *See* SKAT's Response to DSMF (ECF No. 832) ¶ 1.  Indeed, SKAT

expressly informed the plans that its "previous decisions on dividend tax refunds" had been

rescinded and that it intended to "raise a claim for repayment" of refunded tax.  Dulberg Decl. Ex.

99T.  This litigation raises just such a claim to recover tax refunds, supposedly paid in error out of

the Danish tax authority's fisc.  A judgment for SKAT would thus enforce Danish tax law.

## C.   SKAT Fails To Address The Significant Separation Of Powers And Sovereignty Concerns That This Case Raises

***Separation of Powers.***  Defendants explained why SKAT's claims raise separation of

powers concerns.  *See* Defs.' Br. 31-36.  Rather than addressing these arguments or responding to

---

[2]      If no taxes were collected on the transactions at issue in this case, that failing owes to the design of Denmark's
tax system.  If Danish tax law arguably "created a duplicate … right to a refund," then Danish tax law created multiple
good faith refund claimants.  Shay Report ¶ 44.2.  The fact that Danish tax law establishes SKAT as the sole
responsible party for processing and paying out refunds by foreign claimants, *see* JSUMF ¶¶ 13, 15, 34-36, reflects
Denmark's decision to involve SKAT in that process, which is a considered policy choice.  *See* Shay Report ¶ 58
(describing contrast with regime in United States, which places primary onus on withholding agents).

Shay, SKAT simply repeats its refrain that this case is not about taxes. *See* SKAT Opp. 30-31. SKAT can call its claims whatever it wants, but it is the substance that matters. *See Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130 (2d Cir. 2001). The record includes SKAT's statements that it decided to refund taxes to the plans, reversed those decisions, and is now looking to recover those tax payments from the plans. *See* Dulberg Decl. Ex. 99T.

In addition, SKAT's position rests on a misreading of the relevant treaty terms. As Defendants have already explained (Defs.' Br. 35-36), a straightforward reading of the Japanese Protocol confirms that allegedly fraudulent claims for tax refunds are considered revenue claims subject to tax collection assistance. *See* Japanese Protocol art. XIII, ¶ 2. The U.S. and Japan agreed to lend each other assistance with respect to "revenue claims," defined as "taxes … together with interest, costs of collection, additions to such taxes, and civil or administrative penalties related to such taxes." *Id.* ¶ 1. The U.S. and Japan further agreed that that assistance extended to "a revenue claim in respect of an individual" who is a national of either contracting country when that individual "has filed … a fraudulent claim for refund." *Id.* ¶ 2. The Japanese Protocol thus defined an allegedly "fraudulent claim for refund" as a "revenue claim" covered by its administrative collection provision. As a result, it is not necessary for an individual to have actually *paid taxes* to be subject to the Japanese Protocol's administrative collection assistance provision.[3] According to Professor Shay, this makes sense from a policy perspective: In both cases, "the analysis is the same: what amount of tax is due the government and what is the

---

[3]      Indeed, the Japanese Protocol's administrative collection assistance provision explicitly states that the "assistance is not restricted by paragraph 1 of … Article 2." Japanese Protocol art. XIII, ¶ 1. Paragraph 1 of Article 2 defines the "taxes" to which the "Convention shall apply." *Convention Between the Government of the United States of America and the Government of Japan for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income*, U.S.-Japan, Nov. 6, 2003, S. Treaty Doc. No. 108-14, https://home.treasury.gov/system/files/131/Treaty-Japan-11-6-2003.pdf. For this reason, too, SKAT's argument regarding the U.S.-Denmark Tax Treaty's definition of "taxes" (SKAT Opp. 30) misses the mark.

government obligated to pay the applicant?"  Shay Report ¶ 77.2.

The Japanese Protocol (which entered into force after the Court issued its ruling on Defendants' motion to dismiss, *see* Defs.' Br. 35) makes two things clear.  First, the political branches consider revenue claims to include claims for recovery of taxes paid out by a foreign sovereign as refunds, including refunds that may have been obtained by fraud.  As Defendants pointed out, although the U.S.-Denmark Tax Treaty and the U.S.'s other in-force bilateral tax treaties are not as explicit as the Japanese Protocol, they support the same understanding because they do not *exclude* recoveries of this type of revenue claim.  *See* Defs.' Br. 36 n.33.  Accordingly, the political branches would characterize this case as a *tax fraud* case, not "garden variety commercial fraud." Second, the political branches take special care when they authorize collection assistance against U.S. nationals.  *See* Defs.' Br. 33 (citing Shay Report ¶¶ 65.2(i), 66, 68-69).  The U.S.-Denmark Tax Treaty does not authorize such assistance.  Permitting this case to proceed would infringe upon the legitimate powers and policy interests of the political branches and risk undermining U.S. treaty negotiating positions by passing upon a foreign sovereign's revenue claim that is properly the subject of a bilateral tax treaty.  *See Republic of Ecuador v. Philip Morris Cos.*, 188 F. Supp. 2d 1359, 1364-65 (S.D. Fla. 2002), *aff'd sub nom. Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253 (11th Cir. 2003); Shay Report ¶¶ 18.4, 78.1, 78.2.

**Sovereignty.**  SKAT's primary argument for why this case does not raise sovereignty concerns is its selective insistence that this case "is not even premised on Danish tax law." SKAT Opp. 28.  SKAT's arguments are insincere, weak, and miss the point.  SKAT claims that "Danish law on beneficial ownership" is not a "revenue law" that "embodies Denmark's moral or political choices."  *Id.* at 28-29.  But that is wrong.  It was a considered policy choice for Denmark to structure its dividend withholding tax regime as it did.  *See* Shay Report ¶¶ 49, 50.5.  And

Denmark's decision to rely on domestic law for the definition of "beneficial ownership" under the U.S.-Denmark Tax Treaty reflects a policy choice to construe the term "in light of its tax policies and the role the term plays in its tax law." *Id.* ¶ 54.6.

SKAT also argues that the Court can determine beneficial ownership without risking conflict with Danish courts and tribunals. *See* SKAT Opp. 29. That argument is short-sighted and misguided. If this Court rejects Defendants' argument, it will necessarily adopt a definition of beneficial ownership in tension with definitions that SKAT and the Ministry of Taxation have espoused in the past. *See infra* § III.B. And, if this Court accepts Defendants' argument, it will necessarily disagree with SKAT's current position. The Revenue Rule sensibly acts as a prophylactic against this uncomfortable scenario. *See Canada*, 268 F.3d at 112 (because it is "unwise for the courts to … attempt to discriminate between those claims which they would and those which they would not enforce," "[s]afety lies only in universal rejection" (cleaned up)).

Defendants have not "fail[ed] to explain how" this case will raise sovereignty concerns. SKAT Opp. 28. To the contrary, Defendants have explained in detail how SKAT's position could upset bedrock principles of modern securities and tax regimes. For instance, Defendants pointed to authority showing that, in the U.S., a securities entitlement transfers on the trade date, rather than the settlement date. *See* Defs.' Br. 20. Instead of engaging with that point, SKAT submits a declaration on Danish law that suggests an opposite result. *See* Aasmul-Olsen Decl. (ECF No. 836) ¶ 41 (positing that delivery of shares, or some form of segregation, is required). Similarly, Defendants cited authority suggesting that book-entry ownership suffices to establish a securities entitlement under U.S. law. *See, e.g.*, Defs.' Br. 23. SKAT does not contest this background market principle but advances its (incorrect) view that book-entry ownership does not suffice in

8

the circumstances presented in this case.  *See* Andersen Decl. (ECF No. 834) ¶¶ 40-55.[4]  Finally, SKAT never addresses Defendants' assertion that 26 U.S.C. § 871(m) reflects the U.S.'s judgment to tax dividend compensation payments directly and to do so on instruments (like derivative contracts) where neither the investor nor its custodian holds the underlying equities—in other words, where there are no shares and merely "paper transactions" (SKAT Br. 2).  *See* Defs.' Br. 25; *see also* 17 C.F.R. § 240.13d-3.  That Denmark has not done the same represents a sovereign policy choice.  Adopting SKAT's current position would result in this Court's construing and then enforcing Danish tax law in significant tension with modern financial markets around the world.[5]

## D.    SKAT's Reliance On Recent Proceedings Before The Danish National Tax Tribunal Reinforces Why The Revenue Rule Applies

SKAT places great weight on the fact that the Danish National Tax Tribunal (DNTT) has rejected certain Bellwether Plans' challenges to SKAT's tax refund revocation decisions.  *See, e.g.*, SKAT Opp. 16-17; Andersen Decl. ¶¶ 28-40; Aasmul-Olsen Decl. ¶¶ 65-71.  SKAT's reliance is misplaced, for the DNTT proceedings only highlight the applicability of the Revenue Rule.  As its name suggests, the DNTT is a *tax* tribunal.  *See* Aasmul-Olsen Decl. ¶ 65; Andersen Decl. ¶ 17.  The DNTT hears claims brought by *taxpayers*.  *See* Andersen Decl. ¶ 18; *id.* Ex. 13 at 3.  The

---

[4]    Both Andersen and Aasmul-Olsen question Pilgaard's reliance on certain Danish judicial decisions that confirm ownership transfers on the date when a final and binding agreement is concluded, arguing that those cases are not dispositive because they supposedly concern the effective time for transfer of ownership and not whether a transfer of ownership had been effected.  *See* SKAT Opp. 19; Aasmul-Olsen Decl. ¶¶ 54-55; Andersen Decl. ¶ 27.  But SKAT cites no Danish court or tribunal that has ever ruled that ownership is *not* conveyed at the time of the agreement, or that the time of the segregation of shares is when ownership transfers under Danish tax law, let alone that such segregation is a precondition to beneficial ownership.

[5]    SKAT claims that U.C.C. § 8-501 "is consistent with Danish law in that neither provides for share ownership based on fraudulent trading of non-existent shares."  SKAT Opp. 21 n.16; *see also id.* at 29 n.25.  SKAT's argument assumes the conclusion because it depends on the notion that investors cannot claim entitlement to dividends when the underlying shares are not held at a sub-custodian.  *See* Defs.' Opp. 21-23.  But SKAT does not meaningfully address Defendants' argument that netting and internalized settlement mean that a custodian can settle its customers' transactions without sourcing shares, which is essential to understanding why the plans' trading was authentic.  *See* Defs.' Br. 23-24 (citing Carr Report § V).  As Defendants have explained, netting and internalized settlement are common features of financial systems around the world.  *See* Defs.' Opp. 21-23 (citing, *inter alia*, Carr Rebuttal ¶¶ 111-17).

DNTT renders decisions on Danish *tax law*. *See id.* ¶ 17. And the DNTT's procedural rules derive from Danish *tax law*. *See id.* ¶¶ 18, 34; *see also Tax Appeals Agency*, SKAT, https://www.skatteankestyrelsen.dk/servicemenu/english/ ("The agency provides the basis for the decisions on appeals involving taxation[.]") (last visited June 26, 2022). When certain plans brought claims in the DNTT, they did so at SKAT's invitation (Dulberg Decl. Ex. 99T at 11-12) and because the question of their entitlement to dividend withholding tax refunds was a *tax* dispute that could be resolved consistent with ordinary Danish tax-law procedure. If the DNTT proceedings have any relevance here (they do not, *see infra* § VI.G), they only underscore that the questions presented are tax questions to be decided and enforced as a matter of Danish tax law.[6]

### E. SKAT Is Collaterally Estopped From Litigating The Revenue Rule Question With Respect To The ED&F Bellwethers

SKAT is collaterally estopped from challenging the applicability of the Revenue Rule with respect to the ED&F Bellwethers. As discussed in Defendants' moving brief, a dedicated "Revenue Rule Trial" was conducted in England to determine whether Dicey Rule 3—the English law equivalent of the American Revenue Rule—operated to preclude SKAT's claims. *See* Defs.' Br. 38-44; Dillman Decl. (ECF No. 804) Ex. 140, *Skatteforvaltningen v. Solo Cap. Partners LLP*, [2021] EWHC 974 (Comm). As a result of the Revenue Rule Trial, all of SKAT's claims against ED&F in England—including claims involving the same transactions and tax refund applications at issue here, JSUMF (ECF No. 790) ¶ 291—have been fully and finally dismissed. SKAT contends that the judgment of the English High Court of Justice has no collateral estoppel effect under Utah law, *see* SKAT Opp. 31-34, but SKAT does not deny that it was a party to the Revenue Rule Trial, that the trial was "competently, fully, and fairly litigated," or that the trial resulted in a

---

[6] SKAT's argument that Defendants have engaged in "forum shopping" is outrageous. SKAT, not Defendants, filed the many dozens of lawsuits that have been consolidated in this MDL, and it is SKAT alone that has chosen to assert different claims against different parties in different countries.

"final judgment on the merits." *Macris & Assocs., Inc. v. Neways, Inc.*, 16 P.3d 1214, 1222 (Utah 2000) (cleaned up).   SKAT contends only that the issue determined by the English court is insufficiently similar to the "revenue rule issue that this Court must decide." SKAT Opp. 31-33.[7]

The argument is baseless.   As this Court explained, the Revenue Rule "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws." *In re SKAT*, 356 F. Supp. 3d at 310.   The prohibition under Dicey Rule 3 is the same: English courts may not hear claims for the "enforcement, either directly or indirectly, of a ... revenue ... law of a foreign State." Dillman Decl. Ex. 140 [¶ 4].   This language was echoed by the English High Court of Justice, which expressly held that SKAT's claims did indeed seek "indirectly to enforce ... Danish revenue law." *Id*. ¶ 120.   Thus, the issue before this Court— whether SKAT's claims seek "direct or indirect enforcement" of Denmark's tax laws, 356 F. Supp. 3d at 310—is the same issue that was determined by the English court; the issues could scarcely be more identical.

SKAT responds that Dicey Rule 3, because it is the law of a foreign nation, may not reflect quite the same mix of policy considerations as the American Revenue Rule, and that English courts applying Dicey Rule 3 may look to different "legal standards" and different "interpretive case law" than U.S. courts applying the American Revenue Rule. SKAT Opp. 32-33.[8]   But none of this is to the point.   Under Utah law, the applicability of collateral estoppel turns on whether the same "underlying issue" was decided in a prior action, *see Ostler v. Ret. Bd.*, 400 P.3d 1099, 1105-06

---

[7]     To the extent SKAT suggests that Utah's collateral estoppel requirements are peculiarly exacting, the suggestion is unfounded.  The requirements for collateral estoppel under Utah law are in fact "substantially the same" as the federal requirements.  *See Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 977-78 (10th Cir. 1995) (cleaned up).

[8]     SKAT's argument would lead to the absurd and incorrect conclusion that any issue decided in the context of a foreign nation's laws must necessarily fail to satisfy the identity-of-issue requirement.  *See China Shipping Container Lines Co. v. Big Port Serv. DMCC*, 2019 WL 9362547, at *7 & n.13 (S.D.N.Y. Jan. 15, 2019) (decisions and orders of the Courts of Singapore); *Scheiner v. Wallace*, 832 F. Supp. 687, 695 (S.D.N.Y. 1993) (English action).

(Utah Ct. App. 2017), regardless of whether that prior action was "based on different grounds, or tried on different theories, or … instituted for different purposes," *Robertson v. Campbell*, 674 P.2d 1226, 1230 (Utah 1983) (cleaned up); *see also Collins v. Sandy City Bd. of Adjustment*, 16 P.3d 1251, 1254 (Utah Ct. App. 2000) (rejecting argument that actions "based on different legal grounds" cannot share "identical issues"). The "underlying issue" determined by the English court was whether SKAT's claims seek—directly or indirectly—to enforce Denmark's tax laws, and that is the same issue presented here. *See Ostler*, 400 P.3d at 1105-06.

SKAT's primary authority—*Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465 (Utah 2011)—is not to the contrary. In *Jensen*, the Utah Supreme Court held that dismissal of the plaintiffs' claims under the federal constitution did not collaterally estop the plaintiffs from pursuing claims under Utah's state constitution, explaining that principles of collateral estoppel did not prevent the application of two materially different standards to the same set of facts in successive lawsuits. *See* 250 P.3d at 478-79 (noting the "independent protections afforded by [Utah's] state constitution"). Here, by contrast, there is a single issue common to both actions: Whether SKAT's claims seek direct or indirect enforcement of Danish tax law. The determination of *that* issue by the English High Court of Justice is binding upon SKAT, and it is as dispositive under Dicey Rule 3 as it is under the American Revenue Rule. *See West v. Christensen*, 576 B.R. 223, 231 (D. Utah 2017) (affirming application of collateral estoppel under Utah law where same "key issues" were "dispositive in both actions").[9]

---

[9]    SKAT's reliance on *Pasquantino v. United States*, 544 U.S. 349, 125 S. Ct. 1766 (2005) and *Kuhar v. Thompson Mfg. Inc.*, 506 P.3d 1200 (Utah 2022)—*see* SKAT Opp. 32 & n.29—is likewise misplaced. In *Pasquantino*, the Supreme Court remarked that, in evaluating the interplay between the Revenue Rule and the federal wire fraud statute, it would be "perilous" to look to foreign case law for "sure inferences" of Congressional intent. 544 U.S. at 363, 125 S. Ct. at 1776. To the extent *Pasquantino* suggests that the Revenue Rule may, at the margins, be interpreted more or less expansively abroad than in the U.S., the suggestion has no relevance here, for the Revenue Rule issue determined by the English High Court of Justice—whether SKAT's claims seek direct or indirect enforcement of Danish tax law—is equally pertinent and equally dispositive under *both* English and American law. As for *Kuhar*, SKAT relies on a footnote in which the Utah Supreme Court suggested that it was "conceivable" that expert testimony

As a fallback argument, SKAT urges this Court to reject application of collateral estoppel on policy grounds.  SKAT Opp. 33-34.  SKAT takes its lead from *Gudmundson v. Del Ozone*, 232 P.3d 1059 (Utah 2010), but the decision is inapposite.  In *Gudmundson*, the Utah Supreme Court recognized that courts "[t]ypically … favor the use of defensive collateral estoppel" but nevertheless concluded that, under the "unique facts" of the case, giving preclusive effect to a workers' compensation adjudication would "subvert the general purpose behind workers' compensation" and undermine the statutorily recognized ability of injured employees to bring claims against non-employer defendants.  232 P.3d at 1068-69.  The unique policy considerations informing *Gudmundson* are not present here, nor is there any reason to suppose that giving collateral estoppel effect to the judgment of the English court would in any way frustrate the statutory objectives of Utah state legislators.  *See id*; *see also Cook v. Aagard*, 547 F. App'x 857, 860 (10th Cir. 2013) (affirming application of collateral estoppel notwithstanding *Gudmundson*); *Smythe v. Bish*, 2016 WL 3647693, at *3 (N.D.N.Y. July 1, 2016) (distinguishing *Gudmundson* as resting on "special circumstances surrounding worker's compensation").  To the contrary, the application of collateral estoppel here would serve the "primary purposes" of the doctrine under Utah law:  It would promote judicial efficiency, protect the ED&F Bellwether Defendants from defending claims already found wanting, and eliminate the risk of a final adjudication at odds with a final judgment of the English High Court of Justice.  *See Gudmundson*, 232 P.3d at 1067.

## II. Undisputed Facts Show Defendants Were Beneficial Owners Entitled To Refunds

### A. SKAT Improperly Disputes Indisputable Facts

Under Local Rule 56.1, each paragraph of a moving party's statement of facts is deemed

---

inadmissible under federal law may nevertheless be admitted under Utah's "arguably more lenient standards."  506 P.3d at 1203 n.2.  This dicta reflects the principle that collateral estoppel need not bar successive claims applying materially different legal standards to the same underlying facts; *Kuhar* does not support the proposition that a plaintiff may relitigate the *same* underlying issue in two successive actions, as SKAT seeks to do here.

admitted unless "specifically controverted" on the basis of material that would be admissible. Local Rule 56.1(c), (d). The rule is meant to "streamline the consideration of summary judgment motions," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), but that purpose is defeated where, as here, the nonmoving party fails meaningfully to respond to the moving party's statement of facts. SKAT repeatedly uses its Rule 56.1 response as a vehicle to "interject argument" or to introduce self-serving narrative without "specifically controverting" the Defendants' asserted facts. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418-19 (S.D.N.Y. 2014). In many instances, SKAT does not attempt to controvert the asserted facts, but instead purports to reinterpret those facts or supply "context." *See Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking portions of Rule 56.1 statement where plaintiff responded with "argumentative and often lengthy narrative … to 'spin' the impact of the admissions plaintiff ha[d] been compelled to make"). In other instances, SKAT purports to take issue with the accuracy of asserted facts but offers no explanation or citation to controverting evidence. Sometimes SKAT cites exclusively to inadmissible evidence, and other times to no evidence at all.

The table below sets forth in further detail the deficiencies in SKAT's Responses to Defendants' Rule 56.1 statement. SKAT's Responses to the indicated paragraphs should be disregarded, and the correspondingly numbered paragraphs should be deemed admitted.

| Objection/Basis for Striking | Paragraphs |
| --- | --- |
| SKAT purports to dispute a fact but fails to cite *any* record evidence, as required by Local Rule 56.1(d), Fed. R. Civ. P. 56(c). | 2, 15, 197, 325, 341, 343-44, 385-86 |
| SKAT purports to dispute a fact but fails to cite any *admissible* evidence, as required by Local Rule 56.1(d); Fed. R. Civ. P. 56(c). | 144, 147, 149-50, 153, 156, 158-59, 162, 165, 167-68, 171, 174, 176-77, 180, 183, 185-86, 189, 192, 194-95, 198, 208, 220, 229, 238, 247, 250-53, 256, 262, 264, 268, 270-71, 273-74, 277, 283, 285, 287-88, 291, 294, 300, 303, 309, 317, 326, 329, 342, 352, 361, 364 |

| Objection/Basis for Striking | Paragraphs |
|---|---|
| SKAT does not specifically controvert the purportedly disputed fact but instead interjects arguments, immaterial facts and/or non-controverting evidence. | 10-11, 13, 17-18, 25-30, 33-34, 44, 52, 54-55, 57, 59-61, 65, 69-70, 78, 112-14, 116-17, 129, 132, 134, 139, 360, 389 |
| SKAT does not specifically controvert the purportedly disputed fact but instead offers its own interpretation of, or additional quotations from, a cited document. | 62-64, 147, 156, 165, 174, 183, 192, 201, 212, 223, 232, 241, 250, 258, 264, 270, 279, 285, 294, 303, 311, 320, 331, 346, 355, 366 |
| SKAT does not specifically controvert the purportedly disputed fact but instead disputes it "to the extent" of its potential implications or on the basis that "context" was omitted. | 12, 19-20, 22-23, 32, 35-43, 45, 56, 72, 76, 80, 82, 97, 101, 103, 107, 120, 130, 141, 149-50, 158-59, 167-68, 176-77, 185-86, 194-95, 207, 211, 216-17, 251-53, 271, 273-74, 287-88, 373-74, 376-80, 386-87 |
| SKAT does not specifically controvert the purportedly disputed fact but instead disputes its materiality, often without explanation. | 3-9, 14, 16, 21, 24, 46-48, 50-51, 53, 58, 96, 105-06, 108-11, 337-39, 371-72, 390 |

## B.     Defendants Were Beneficial Owners

In their opening brief, Defendants established that they were the beneficial owners of dividends under Danish tax law. In response, SKAT does not set forth any alternate account of beneficial ownership under Danish law, but instead insists that dividend payments received by the plans were not really dividends, or that the shares purchased by the plans were not actually owned by the plans, or that the purported absence of shares from sub-custodial accounts deprives the plans of any kind of ownership at all. SKAT's arguments all fail.

*The Solo Bellwethers.* SKAT offers three reasons why the Solo Bellwether Plans were not beneficial owners: (i) the principle of *nemo dat quod non habet* prevents an investor from owning a share in which the seller did not have an ownership interest at the time of sale; (ii) ownership of shares does not attach until shares are delivered and settled; and (iii) ownership requires that shares be segregated at a custodian or sub-custodian. None is persuasive.

SKAT characterizes *nemo dat quod non habet* as a "concept of Danish civil law" and

suggests in conclusory fashion that the principle applies equally under Danish *tax* law—SKAT Opp. 18—but SKAT never argues that the *nemo dat* concept has any relation to beneficial ownership. Nor can it. Beneficial ownership for Danish tax purposes is not co-extensive with ownership under Danish civil law. *See* Defs.' Br. 22 & n.18; Defs.' Opp. 17-19;[10] *see also* Andersen Decl. Ex. 34 (*Bech-Bruun I*) at 3-4 (distinguishing "legal/civil law ownership of the shares" from "ownership under tax law"). Indeed, SKAT's own in-house legal department issued warnings dating back to 2004 regarding the possibility that the civil owner of a share could, for tax purposes, be different from the beneficial owner of the *same share*. Schoenfeld Decl. Ex. 16T at 3; *see also id.* at 9 (Ministry of Taxation rejecting SKAT's request to change the law in response). Given this distinction between civil and beneficial ownership, SKAT's reliance on civil concepts like *nemo dat quod non habet* is fundamentally misplaced.[11]

SKAT's further argument that delivery of shares for settlement is a necessary pre-condition to beneficial ownership is inconsistent with modern market practice and Danish securities laws regarding settlement. *See* Pilgaard Decl. (ECF No. 801) ¶ 205 (settlement occurs with an instruction and book entry); Pilgaard Reply Decl. ¶ 93 (naked short selling, in which seller has no shares and has no right to acquire them, was permitted by Danish law for many years and was treated like any other sales for tax purposes). When an investor places a trade to buy shares, that trade has a settlement date, typically several days after the trade, on which the seller agrees to deliver the shares. *See* Bahnsen Decl. Ex. 12 (Carr Report) ¶¶ 46, 50-51. But a buyer who does not yet hold the purchased shares in his account still owns them and can, for example, sell them to

---

[10] *See also* Second Weinstein Decl. Ex. 196 (acknowledging that "[a]s a starting point, it applies in principle that tax law is governed by civil law," but emphasizing "exemptions" and pointing "[i]n particular" to "stock lending" where "the borrower becomes the owner of the stock according to civil law, but not the legal owner of the stock under tax law"); Pilgaard Reply Decl. ¶¶ 87-90.

[11] Even if *nemo dat* applied in these circumstances (it does not), SKAT's argument that the sellers of the Danish equities did not in fact have those shares to sell rests on evidence that is not admissible. *See* Defs.' Opp. 50-55.

another party.  *See* Carr Report ¶ 37; Pilgaard Decl. ¶¶ 157, 163 (ownership attached at purchase agreement, not share delivery one year later).

SKAT is simply wrong that this uncontroversial feature of market functioning leads to shares being created "out of thin air."  SKAT Opp. 20; Aasmul-Olsen Decl. ¶ 13.  Because shares can be, and frequently are, bought, sold, loaned, and borrowed for short amounts of time, there can be more beneficial owners of a company's shares than there are shares outstanding.  Consider the following example from Dr. Carr's Reply Report:  "[I]nvestor A owns 100 shares and lends 100 shares to investor B.  If investor B sells 100 shares to investor C, there are economic claims to 200 shares because a) investor A retains its economic exposure, and b) investor C also has an economic exposure because of the purchase."  Bahnsen Decl. Ex. 14 (Carr Reply) ¶ 65.  This is a natural consequence of stock lending, which is allowed in Denmark.  *See Published net short positions*, Danish FSA, https://www.dfsa.dk/Rules-and-Practice/Short-selling/Published-net-short-positions (updated May 11, 2022).[12]  The shares do not appear "out of thin air," but claims to shares can exceed issued shares in the financial markets on any given day, and the Ministry of Taxation itself has acknowledged the issue (Schoenfeld Decl. Ex. 16T).  And in such a case, a forensic accountant such as SKAT's expert Bruce Dubinsky would not find any shares held in any custodial or sub-custodial account associated with Investor A.

Nor must shares be segregated at a custodian or sub-custodian as a pre-condition to beneficial ownership.  *See* Defs.' Opp. 16-17.  SKAT again conflates civil ownership of shares with beneficial ownership for tax purposes.  *See, e.g.*, Aasmul-Olsen Decl. ¶ 41.  Helen Sorensen, a product manager at VP Securities, agreed that the "beneficial owner of Danish securities may

---

[12]     Consider also the December 2020 Game Stop incident, where a frenzy of short selling led to more long positions active in the market than outstanding shares of the company.  *See* Carr Report ¶ 107.  In that situation, no shares of Game Stop were "created," but there were more claims to shareholdings than issued shares.

not be the registered owner with VP Securities." Schoenfeld Decl. Ex. 2 (Sorensen Tr.) Vol. 2, 44:8-12. Both the Danish and U.S. legal systems recognize situations where an investor can be a beneficial owner for tax purposes without receiving a dividend, *see* Pilgaard Decl. Ex. 83 (taxpayers liable for withholding tax even though they received no dividend), or possessing a share, *see* 26 U.S.C. § 871(m) (recognizing imposition of withholding tax without underlying shareholdings). SKAT describes the transactions at the Solo Custodians as entirely offsetting purchases and sales, but if that were the case, it would not be surprising that the Solo Custodians did not source the shares externally from the market. Where a custodian's positions net out entirely at the end of a day, it "may internally net these amounts to avoid having to fund the positions elsewhere." Bahnsen Decl. Ex. 13 (Carr Rebuttal) ¶ 117 (quoting Bank of England Prudential Regulation Authority); *see also* Carr Reply ¶ 58 ("internalized settlement, including netting offsetting transactions, is a well-accepted and common practice" at, among other places, the London Stock Exchange, a fact which SKAT does not address or refute);[13] Defs.' Opp. 21-23.[14]

In short, none of SKAT's critiques meets head-on the Solo Bellwether Plans' presentation of the undisputed facts in the record that support a finding that they were beneficial owners of dividends entitled to refunds of withholding tax. The parties agree that these plans entered into documented trades to purchase shares in advance of the ex-dividend date and received credits for net dividends in their accounts. *See* JSUMF ¶¶ 111, 113, 125. The plans had the right to use and enjoy the dividends they received for any purpose. SKAT presents no meaningful rebuttal other than to argue that the plans received no dividends at all, despite the clear entries in their account

---

[13]     Even more, the LSE Rule book explicitly recognizes that "a zero cash and zero stock position" can be the appropriate outcome in a net settlement. Carr Reply ¶ 68.

[14]     SKAT's only rebuttals to Defendants' arguments regarding net settlement come from (1) its forensic accounting expert Bruce Dubinsky, who is *not* an expert in settlement of shares, *see* Defs.' Opp. 23, and (2) its Danish legal expert, who reverts to the concept of *nemo dat quod non habet*, *see* Aasmul-Olsen Decl. ¶ 35, but fails to explain why this civil law concept is a precondition to the transfer of beneficial ownership for tax purposes.

statements.  On these undisputed or unrebutted facts, the Court can find that the plans were beneficial owners entitled to refunds of withholding tax.

The recent *Bech-Bruun* decision is instructive.  There, the Danish court found that where a U.S. pension plan purchased Danish shares before the ex-dividend date, settled the trade after the dividend record date, received dividends, hedged its exposure, loaned the shares, and sold the shares—just as here—the plan could "remain [] the [beneficial] owner under tax law."  *Bech-Bruun I* at 4.  Indeed, the Court noted that SKAT had "agreed" that "the pension plan is deemed to be the beneficial owner of the shares" under the examined conditions.  *Id.* at 3-4.  Moreover, *Bech-Bruun* concerned a "tax opinion [that] had been prepared by [Danish law firm] Hannes Snellman," which "concluded … that a US pension fund should be entitled to claim a full refund of the withheld Danish dividend on the shares … under the" U.S.-Denmark Tax Treaty.  *Id.* at 2.  That tax opinion—prepared for Solo Capital and analyzing the law from the perspective of a U.S. pension plan (rather than any custodian)—discusses the very trading model at issue in this case, *see* Schoenfeld Decl. Ex. 10 at 1-2, and SKAT has never suggested—either in this litigation or in Denmark—that the advice of Hannes Snellman was improper or incorrect.  Critically, a portion of the tax opinion recognized that recording of ownership with VP Securities would depend on the custodian's other long and short positions.  *See* Pilgaard Reply Decl. ¶ 98.  The tax opinion—which was also endorsed by Bech Bruun—thus depended on the critical role of internal net settlement in the transactions at issue here.  *See id.*  That SKAT and its experts now minimize the importance of internalized net settlement runs counter to the Hannes Snellman tax opinion.

***The ED&F Bellwethers.***  As for the ED&F Bellwethers, SKAT devotes scarcely over one page to the beneficial ownership question and fails to create a dispute of material fact as to beneficial ownership.  *See* SKAT Opp. 22-23.  SKAT does not even address the fact that its own

expert has acknowledged that the so-called "cum-cum" trades gave rise to what he calls a "real dividend." *See* Defs.' Br. 5. SKAT nowhere disputes that the ED&F Bellwether Plans acquired dividend-bearing shares through each of the 13 "cum-cum" trades, resulting in the payment of a dividend from which tax was withheld. *See* Defs.' Opp. 5. Nor does it dispute that these transactions settled, and that each of these transactions yielded a dividend payment directly from the relevant Danish issuer, confirmed by a SWIFT message from the sub-custodian. *Id.* Rather, SKAT cites to its moving brief, which argues only that ED&F, not the pension plans, was the proper taxpayer based on contractual documents. *See* SKAT Opp. 23. SKAT's interpretation of the relevant agreements is incorrect, *see* Defs.' Opp. 26-28, and SKAT has thus failed to create a dispute of material fact as to the "cum-cum" trades.

SKAT does little more regarding the non-Annex E "cum-ex trades," cross-referencing only its own argument relying on an expert whose testimony the ED&F Bellwether Defendants have moved to exclude. *See* SKAT Opp. 22. And as to Annex E, SKAT relies entirely on inadmissible evidence that cannot create a genuine issue of fact, as discussed in further detail below. *See infra* § III.D. SKAT similarly fails to create a dispute of material fact as to beneficial ownership with respect to these trades, which, like the "cum-cum" trades, all settled and resulted in the payment of a dividend by the counterparty from which the shares were acquired. *See* Defs.' Opp. 6. Because SKAT has failed to engage with the undisputed facts surrounding the ED&F Bellwether Plans' trades, summary judgment in favor of the ED&F Bellwether Defendants is appropriate.

## III.    SKAT Cannot Prove That Defendants Made Any Actionable False Statement

SKAT's own pleading dooms its conclusory argument that "an actionable false statement is not an element of SKAT's restitution claims," SKAT Opp. 34 n.31, for all of SKAT's claims rest on the premise that Defendants allegedly misled SKAT by submitting reclaim applications containing purportedly false statements. *See* Defs.' Br. 45 n.40. SKAT does not articulate any

theory under which SKAT's "restitution claims," as pleaded, would be viable without proof of an actionable false statement.  *See* SKAT Opp. 34 n.31.  None of the allegedly false statements on which SKAT predicates its claims is actionably false.

### A. Defendants' Statements Regarding Beneficial Ownership And Entitlement To Refunds Are Inactionable Legal Conclusions

Citing *National Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621 (1969), SKAT argues that New York law "has outgrown the over-simple dichotomy between law and fact in the resolution of issues in deceit," *id.* at 627-28, and that New York cases predating *National Conversion* "are no longer good law," SKAT Opp. 37.  However, *National Conversion* does not have the sweeping effect SKAT suggests and does not undermine Defendants' arguments.

In *National Conversion*, the New York Court of Appeals recognized the distinction between a "pure opinion of law which may not, except in unusual circumstances, base an action in tort" and a "mixed statement of fact as to what the law is or whether it is applicable."  23 N.Y.2d at 627.  The statement at issue in *National Conversion* was a mixed statement:  Defendant landlords claimed that certain premises "were in an unrestricted district," effectively representing that "they knew, as a fact, that the zoning resolution did not restrict the use of the particular premises[.]"  *Id.* at 628.  Although the statement could be construed in part as conveying "opinions as to the law," it also contained factual representations about "matters to be found *in* a law."  *Id.* (emphasis added).

The statements at issue in this case fall into a different category:  "pure opinion[s] of law," which remain inactionable after *National Conversion*, as before it.  *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405, 409 (S.D.N.Y. 1998) (cleaned up) (quoting *Nat'l Conv.*, 23 N.Y.2d at 627).[15]  SKAT insists that the shares and dividends "did not exist," SKAT Opp. 35, but

---

[15]     *See also Cucchiaro v. Cucchiaro*, 165 Misc. 2d 134, 140 (N.Y. Sup. Ct. 1995); *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 220 (1978); 60A N.Y. Jur. 2d *Fraud and Deceit* § 49.

as discussed above, even if true, that factual assertion does not answer the question. SKAT simply ignores the many courts that have held that whether an entity is a "beneficial owner" is a legal question. *See* Defs.' Br. 48. Thus, any representation that a plan was a "beneficial owner," *see id.* at 45 ¶ 1, was necessarily a representation of the speaker's opinion that such plan possessed that "technical legal status," *id.* at 48. Similarly, because the interpretation of a treaty is unquestionably a "question of law," *id.* at 53, any assertion that the plans were entitled under the Treaty to dividend withholding tax refunds, *see id.* at 45 ¶ 2, were inactionable opinions on questions of law.[16]

A "plaintiff is generally required to show that an alleged fraudulent statement is one of fact," and this "well-established" rule has "particular force when the opinion relates to an issue that was known to be in dispute at the time the statement was made." *Union Carbide*, 9 F. Supp. 2d at 409. That is the case here; Defendants made good-faith assertions about Danish tax law that were, at a minimum, objectively reasonable interpretations of a legal issue known to be unsettled at the time. *See* Defs.' Br. 49-52. SKAT's own Danish law experts offer no clear articulation of beneficial ownership and in fact corroborate that beneficial ownership is not a clearly defined concept under Danish law. *See* Andersen Decl. ¶ 21; Aasmul-Olsen Decl. ¶ 62.[17]

---

[16]     SKAT's attempt to distinguish *DirecTV* neatly illustrates why its reliance on *National Conversion* is misplaced. *See* SKAT Opp. 37-38; *DirecTV, Inc. v. Lewis*, 2005 WL 1006030 (W.D.N.Y. Apr. 29, 2005). SKAT acknowledges that the *DirecTV* court found a statement inactionable because it amounted to an expression of a legal conclusion. *See* SKAT Opp. 37. Still, SKAT argues, its claims may proceed because "[u]nlike DirecTV's statement about 'unloopers,' the defendants plans' representations of share ownership and tax-exempt status in tax refund applications … were statements of fact, not expressions of opinion." *Id.* at 37-38. But SKAT's claim that descriptions of the plans as "beneficial owners" are statements of fact is conclusory, and SKAT ignores Defendants' other cases suggesting precisely the opposite, *see* Defs.' Br. 48 & n.41. SKAT does not even acknowledge Defendants' cases establishing that statements about entitlement to refunds under a Treaty are purely legal. *See id.* at 53.

[17]     To the extent SKAT argues that legal conclusions about beneficial ownership may be actionable because they prompted SKAT to draw false *inferences* about the factual existence and location of shares in Danish companies, the argument repeats an error that SKAT has made (and continues to make) throughout this litigation: SKAT never connects the dots between holding shares and beneficial ownership, nor can it. *See* Defs.' Opp. 15-21 (explaining why beneficial ownership of dividends does not require custody of Danish shares); Pilgaard Decl. ¶ 184 (quoting OECD's Commentary to Model Tax Convention for proposition that "the beneficial owner of a dividend as opposed to the owner of the shares … may be different in some cases"). SKAT assumes that if there were "no shares" held by a custodian or sub-custodian, the plans could not have been beneficial owners, but that factual premise is wrong, and SKAT cannot use that incorrect premise to meet its burden to prove a false statement.

SKAT argues that "even if [D]efendants' representations of beneficial ownership and tax-exempt status are understood as opinions, whether they were sincerely held presents a question of fact precluding summary judgment." SKAT Opp. 37 n.33. But to "raise a genuine issue of fact, [SKAT] must cite to particular parts of materials in the record." *Wells Fargo Tr. Co., N.A. v. Synergy Grp. Corp.*, 465 F. Supp. 3d 355, 368 (S.D.N.Y. 2020) (cleaned up), *aff'd*, 848 F. App'x 467 (2d Cir. 2021). SKAT identifies no facts in the record that would allow a reasonable fact-finder to decide that the plans held any legal conclusions insincerely, and the mere fact that SKAT reaches contrary legal conclusions does not raise a genuine dispute of material fact as to whether Defendants "misrepresented … [their] sincere opinion[s]." *Union Carbide*, 9 F. Supp. 2d at 409.

## B. Defendants' Legal Statements Were, At A Minimum, Objectively Reasonable

In cases involving allegedly false statements concerning complex areas of law or regulation, courts hold that a challenged statement cannot be false as a matter of law if it was based on an objectively reasonable view of the law. *See* Defs.' Br. 49-53. Contrary to SKAT's suggestion, *see* SKAT Opp. 38-39, courts routinely follow this obvious legal principle in criminal and civil cases alike—a statement is not false, regardless of the type of action in which it is challenged, if it is based on an objectively reasonable view of the law.

SKAT conspicuously does not respond to Defendants' citation (at 50 n.43) to *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996), in which the Ninth Circuit affirmed summary judgment against a plaintiff who claimed that the defendant agency had "fraudulently induced the United States to underbill it." 81 F.3d at 1467. In assessing whether the agency's outdated cost allocation qualified as a "false record or statement" under the False Claims Act, the Ninth Circuit observed that the relevant statutory language "provide[d] the relevant government officials with fairly wide discretion," and that determining cost allocation "in light of the statute's imprecise and discretionary language was a disputed question." *Id.* at 1477. Thus, even viewed

23

in the most favorable light, the "evidence show[ed] only a disputed legal issue," not enough to "support a reasonable inference that the allocation was false." *Id.* Courts in the Second Circuit have reached similar conclusions in civil false claims cases.[18]

It is clear, in short, that "ambiguity is relevant to falsity," not just to scienter, *United States v. Harra*, 985 F.3d 196, 215 (3d Cir. 2021), and SKAT points to no pertinent difference between the criminal and civil contexts that would make the principle less relevant here. Case law confirms that in civil cases, as in criminal cases, complex and unsettled areas of law do not lend themselves to claims that a statement is actionably false. *See Union Carbide*, 9 F. Supp. 2d at 409; *600 W. 115th St. Corp. v. 600 W. 115th St. Condo.*, 180 A.D.2d 598, 599 (1st Dep't 1992). With that framework in view, SKAT misses the mark in arguing that the reasonableness of Defendants' "interpretations of applicable law" would "at best present a fact issue precluding summary judgment." SKAT Opp. 39. In the "absence of a material factual dispute," objective reasonableness is a "purely legal determination for the court to make," *Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir. 1995), and here the identification of the Bellwether Plans as beneficial owners was objectively reasonable in light of *undisputed* facts. *See* Defs.' Br. 52. Importantly, for instance, the futures contracts into which the plans entered were indisputably "real." SKAT's own expert, Bruce Dubinsky, found that the plans' "flex futures contracts ... were real" based on records from JPMorgan Chase showing that "Solo Capital actually entered into fully offsetting flex futures contracts." Schoenfeld Decl. Ex. 3 (Dubinsky Reply) ¶ 47. The plans' dividend arbitrage trading strategies relied heavily on these futures contracts to hedge risk associated with ownership of the related Danish securities. *See* Carr Report ¶¶ 67-94. While SKAT claims that

---

[18]    *See, e.g.*, *U.S. ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 488 (S.D.N.Y. 2006) ("Because defendants' interpretation of the [statute] constituted a legal opinion rather than a statement of fact, any statements or omissions relating to the [statute] were not 'false' within the meaning of the" False Claims Act); *Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378 F. Supp. 2d 75, 96 (E.D.N.Y. 2004) (similar).

the equity purchases were not real (primarily because SKAT ignores net settlement practices and the regulations that support them), the only way the plans could manage the significant liabilities associated with "real" futures contracts would be to have economic ownership of the underlying Danish shares.  The complexity of the legal question was also reflected by the fact that SKAT and the Danish Ministry of Taxation themselves were at odds over the requirements of beneficial ownership under Danish tax law.  *See* Schoenfeld Decl. Ex. 16T at 3.

### C.      Even If The Challenged Statements Were Actionable, SKAT Cannot Prove That They Were False

#### 1.      The Bellwether Plans Were Beneficial Owners And Received Net Dividend Payments

SKAT argues that the plans were not beneficial owners because the plans did not "own[] Danish shares on which they received dividends, net of withholding tax."  SKAT Opp. 40.  Here, SKAT again makes the mistake of conflating the distinct concepts of beneficial ownership for tax purposes—the kind of ownership relevant to Form 06.003—and civil registered ownership.  As explained above (*supra* § II.B), beneficial ownership is the only kind of ownership relevant here, and the Bellwether Plans were, in fact, the beneficial owners of Danish equities and associated dividends.  With respect to the Solo Bellwether Plans, SKAT points to cover letters submitted by payment agents and argues that those letters "were explicit in representing that the plans purportedly had suffered Danish withholding tax, and so necessarily owned actual Danish shares." *Id*.  But those cover letters made no representations about ownership, and the statements about withholding tax were true:  The Solo Bellwether Plans had suffered Danish withholding tax because the plans had been credited with net dividend payments—a fact SKAT cannot refute.  The Solo Bellwether Plans received ample statements from their custodians—the veracity of which they had no reason to doubt—showing book entry credits of net dividend amounts.  *See* Defs.' Br. 54-55.  Those statements formed the basis of the submissions by the payment agents to SKAT,

25

and thus the statements about receipt of net dividend amounts were true.

As for the ED&F Bellwether Plans, SKAT does not even contest that shares were acquired and dividends received in over half of the transactions at issue—the so-called "cum-cum" transactions.  With respect to these trades, SKAT merely argues (wrongly, *see* Defs.' Opp. 26-28) that it was ED&F, not the plans, that ultimately took title to the shares and/or dividends.  *See* SKAT Opp. 40.  The remaining twelve transactions—the so-called "cum-ex" transactions—settled in the correct securities and in the correct amounts, *see* Defs.' Br. 10, which SKAT does not dispute.  Rather, SKAT relies entirely on expert testimony that Defendants have moved to exclude, and on evidence that is not admissible (*see infra* § III.D).[19]  *See* SKAT Opp. 41.

### 2. The Bellwether Plans Were Entitled To Refunds Under The Treaty

The Bellwether Plans were all tax-exempt, and SKAT's efforts to cast doubt on their tax-exempt status are not only ineffective but beside the point:  The Treaty does not require that a pension plan qualify as tax-exempt under the Internal Revenue Code (IRC) to be exempt from tax on Danish dividends, nor did SKAT impose any such requirement.  *See* Defs.' Br. 5.[20]  SKAT's citation to *AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc. 3d 161 (N.Y. Sup. Ct. 2009) is therefore inapposite.  There, "implied[] represent[ations] that [defendants] were wholly owned by

---

[19]    In its statement of facts, SKAT attempts to blur the distinction between the Annex E tax vouchers—the alleged falsity of which is supported solely by documents and testimony that are inadmissible as against the ED&F Bellwether Plans—and the non-Annex E tax vouchers, which SKAT merely argues were false based on arguments made in its opening brief, and which Defendants have already refuted.  *See* SKAT Opp. 7-8.  SKAT's lack of *any* admissible evidentiary support for its argument for the falsity of the non-Annex E tax "Cum-Ex" vouchers underscores the appropriateness of summary judgment in favor of the plans with respect to the non-Annex E tax "Cum-Ex" trades.

[20]    SKAT argues that the Court should look to the "U.S. Department of Treasury's Technical Explanation" as evidence that the Treaty means something other than what it plainly says.  SKAT Opp. 44-45 n.40.  But SKAT cites to a Technical Explanation that, in relevant part, has been superseded.  *See Denmark – Tax Treaty Documents*, IRS, https://www.irs.gov/businesses/international-businesses/denmark-tax-treaty-documents (last visited June 26, 2022).  In any event, resort to the Technical Explanation is unnecessary because "[i]f the text of the treaty is clear and unambiguous, it is to be enforced according to its terms, without the need for extrinsic evidence."  *Blue Ridge Invs., LLC v. Republic of Argentina*, 902 F. Supp. 2d 367, 376 (S.D.N.Y. 2012) (cleaned up), *aff'd*, 735 F.3d 72 (2d Cir. 2013).

licensed physicians" were significant because such licensing status was required under New York insurance regulations for reimbursement. *Id.* at 166, 170. Not so here.

Further, SKAT admits that each reclaim application contained an IRS certification. *See* SKAT Opp. 45. These certifications reflected the IRS's administrative determinations that the plans met the requirements for tax-exempt status pursuant to 26 U.S.C. §§ 401(a), 501(a). Such determinations were, at least, final agency actions which may not be collaterally attacked in private civil litigation. *See, e.g.*, *StrucSure Home Warranty, LLC v. Sulzbach*, 2021 WL 3516242, at *3 (S.D. Tex. Aug. 10, 2021); *Adams v. Resol. Tr. Corp.*, 927 F.2d 348, 354 & n.15 (8th Cir. 1991).

SKAT is therefore estopped from challenging the IRS's determination that the plans were tax exempt under U.S. law. Moreover, because the Bellwether Plans were in fact all tax exempt, SKAT cannot prove that any representations to that effect—assuming any were even made—were false. In arguing otherwise, SKAT relies on three purported tax-qualification "requirements" of U.S. pension law, but each such "requirement" is either not a requirement or was clearly met.

First, SKAT asserts that section 401(a) of the IRC requires pension plans to "be created and operated for the exclusive benefit of the plans' participants and their beneficiaries," and that there is a triable issue as to whether the Bellwether Plans violated that requirement by agreeing to pay fees to third-party service providers. SKAT Opp. 46. But SKAT is wrong that an agreement to pay service fees can cause a plan to lose its tax-qualified status. The only purported support that SKAT musters is a paragraph from its own expert's report that concerns "prohibited transactions," not the "exclusive benefit" requirement. *Id.* (citing Second Weinstein Decl. (ECF No. 835) Ex. 228 (Wagner Report) ¶ 112). The rules on "prohibited transactions" are administered by the Department of Labor, not the IRS, and their violation alone does not impact a plan's tax qualification. *See* Second Weinstein Decl. Ex. 227 (Wagner Reply) ¶ 52 (distinction between

27

"exclusive benefit" and "prohibited transaction rules"); Bahnsen Decl. Ex. 10 (Reish Rebuttal) ¶¶ 33-34 ("excessive fees" may violate prohibited transaction rules but not exclusive benefit rule).[21]

Second, SKAT contends that there is a genuine issue of material fact as to whether each plan was "funded from the trade or business of the plan's sponsor." SKAT Opp. 47. The IRC contains no such requirement. 26 U.S.C. § 401(a)(27) ("Contributions need not be based on profits."). While the IRS limits the sources and amounts of plan contributions, plans may be funded beyond "the trade or business of the plan's sponsor": The IRS recognizes that contributions may come from various sources, including capital contributed by owners of the sponsoring entity, money borrowed by the sponsoring entity, or transfers and rollovers from other accounts. Reish Rebuttal ¶¶ 54, 58-60; Wagner Reply ¶ 20; Dillman Reply Decl. Ex. 6 (Wagner Tr.) 83:2-18.[22]

Third, SKAT claims there is a disputed issue of material fact as to whether the Solo Bellwether Plans were "created with the intention that they be permanent, not temporary." SKAT Opp. 48.[23] SKAT again misinterprets the applicable rule. SKAT argues that some, but not all, of the Solo Bellwether Plans were either created shortly before the trading or were terminated or "effectively abandoned" after Denmark stopped paying reclaims, *see id.*, but there is no requirement that a qualified plan must exist for any particular period of time, nor is there any bar to forming a pension plan for the purpose of participating in a particular investment opportunity; the only requirement is that the plan, when formed, was intended to exist indefinitely, rather than

---

[21]     Nor can SKAT manufacture an "exclusive benefit" violation with bald assertions that the Solo Bellwether Plans were formed "primarily for the purpose of benefitting Shah" and other defendants, when there is no dispute that participation in the trading was profitable for the plans, SKAT Opp. 46 nn. 43-44, and the fees paid to Solo and other service providers were for services that helped generate those profits, *see* Reish Rebuttal ¶¶ 36-38, 42-45.

[22]     SKAT's claim that the "AIG plan's sponsoring entity was not conducting any business" at the time of the AIG Plan's formation is disputed. *See* Defs.' Response to PSMF ¶ 45. Furthermore, SKAT's suggestion that the Riverside Plan's funding was improper is also disputed. *See id.* ¶¶ 58, 59.

[23]     SKAT does not argue that the ED&F Bellwether Plans failed to satisfy this purported requirement, nor does it argue that the RJM Plan has been terminated or abandoned (and indeed it has not).

for a limited duration.  Reish Rebuttal ¶¶ 78; 86-92.  Such was the case here.[24]

### D. SKAT's Arguments As To Falsity Of The ED&F Bellwether Plan Applications Rely On Inadmissible Testimony And Documents

Defendants have argued that SKAT adduced no admissible evidence of falsity.  *See* Defs.'

Br. 56-57.  SKAT's response—that ED&F's 30(b)(6) witness had "personal knowledge" of trading

documents created by ED&F during the relevant period, and that ED&F work product submitted

to the U.K. Financial Conduct Authority ("FCA") by ED&F's attorneys is admissible under the

residual exception to hearsay, *see* SKAT Opp. 41-44—merely highlights that evidentiary deficit.

First, SKAT relies on inapposite cases regarding the admissibility of Rule 56(e) affidavits

submitted by parties to the claims at issue.[25]  SKAT ignores cases analyzing the admissibility of

nonparty 30(b)(6) testimony, which hold that such testimony is admissible only as to topics

"particularly suitable for Rule 30(b)(6) testimony, … such as corporate policies and procedures,"

not to specific conduct on a particular occasion.  *See* Defs.' Opp. 34-35; *Fed. Trade Comm'n v.

Vyera Pharms., LLC*, 2021 WL 5300019, at *2 (S.D.N.Y. Nov. 15, 2021) (testimony of third-party

30(b)(6) deponents inadmissible absent evidence that "deponent was testifying based on personal

knowledge and not simply as the corporate designee"); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*,

---

[24]    SKAT's position is belied by the IRS's determination—following an extensive two-year audit that occurred *after* the events at issue here and *after* SKAT sought and obtained substantial assistance from the IRS—to issue RJM Capital Pension Plan a "no change" letter indicating that it was a qualified plan.  JSUMF ¶¶ 96-102.  SKAT's notion that the IRS's "no change" letter should be discounted because the audit "was limited to whether the plan's 2016 Form 5500-EZ … was proper" (SKAT Opp. 48 n.46) is misleading:  Form 5500 audits are the venue in which the IRS assesses plan-qualification issues, and IRS examiners are specifically directed to make compliance with qualification rules a focus of the audit.  *See* Internal Revenue Manual Sec. 4.71.1.1.1.  Nor is SKAT correct that "the record is unclear as to whether the IRS was aware of critical facts showing that the RJM Capital plan violated the IRC's requirements for tax-exempt pension plans."  SKAT Opp. 48 n.46.  SKAT's expert was forced to retract statements in her Rebuttal Report that the IRS was not provided with various materials when presented with evidence that it was (Dillman Reply Decl. Ex. 6 (Wagner Tr.) 120:15-122:12), and the one supposedly undisclosed fact that SKAT cites in its opposition—the plan's payments of large fees to Ganymede—was in fact disclosed to the IRS (Dulberg Decl. Ex. 30; Bahnsen Decl. Ex. 11 (Reish Reply) ¶ 74(b) (citing monthly bank statements produced to IRS)).

[25]    *See Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016); *OneWest Bank, N.A. v. Guerrero*, 2018 WL 2727891, at *5 (S.D.N.Y. June 6, 2018); *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000) (Rule 56(e) affiants' "personal knowledge" not merely based on deposition preparation); *Societe Generale Energie Corp. v. N.Y. Marine & Gen. Ins. Co.*, 368 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 2005).

2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006). SKAT does not engage with this case law.

The affiants at issue in the cases that SKAT cites are in any event not similarly situated to ED&F's 30(b)(6) witnesses; those affiants were, unlike ED&F's designees, familiar with the materials they discussed as a result of actions taken in their official capacities. In *Searles v. First Fortis Life Ins. Co.*, affiants were either personally involved in the relevant investigation, or gained personal knowledge because her position "qualified her to review the relevant business materials in an official capacity," such that she would be "competent to introduce" documentary evidence she examined at trial. 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000). None of the cases cited by SKAT found personal knowledge based exclusively on deposition preparation conducted years after the fact. *See* Dillman Reply Decl. Ex. 1 (Hashemi Tr.) 15:17-20:25; *id.* Ex. 2 (Wall Tr.) 14:12-16:7; *see also Vyera Pharms.*, 2021 WL 5300019, at *2; *In re RFC & RESCAP Liquidating Tr. Action*, 2020 WL 504661, at *7 (D. Minn. Jan. 31, 2020) ("[W]itnesses are not allowed to gain personal knowledge solely from deposition preparations."). The testimony on which SKAT relies is not based on personal knowledge and is additionally inadmissible against the ED&F Bellwether Plans for the reasons advanced in Defendants' opposition. *See* Defs.' Opp. 33-35.

Second, the reports submitted by ED&F to the FCA are not admissible under the residual exception to hearsay.[26] *See* Fed. R. Evid. 807. "Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (cleaned up). To satisfy the residual exception, a statement must not only be "supported by sufficient guarantees of trustworthiness," but it must also be "more probative on the point for which it is offered than any other evidence that the

---

[26] For the same reasons, the other non-business record summaries and work product submitted by ED&F to the FCA are hearsay not subject to any exception, including the residual exception.

proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(1)-(2). SKAT fails to grapple with the second point because it made no reasonable efforts to obtain other evidence. Indeed, SKAT made no effort to depose any ED&F trader or any of the operations personnel responsible for settling transactions or producing tax vouchers. *See* Defs.' Br. 56. The only percipient testimony obtained from an ED&F witness came from Adam Piper, ED&F's former Chief Risk Officer, whose deposition was not noticed by SKAT and on whose testimony SKAT does not rely. It cannot be that the reports submitted to the FCA—prepared by counsel for ED&F based on conversations with ED&F employees and review of ED&F documents—are more probative than the testimony of those same employees and the text of those same documents.

Moreover, admission into evidence of reports submitted by ED&F's counsel to the FCA would be inconsistent with the residual exception's purpose: to admit only evidence that negates "the four classic hearsay dangers" of "(1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 232-33 (2d Cir. 1999). The residual exception is even less appropriate where hearsay is not based on the declarant's personal knowledge,[27] *see United States v. Mejia*, 948 F. Supp. 2d 311, 317 (S.D.N.Y. 2013), or where it is not contemporaneous with the events described, *see, e.g.*, *Harig v. City of Buffalo*, 2021 WL 5822189, at *5 (W.D.N.Y. Dec. 8, 2021). The reports referenced by SKAT were prepared in 2019 by counsel for ED&F in the U.K., were the result of an investigation rather than personal involvement or perception, and described conduct that had occurred between 2012 and 2015. *See* Second Weinstein Decl. Ex. 261 at ED&F-00609825. The reports include double hearsay relaying conversations between ED&F's counsel and members of ED&F's equity finance desk (who were

---

[27] The personal knowledge element is a key distinguishing characteristic of the plea allocution cases on which SKAT relies. In an allocution, the criminal defendant necessarily was personally involved in the conduct leading to the prosecution and the plea, and so is therefore speaking of his own recollection.

not necessarily forthcoming). *See, e.g.*, *id.* at ED&F-00609846-47. To the extent SKAT seeks to rely on underlying documentation analyzed by ED&F's counsel, that documentation (all business records of ED&F) has already been produced to SKAT and has already been analyzed in Defendants' summary judgment papers.

## IV.    SKAT Cannot Show That The Refunds Belong To It

SKAT does not dispute that each of its claims requires proof that the money it seeks to recover belongs not to the Kingdom of Denmark, but to SKAT itself. *See* Defs.' Br. 57 & n.48. And SKAT conspicuously does not contest undisputed facts establishing that the Kingdom is the rightful legal owner of that money: (1) dividends paid by Danish companies are taxed by the Kingdom, not SKAT; (2) SKAT cannot keep the tax revenue that it collects and has no discretion as to what to do with it; (3) SKAT deposits the money that it collects into a bank account belonging to the Kingdom; and (4) any financial loss from a tax shortfall (including the alleged loss suffered here) is borne by the Kingdom, not SKAT. *See* Defs.' Br. 57.

In response, SKAT relies on the conclusory assertion that it and the Kingdom "are not separate legal entities." SKAT Opp. 48. But Defendants have explained that they are. *See* Pilgaard Decl. ¶¶ 62-82; Pilgaard Reply Decl. ¶¶ 47-83. The "Danish administration is divided into separate authorities with distinct powers in relation to their subject-matter." Pilgaard Decl. ¶ 79. These ministries and agencies "bring lawsuits in their own names," and "litigation involving different branches and agencies of the Danish government always involves the relevant branch or agency as a party." *Id.*[28] In short, the Danish government "is not one total legal entity." *Id.*

Nothing in the declaration of Professor Andersen—the principal source cited in SKAT's

---

[28]    SKAT has previously stated that it filed these lawsuits "in its own right, not on behalf of any other party," and not "as an agent on behalf, or as an assignee, of the Kingdom of Denmark." Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss, ECF No. 158 (July 19, 2019), at 8.

opposition for its alter ego theory—establishes that SKAT and the Kingdom are a unitary legal entity. *See* SKAT Opp. 48 (citing Andersen Decl. ¶¶ 97-128). To the contrary, Professor Andersen himself acknowledges that SKAT is an "arm" of the Kingdom, *e.g.*, Andersen Decl. ¶¶ 49, 98, 105, 123, 133, and that the alleged financial loss claimed in this litigation was a loss "effectively to the Kingdom of Denmark." *Id.* at ¶ 49. Professor Andersen's observation that Danish law provides that "a claim by a ministry may be subject to a counterclaim … in the amount of a defendant's unrelated claim against any other ministry or agency," *id.* at ¶ 128, does not establish that Danish ministries and agencies are alter egos of one another, let alone alter egos of the Kingdom of Denmark itself. *See* Pilgaard Reply Decl. ¶¶ 69-77.

## V. SKAT's Claims Are Time-Barred

### A. Denmark's Three-Year Statute Of Limitations Bars SKAT's Claims

The parties agree that Danish law provides for a three-year limitations period running from the point at which SKAT knew or should have known of its claims against Defendants. *See* SKAT Opp. 49-50; Andersen Decl. ¶ 150. The parties further agree that this limitations period is assessed separately with respect to each refund paid by SKAT. *See* Defs.' Br. 61; Andersen Decl. ¶ 191. SKAT also does not dispute the basic *facts* underlying Defendants' position that SKAT's investigative obligations were triggered more than three years before the complaints were filed— SKAT disputes only the sufficiency of those facts as a matter of law. But given the panoply of warnings and red flags known to SKAT before January 2015, no reasonable fact-finder could conclude that SKAT's duty to investigate had not been triggered. Accordingly, SKAT's claims based on payments made over three years before the filing of the complaints are time-barred.

SKAT does not dispute its essential duty of inquiry. Instead, SKAT attacks a straw man, disclaiming responsibility to make "*active investigations* (like police investigations in criminal matters)" of all "facially sufficient tax refund applications." SKAT Opp. 51. But Defendants

never suggested SKAT had to conduct anything "like police investigations," Ørgaard Reply Decl. ¶ 14, and its administrative obligation "is clearly and undeniably the established rule in Denmark." *Id.* ¶ 11.  The record reflects that SKAT did no investigation whatever of any of the Bellwether Plans' reclaim applications, *see* JSUMF ¶ 33, and even the enactment of Section 69B of the Withholding Tax Act—which gave SKAT an extra five months specifically to investigate the accuracy of tax reclaim applications, Pilgaard Decl. ¶¶ 141-43—did not "result in the processing in the dividend area becoming more thorough[.]"  McCarthy Decl. Ex. 3 (*Bech-Bruun* II) at 144.

SKAT also does not meaningfully dispute the facts related to obvious red flags it knew about before paying the reclaims at issue here.  Those red flags, coupled with SKAT's duty of inquiry, lead inescapably to the conclusion that SKAT "should have become aware" of its claims against Defendants.  Ørgaard Decl. (ECF No. 802) ¶ 13.  SKAT's attempt to downplay the significance of these red flags misses the mark.  For example, pretending that Jeppesen raised only "a legal issue" without relevance to the facts of this case, SKAT Opp. 52, SKAT ignores Jeppesen's own testimony that his concerns transcended the facts of any particular application. *See* McCarthy Decl. Ex. 2 (Jeppesen Tr.) 150:17-25, 151:22-25.  As Defendants explained (and SKAT does not genuinely dispute), SKAT knew from at least 2007 that it had no way of determining whether an application involved borrowed shares or even whether an application was based on fabricated documents.  *See* Defs.' Br. 63-64.  SKAT's fundamental error was its deliberate decision to pay "all facially sufficient tax refund applications," SKAT Opp. 51, with the knowledge that such applications did not actually establish the beneficial ownership on which entitlement to reclaims was founded.  *See* Defs.' Br. 64; JSUMF ¶ 33.  Fully aware that it was issuing refunds blindly, SKAT chose at its peril to do nothing to investigate refund applications. *See* Defs.' Br. 64-65.  And it continued this practice even *after* the legislature increased the time

allotted to review applications sixfold.

SKAT's attempt to minimize the impact of Lisbeth Rømer's numerous warnings, *see* Defs.' Br. 65-66, likewise falls flat. As the *Bech-Bruun* court acknowledged, Rømer's "unit always made every effort to convince the rest of the organization that there were real problems in the area of dividend tax." *Bech-Bruun* II at 139. "[T]he 'refund loophole' alluded to the fact that it was not possible to exercise any controls and that they had to rely on materials received from third parties." *Id.* at 140. The court noted that Rømer warned individuals at the highest levels within SKAT that "there was no real way to exercise controls over the refund of dividend tax[.]" *Id.* SKAT's dissembling arguments as to the impact of Rømer's warnings are fantasy: SKAT knew it had a serious problem but took no steps to investigate the reclaim applications it received before paying them. *See* JSUMF ¶ 33. SKAT ignores the dramatic and undisputed uptick in refunds during the period at issue and admits that it refunded more dividend withholding tax in 2014 than was actually due, reinforcing the obvious need for at least *some* investigation. *See* Defs.' Br. 67-69.

SKAT suggests that Defendants "ignore[] a substantial body of Danish case law applying the law on suspension of the statute of limitations to SKAT's claims against Danish taxpayers." SKAT Opp. 50.[29] SKAT's argument appears to rest on the false premise that Defendants *withheld* information from SKAT. As a factual matter, that premise is undercut by SKAT's own characterization of the applications as "facially sufficient," SKAT Opp. 51, and by SKAT's admissions that it did not require any information beyond what was specifically requested in the reclaim applications, *see* JSUMF ¶¶ 38-48, 64. In fact, SKAT's Danish law expert ultimately accepted Professor von Eyben's explanation that limitations periods should not be suspended

---

[29] At the same time, SKAT repeatedly claims that this case does not concern taxes and that Defendants were never taxpayers. *E.g.*, SKAT Opp. 14, 25, 27. SKAT's arguments once again reinforce why the Revenue Rule applies.

where a tax authority, under an obligation to conduct an inspection that would have disclosed the pertinent facts, fails to do so. *See* Andersen Decl. ¶¶ 154-55, 172; *cf.* Ørgaard Decl. ¶ 19 (von Eyben's observation turns on whether SKAT had "grounds to seek additional information to clarify the facts"). So too here. Ørgaard Reply Decl. ¶¶ 20-26.

Because SKAT had ample reason to investigate every reclaim application submitted by a Bellwether Plan—including multiple warnings from Jeppesen in 2007 and from Rømer throughout her tenure at SKAT—it was under a legal obligation to do so and cannot benefit from a suspension of the statute of limitations. *See* Defs.' Br. 69. The three-year period started running the moment SKAT paid each reclaim, and so all claims based upon reclaims paid more than three years before SKAT filed suit are untimely and should be dismissed.

## B. SKAT's New York Law Unjust Enrichment Claims Are Barred By The Three-Year New York Statute Of Limitations

SKAT urges this Court to find that its unjust enrichment claims in the New York bellwether cases are subject to a six-year limitations period. *See* SKAT Opp. 54-55.[30] This is in direct contravention of the "practice of the federal courts in this district" of applying "a three-year statute of limitations period when a claim for unjust enrichment seeks monetary relief." *Bascunan v. Elsaca*, 2021 WL 3540315, at *6 & n.5 (S.D.N.Y. Aug. 11, 2021). The unjust enrichment claims in the New York bellwether cases are time-barred to the extent they are based on payments made more than three years before the complaints were filed.

## VI. SKAT's Other Arguments Should Be Rejected

### A. SKAT's Restitution Claims Are Equitable

---

[30]     SKAT's reference to skepticism expressed by the court in *City of Almaty v. Sater* is a red herring. Not only did the *Almaty* court survey the case law within this district and conclude that federal courts largely follow the three-year period when monetary relief is sought, 503 F. Supp. 3d 51, 65 (S.D.N.Y. 2020), but the *Almaty* court also held that a three-year period applied on the facts of the case under *either* Appellate Division's approach. *Id.* at 66.

SKAT's claims for money had and received, payment by mistake, and unjust enrichment— what SKAT calls its "restitution claims"—are equitable. Though "presented as separate causes of action," these claims are all "claims for restitution premised on the principle that recovery is to be had ... according to what is equitable and good." *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010). An essential element of the claims is that equity demands restitution. *See id.* at *5. SKAT's restitution claims must therefore be dismissed because SKAT's legal claims constitute an adequate remedy at law. *See* Defs.' Br. 72-75. That SKAT's restitution claims seek monetary relief does not transform them into legal claims. SKAT's backdoor pursuit of a money judgment through its restitution claims is improper. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

## B.     SKAT Made No Mistake

SKAT ignores the voluminous record evidence that it issued refunds without investigation or factual analysis, in full knowledge that it could not confirm the identify of non-Danish beneficial owners of shares held in omnibus accounts. *See* Defs.' Br. 63-70. Defendants do not argue that SKAT negligently processed the claims at issue, as SKAT suggests. *See* SKAT Opp. 57. To the contrary, it was SKAT's deliberate practice to issue refunds without adequate review, knowing that unentitled parties could receive refunds. *See* Defs.' Br. 63-70; DSMF (ECF No. 800) ¶¶ 13, 46, 50-51, 61. SKAT's conscious decision to process these claims like all others makes it impossible as a matter of law that SKAT made any mistake.

## C.     SKAT Cannot Show Reasonable Reliance

No reasonable jury could conclude that SKAT reasonably relied on the misrepresentations alleged in this case, as the record roundly contradicts SKAT's insistence that "there were no 'red flags' or 'warning signs[.]'" SKAT Opp. 59. In June 2015, a Danish attorney made allegations of fraud to the director of SKAT's anti-fraud unit, naming Sanjay Shah as the "key figure," noting

Shah's relationship to Solo Capital, and naming multiple specific plans allegedly involved in the fraud, including some associated with the main and backup bellwether cases in this matter. *See* Defs.' Br. 14. At the time of those allegations, SKAT already knew—and had known for years—that it could not confirm the identity of foreign shareholders holding shares in omnibus accounts, the scenario presented in this case. *See id.* at 66-67.[31]

SKAT sidesteps its own "sophistication and expertise," which is "a principal consideration" in "evaluating justifiable reliance[.]" *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 623 (S.D.N.Y. 2001) (collecting cases). SKAT maintains that Defendants' cases—because they involved arm's length commercial transactions—are inapposite. But that distinction is immaterial because it ignores the critical relevance of the sophistication of the plaintiff in evaluating reasonable reliance. SKAT's position would lead to the bizarre result that an individual with significant investing experience is held to a higher standard of reasonableness than an entire branch of a foreign government, equipped with employees possessing subject matter expertise and backed by the resources and powers of a sovereign nation.

## D.   SKAT Cannot Establish Scienter

To succeed against the ED&F Bellwether Defendants on its fraud claims, SKAT must prove not only that the ED&F Bellwether Defendants made false representations to SKAT, but also that they *knew* those representations were false or knew they had "insufficient knowledge upon which to base the representation[s]." *Rawson v. Conover*, 20 P.3d 876, 882 (Utah 2001). But SKAT has not adduced any evidence of such knowledge, let alone "clear and convincing"

---

[31]     There is no merit to SKAT's assumption that inquiry would have been futile because the plans would have lied. Reliance on alleged misrepresentations is unreasonable when the relying party "failed to make use of the means of verification that were available to it[.]" *UST Priv. Equity Invs. Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (1st Dep't 2001). What might have occurred had SKAT exercised the means of verification available to it—*e.g.*, by seeking additional information from the plans—is a legally irrelevant hypothetical exercise.

evidence. *See Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 536-37 (Utah 2002). Utah courts regularly hold that scienter has not been established at the summary judgment stage—*see, e.g.*, *Prince*, 56 P.3d at 537; *Rawson*, 20 P.3d at 882-83—including where the defendant had general knowledge of the underlying business transactions and a long-standing relationship with a party accused of making false statements. *See Hansen v. Native Am. Refinery Co.*, 2010 WL 1949749, at *4 (D. Utah May 14, 2010). Here, SKAT dwells on the industry experience of Acer and Kaminer, on Kaminer's business relationship with ED&F personnel, and on the fact that ED&F provided financing. That is exactly the type of proof that *Hansen* found insufficient to create a dispute of material fact as to scienter.[32] Nor can SKAT prove scienter through speculation about what ED&F Bellwether Defendants *must have known*. *See id.*; *see also Rawson*, 20 P.3d at 882.

SKAT also fails to connect its purported evidence of scienter with any of the theories of falsity it now advances, *i.e.*, that there were circular trades involving an entity unaffiliated with the defendants, *see* SKAT Opp. 6-8, or that ED&F beneficially owned the Danish shares based on contractual language in the pension plans' agreements, *see id.* at 8. SKAT offers no evidence that the ED&F Bellwether Defendants were aware of any alleged circularity in the trading executed by ED&F or that they shared SKAT's interpretation of the contract language which, according to SKAT, divested them of "beneficial ownership" of the Danish shares and associated dividends.

To the contrary, with respect to the so-called "cum-ex" trades, SKAT's argument for falsity relies on documents which *did not even exist* at the time of the transactions, including (i) Annex

---

[32] SKAT also fails in its attempt to create a dispute of material fact by impugning Kaminer's credibility. For instance, SKAT argues without support that Kaminer must have "understood the nature of the trades at least as well as" Victoria Foster, an ED&F employee personally involved in the execution of the transactions. SKAT Opp. 64 n.61. SKAT's insinuations about what Foster—let alone Kaminer—"understood" are vague and speculative, particularly as Foster was never deposed. Even if Foster's knowledge were established, it would not be imputable to Kaminer, and certainly not on the sole basis that the two of them communicated. SKAT also seeks to discredit Kaminer's testimony on the ground that it was "dismissed as 'non-sensical'" by SKAT's expert, *see id.*, but this same expert conceded that it was not his role to opine on parties' "state of knowledge." Dillman MIL Decl. (ECF No. 813) Ex. 3 (Wade Reply) ¶ 219. In any event, Wade's opinions should be excluded for the reasons advanced in Defendants' separate motion.

E; (ii) ED&F's disclosures to the FCA; and (iii) the transcript of ED&F's Rule 30(b)(6) testimony. SKAT Opp. 6-8.  SKAT offers no evidence that these materials (or the information contained within them) were available to the ED&F Bellwether Defendants when the tax refund applications were submitted to SKAT.  As for the "cum-cum" trades, SKAT adduces no evidence that Kaminer, Schulman or Crema construed the relevant contract language in the way urged by SKAT or, for that matter, that they believed there was anything in the agreements with ED&F that would or could have divested the plans of "beneficial ownership."  SKAT's argument in fact *ignores* record evidence, including the Custody Agreements themselves—which established the terms under which ED&F would hold acquired assets in *custody* for the pension plans, *see* Dillman Reply Decl. Exs. 3, 4 (Custody Agreements), Clause 2(a); *see also* Salter Decl. (ECF No. 822) ¶¶ 59.2, 108— and emails demonstrating that when questions arose about the relevant contractual language, Kaminer was advised that all acquired securities would be held in custody for the plans, pursuant to their agreements with ED&F.  *See* Dillman Reply Decl. Ex. 5, at ACER_00022667-68.[33]

## E.    SKAT's Aiding And Abetting Claims Fail Under Utah Law

SKAT accepts that Utah has not recognized a cause of action for aiding and abetting fraud but nevertheless argues that its courts would do so "if faced with the issue."  SKAT Opp. 64-67. In the alternative—and notwithstanding that the parties have analyzed the causes of action against the ED&F Bellwether Defendants under Utah law—SKAT argues (incorrectly) that Utah courts would apply *Danish* law in case of a conflict and further argues (incorrectly) that Denmark recognizes an aiding and abetting fraud cause of action.  *See id.* at 67-69.  SKAT's insistence that the Utah Supreme Court would recognize aiding and abetting is contrary to lower court precedent,

---

[33]     SKAT also points to the execution by Crema and Schulman in April 2012 of a "Confirmation of Election Statement/FSA Client Categorisation."  *See* SKAT Opp. 63; Second Weinstein Decl. Exs. 239, 288.  The Custody Agreements, however, were executed in June 2012, and thus post-date the April 2012 documents.  *See* Dillman Reply Decl. Exs. 3, 4.

and SKAT fails to establish that there is any conflict between Utah and Danish law on this issue.

As an initial matter, there is no basis for SKAT's contention (SKAT Opp. 65-67) that Utah courts would recognize a cause of action for aiding and abetting fraud. Utah courts have in fact numerous times declined to recognize such a cause of action. *See* Defs.' Br. 83; *Coroles v. Sabey*, 79 P.3d 974, 978 (Utah App. Ct. 2003). Faced with similar arguments, federal courts have consistently declined to recognize new state law causes of action. *See, e.g.*, *Douglas v. York Cnty.*, 433 F.3d 143, 149 (1st Cir. 2005); *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000).

SKAT also provides no support for its alternative argument that Denmark recognizes claims for aiding and abetting fraud, and SKAT in any event fails to meet its burden of proving Danish law so as to "enable the district court to apply it" here. *Yukos Cap. S.A.R.L. v. Feldman*, 2016 WL 183360, at *2 (S.D.N.Y. Jan. 11, 2016). SKAT's expert suggests that Denmark generally recognizes the principle of joint liability, but that is a long way from recognition of a specific cause of action for aiding and abetting fraud. *Compare* Andersen Decl. ¶¶ 72-91 *with* SKAT Opp. 67. Indeed, the cases on which SKAT's expert relies—*see* Andersen Decl. ¶¶ 79-91; *id.* Exs. 11, 14-15—address violations of statutory restrictions on asset-stripping or self-funding; none involves fraud or aiding and abetting. Moreover, in the *Thrane* case—which SKAT's expert characterizes as a "significant illustration" of "aiding and abetting" liability under Danish law—the Danish Supreme Court's judgment was premised expressly on defendants' failure to "really do anything to avert [SKAT's] risk." Andersen Decl. Ex. 11.[34] Such a theory of liability would be inconsistent with aiding and abetting fraud as applied in U.S. jurisdictions that recognize such claims, for fraud typically cannot be aided and abetted by inaction, absent a fiduciary relationship not present here.

---

[34] Curiously, Professor Anderson appears to rely on a different translation of the *Thrane* decision than the translation appended as an exhibit to his declaration. *Compare* Anderson Decl. ¶ 90 *with* Anderson Decl. Ex. 11.

*See, e.g.*, *Berdeaux v. OneCoin, Ltd.*, 561 F. Supp. 3d 379, 417 (S.D.N.Y. 2021).[35]

Finally, even if Denmark did recognize aiding and abetting fraud, Utah courts would not apply Danish law to SKAT's claim. SKAT wrongly relies on Section 148, rather than Section 145, of the Restatement.[36] Section 145 looks to "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." On balance, these factors weigh in favor of Utah law. All of the alleged aiding-and-abetting conduct occurred in those States where the ED&F Bellwether Defendants operated or were located—including in Utah, where Kaminer undisputedly operated Acer and provided relevant trade instructions to ED&F. *See* Bahnsen Decl. Ex. 7 (Riverside Am. Compl.) ¶¶ 17, 19, 60-61, Count II; Defs.' Response to PSMF (ECF No. 819) ¶ 64; DSMF ¶¶ 118-20; Blessington Decl. (ECF No. 821) Ex. 6. And because the ED&F Bellwether Defendants have no direct relationship with SKAT, *see* JSUMF ¶¶ 367, 377-78, 382, any relevant relationship would be centered on Utah, where Kaminer and Acer held power of attorney for the plans. Accordingly, Utah has the most significant relationship to the alleged aiding and abetting under Section 145, and a cause of action for aiding and abetting fraud is unsustainable under Utah's law.

## F.   N.Y. Law Applies To Claims Against The N.Y. Bellwether Defendants

Buried in footnotes in its opposition, SKAT asks this Court to conclude that Danish law applies to certain of its claims against the New York bellwether defendants. *See* SKAT Opp. 13-

---

[35]     Tellingly, neither SKAT nor its experts have attempted to outline the essential elements of a purported claim for aiding and abetting fraud under Danish law. Thus, even if such a claim were cognizable in Denmark, SKAT has provided the Court with no basis for instructing a fact finder on the proper application of the claim under Danish law. *See Yukos Cap.*, 2016 WL 183360, at *2.

[36]     Section 148 expressly deals with claims of fraud, not aiding and abetting fraud. Courts undertaking a choice of law analysis for aiding and abetting fraud under the Restatement (Second) Conflict of Laws have applied the Section 145 factors. *See, e.g.*, *In re Estrategias en Valores, S.A.*, 628 B.R. 722, 734 (Bankr. S.D. Fla. 2021); *CadleRock Joint Venture, L.P. v. Royal Indem. Co.*, 2012 WL 511570, at *4 (N.D. Ohio Feb. 15, 2012).

14 n.12, 80 n.81, 84 n.85. But SKAT's requests are off the mark. New York choice of law rules for tort claims require courts to conduct an "interest analysis," under which "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013) (cleaned up). When, as here, the relevant claims involve "conduct-regulating" (rather than "loss-allocating") rules, "the law of the jurisdiction where the allegedly tortious acts occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* at 49 (cleaned up).[37]

When the torts at issue involve conduct-regulating rules and the place of injury and place of allegedly wrongful conduct differ, courts presume that the law of the place of the allegedly wrongful conduct applies. *See Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 399 (S.D.N.Y. 2018) (following *Licci*). Although the "interest analysis" allows for flexibility and the *Licci* presumption can be overcome, "courts in this District have often concluded that New York has the greater interest in adjudicating claims arising from allegedly fraudulent acts that were committed in New York but injured plaintiffs in other jurisdictions." *In re AXA Equitable Life Ins. Co. COI Litig.*, 2022 WL 976266, at *22 (S.D.N.Y. Mar. 31, 2022).

This Court should do the same. SKAT has alleged that the New York bellwether defendants formed an intent to defraud, set up the mechanisms to achieve their purpose, and caused the transmission of purportedly inaccurate reclaim applications—all in New York. *See, e.g.*, Am. Compl., *Skatteforvaltningen v. RJM Cap. Pension Plan & Richard Markowitz*, No. 19 Civ. 1898 (S.D.N.Y. Apr. 21, 2020), Dkt. 60 at ¶¶ 5, 17-18, 28(e), 45, 47-49 (describing centrality of conduct in New York). Because the allegedly wrongful conduct at issue in this case was centered in New

---

[37] Each of SKAT's claims involves a "conduct-regulating" rule. *See AHW Inv. P'ship v. Citigroup, Inc.*, 980 F. Supp. 2d 510, 522 (S.D.N.Y. 2013) (fraud, negligent misrepresentation), *aff'd*, 661 F. App'x 2 (2d Cir. 2016); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492-93 (S.D.N.Y. 2001) (aiding and abetting); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 668-69 (S.D.N.Y. 1996) (unjust enrichment, payment by mistake, money had and received).

York, New York law should apply. *See Toretto v. Donnelley Fin. Sols., Inc.*, 2022 WL 348412, at *8 (S.D.N.Y. Feb. 4, 2022); *Kashef v. BNP Paribas SA*, 442 F. Supp. 3d 809, 820 (S.D.N.Y. 2020).

### G.     The DNTT Proceedings Have No Preclusive Effect

There is no merit to SKAT's argument that the Proper Pacific and FWC Capital Defendants are collaterally estopped by the proceedings before the DNTT. *See* SKAT Opp. 23-25; Second Weinstein Decl. Exs. 190-191. Whether the decision of an administrative agency is entitled to preclusive effect depends on, among other things, "whether the procedures used in the administrative proceeding ... were sufficient both quantitatively and qualitatively, so as to permit confidence that the facts asserted were adequately tested, and that the issue was fully aired." *Auqui v. Seven Thirty One Ltd. P'ship*, 22 N.Y.3d 246, 255 (2013) (cleaned up). That the DNTT is a *foreign* administrative body urges further caution. *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 179 n.7 (S.D.N.Y. 1995) (recognizing that "[t]he rule of collateral estoppel, often difficult of application to domestic judgments ... , presents additional difficulties when sought to be applied to foreign judgments") (cleaned up).

The DNTT proceedings are "quantitatively and qualitatively" different from this civil litigation. Most importantly, the plans carried the burden of proof before the DNTT. Second Weinstein Decl. Ex. 190 at 227, Ex. 191 at 229. Here, SKAT has the burden of proving that the Bellwether Plans were not beneficial owners. That mismatch is dispositive. *See Cobb v. Pozzi*, 363 F.3d 89, 113-15 (2d Cir. 2004) (recognizing that "a difference in the burdens of proof in two proceedings can make the application of collateral estoppel improper" and concluding that plaintiffs had not "carried their burden of demonstrating that the issues raised in both decisions are identical"). In addition, discovery does not appear to have been undertaken in the DNTT proceedings, whereas the parties here have engaged in extensive discovery, including dozens of depositions. Accordingly, the DNTT proceedings have no preclusive effect here.

## VII.    Summary Judgment Should Enter On SKAT's "Restitution Claims"

SKAT's restitution claims against Lehman and Bradley should be dismissed.   As Defendants explained, SKAT cannot prove that the introductory broker fees that Lehman and Bradley received were paid by SKAT or at SKAT's expense.   *See* Defs.' Br. 87.[38]   Thus, SKAT cannot prove the first substantive element of its restitution claims or non-speculative damages. SKAT's response rests upon conjecture.   SKAT speculates that the "only reasonable inference that can be drawn from the record" is that the payments to Lehman and Bradley came from SKAT. SKAT Opp. 69.   SKAT suggests that "[i]t defies belief that these supposed 'introducing broker fees' were not Bradley's share of, and paid from, SKAT's 'refund' payments," *id.* at 71, adding that, "[l]ike Bradley, Lehman has no believable explanation for why Shah would pay him $700,000 or $800,000 simply for establishing a U.S. pension plan and opening accounts for the plan at the Solo Custodians if the money were not Lehman's share of SKAT's payments." *Id.* at 72.

In contrast to SKAT's equivocation and wishful thinking, the record is clear:  A work colleague, Danny Fletcher, paid Bradley, and Lehman "invoiced" Shah entities for payment. *See* SKAT Opp. 69-70.   These payments were not tax reclaim payments from SKAT.   They were income earned through business dealings. *See*, *e.g.*, Schoenfeld Decl. Ex. 18 (Bradley Tr.) 305:16-25 (Bradley and Fletcher had a written "introducing broker agreement, consulting type agreement" directing the payments to Bradley); Weinstein Decl. Ex. 80 (Lehman Tr.) 466:4-467:20 (Lehman was paid "introductory brokerage fee[s]" for introducing pension plans to trading strategy).   SKAT admits the Lehman and Bradley Plans "did not direct the Solo Custodians to transfer money from

---

[38]    SKAT notes that Lehman did not brief Florida law.  But there is no material difference between New York and Florida law.  To prove unjust enrichment in both States, a plaintiff must show it directly conferred a benefit on the defendant. *Compare Swiss Watch Int'l v. Movado Grp., Inc.*, 2001 WL 36270980, at *5 (S.D. Fla. June 21, 2001) *with Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 248 (E.D.N.Y. 2014).  And plaintiffs must prove damages with reasonable certainty, not based upon speculation and conjecture. *Compare Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. Dist. Ct. App. 2018) *with Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 581 (S.D.N.Y. 2010).

their custodial accounts into the bank accounts that Lehman [and Bradley] established for those plans" in the U.S.  SKAT's Response to DSMF ¶¶ 101, 103.

While it may be "black letter law that 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,'" *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 60 (S.D.N.Y. 2020), that law is irrelevant here.  Because SKAT has not offered any concrete evidence that the payments received by Lehman and Bradley derived from SKAT in the first instance, its restitution claims fail as a matter of law.  *See Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 697 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013); *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011).

## VIII.  Altbach Is Entitled To Summary Judgment[39]

### A.  The Fraud Claim Should Be Dismissed

Altbach proved that he never communicated with SKAT or Goal and was not aware of the statements in the Roadcraft Plan reclaim applications.  *See* Defs.' Br. 89-90.  Altbach also proved that the Roadcraft Plan was Goal's principal[40] and, thus, that Goal's knowledge and scienter cannot be imputed to him.  *See id.* at 90-91.  Finally, Altbach argued that, even if he were Goal's principal, SKAT cannot show that Goal knew that statements in the reclaim applications were false or that Goal intended to deceive SKAT.  *See id.* at 91-93.  In opposition, SKAT adduces no non-conclusory contrary evidence and disregards established agency law principles.[41]  SKAT must

---

[39]     SKAT ignores the evidence and the relevant state's law and misapplies the evidence and law that it does discuss.  The relevant state's law is Delaware.  Roadcraft Technologies is a Delaware LLC (Bahnsen Decl. Ex 52), and the Roadcraft Plan is contractually governed by Delaware law. *See* Dulberg Decl. Ex. 20 at WH_MDL_00139354.

[40]     The Goal POA identifies the Roadcraft Plan as its principal.  Bahnsen Decl. Ex. 81.  SKAT does not deny that it received the Goal POAs in the Roadcraft Plan reclaim applications or relied on them.  SKAT also does not contest that apparent authority does not exist in the absence of a communication between the purported principal and the third party relying on the agent. *See* SKAT Opp. 77 & n.78.  Because SKAT adduces no evidence that Altbach personally communicated with SKAT such that SKAT believed that Goal was acting as Altbach's agent, there can be no genuine dispute that the Roadcraft Plan is Goal's principal.

[41]     SKAT also makes a premature alter ego argument, which appears duplicative of its agency arguments.  In any event, SKAT's alter ego analysis is inadequate.  First, SKAT cite no case holding that pension plans are akin to

show that Goal, whose communications were allegedly fraudulent, knew its communications were

fraudulent *and* intended to deceive SKAT when it made them.  *See Teamsters Loc. 445 Freight*

*Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Without such evidence,

Altbach cannot be liable for Goal's purportedly fraudulent statements, even if Goal were Altbach's

agent.  It is irrelevant whether, as SKAT argues, Altbach was Goal's principal.[42]

SKAT argues that proof of Goal's knowledge and scienter is not required because Altbach

used Goal as a conduit to directly communicate false information to SKAT.  *See* SKAT Opp. 79.

But SKAT then was required to prove that Altbach (i) was the "source" of the information in the

reclaim applications, and (ii) provided that information to Goal with the intent and knowledge that

it be communicated to SKAT.  SKAT adduces no such evidence and fails to controvert Altbach's

declaration that he did not communicate with Goal, was unaware of Goal's existence, did not

discuss Goal or the reclaim applications with anyone, and had no knowledge of the Roadcraft Plan

reclaim applications or their contents.  *See* Altbach Decl. (ECF No. 809) ¶¶ 9, 11-12.

corporate structures, whose "veils" can be pierced.  Second, sole-participant pension plans are a common retirement savings tool specifically described on the IRS webpage.  *See* Bahnsen Decl. Ex. 9 (Reish Report) ¶ 21.  Even assuming a pension plan were a pierceable entity, under Delaware law, there is a presumption of separateness between an entity and its owners that cannot be rebutted in the absence of evidence that a principal exercised complete domination and control over the entity.  *See Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018).  Altbach's status as sole participant and trustee of the Roadcraft Plan fails to prove that Altbach completely dominated and controlled it or misused it in a manner intended to shield Altbach from liability to creditors or third parties.  Because SKAT adduces no additional, non-conclusory evidence, SKAT cannot establish Altbach's alter ego liability.  *See Novartis Pharms. Corp. v. Handa Neuroscience, LLC*, 2022 WL 610771, at *7 (D. Del. Mar. 1, 2022) ("clear and convincing evidence" required); *In re Foxmeyer Corp.*, 290 B.R. 229, 237 (Bankr. D. Del. 2003) (same).

[42]     SKAT argues that the Limited POA, signed by Altbach on behalf of the Roadcraft Plan, authorized Goal's actions because there is a "clear chain of agency running from Altbach to Ben-Jacob to Goal." SKAT Opp. 76.  Yet, SKAT's argument fails where, as here, the agent making the false statement has no knowledge of its falsity.  *See* Restatement (Third) of Agency § 5.03, cmt. d(2) (2006) ("[A] principal may not be subject to liability for fraud if one agent makes a statement, believing it to be true, while another agent knows facts that falsify the other agent's statement."); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) (dismissing fraud claims where alleged misstatements were not made by individuals with knowledge of their falsity).  SKAT also argues that Altbach is personally responsible for Goal's actions as the Roadcraft Plan's trustee, relying on New York law.  *See* SKAT Opp. 76 & n.77.  But Delaware law controls here and holds that a trustee is not personally responsible for the acts of its agents in the absence of evidence of willful misconduct.  *See* 12 Del. C. § 3328(c).  The Roadcraft Plan documents also exculpate the Roadcraft Plan trustee from the acts of its agents.  *See* Dulberg Decl. Ex. 20 at WH_MDL_00139411; *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2020 WL 2521557, at *8-9 (Del. Super. Ct. May 18, 2020) (dismissing claims against Delaware trustee based on exculpatory provision in trust instrument).

## B.     The Aiding and Abetting Claim Must Be Dismissed

Altbach proved that he did not have actual knowledge of a fraud perpetrated by others and argued that knowledge imputed from any agent is not tantamount to actual knowledge.  *See* Defs.' Br. 94-95.  Altbach also showed there is insufficient evidence that he substantially assisted in the preparation and dissemination of the Roadcraft Plan reclaim applications.  *See id.* at 95.  Finally, he argued that he cannot be responsible for both intentional participation in a fraud and for aiding and abetting that fraud.  *See id.* at 94 n.80.  SKAT argues there is a genuine question of fact as to whether Altbach consciously avoided confirming the fraud and that imputed knowledge constitutes actual knowledge sufficient for an aiding and abetting claim.  SKAT Opp. 80-82.  SKAT is wrong.

First, conscious avoidance "occurs when 'it can almost be said that the defendant actually knew' because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to able to deny knowledge."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 368 (S.D.N.Y 2007) (cleaned up).  Mere suspicion is not enough to establish actual knowledge.  *See Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).  SKAT adduces no evidence that Altbach harbored any suspicions concerning the trading in Danish securities.  SKAT insinuates that his review and discussion of a WSJ article regarding German tax regulations and dividend arbitrage trading in German stocks should have triggered suspicion.  But mere "[a]llegations that a defendant should have known of fraud are insufficient."  *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,* 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004).  In any event, SKAT adduces no evidence of any actions Altbach supposedly took to consciously avoid confirming any such suspicions.

Second, imputed knowledge is, at most, tantamount to constructive knowledge, which is insufficient to establish actual knowledge.  *See Fraternity Fund*, 479 F. Supp. 2d at 368.  Both conscious avoidance and actual knowledge require a culpable state of mind, which is incompatible

with imputation to an individual principal. *See Wardley Better Homes & Gardens v. Cannon,* 61 P.3d 1009, 1016 (Utah 2002); *accord Roberts Real Est., Inc. v. N.Y. State Dep't of State, Div. of Licensing Servs.,* 80 N.Y.2d 116, 122-23 (1992). SKAT's two cases are not to the contrary. There is no aiding and abetting claim in *Nolan v. Sam Fox Publ'g Co.*, 499 F.2d 1394 (2d Cir. 1974), and *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217 (S.D.N.Y. 2013), involved a corporate principal, which acquires knowledge only through its employee-agents. Because a corporate entity cannot have a culpable state of mind, imputed knowledge may, under certain circumstances, establish the actual knowledge of a corporate entity for purposes of an aiding and abetting claim.

SKAT also fails to adduce clear and convincing evidence that Altbach substantially assisted the purported fraud. "[W]here the alleged primary violations consist of misrepresentations in a document, the defendant must be alleged to have given substantial assistance to the making and dissemination of that document." *Fraternity Fund,* 479 F. Supp. 2d at 371. SKAT adduces three facts to support its assertion that Altbach intentionally and materially advanced the fraud— he formed a pension plan, signed a power of attorney, and authorized the submission of the Roadcraft Plan reclaim applications. *See* SKAT Opp. 82-83. But the record establishes only that Altbach signed the Limited POA; he had no involvement in forming the pension plan and no knowledge of or involvement in the preparation or submission of reclaim applications. *See* Bahnsen Decl. Ex. 73 (Altbach Tr.) 43:12-24, 139:5-24. Moreover, all the facts cited by SKAT, and all the reasonable inferences therefrom, are consistent with a lawful, tax-advantaged opportunity in which Altbach participated at the urging of his good friend and colleague. Altbach Decl. ¶¶ 2-3. Stated differently, SKAT has not adduced evidence that Altbach was engaged in any atypical activities that could support an inference of fraudulent intent. *See Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 226-27 (S.D.N.Y. 2007), *aff'd* 354 F. App'x 496 (2d

Cir. 2009); *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018) (facts must lead to an "unavoidable inference" of fraud). At most, SKAT is left to contend that Altbach substantially assisted the purported scheme through the acts of agents, of which he had no knowledge, which is insufficient for aiding and abetting liability.

### C. The Negligent Misrepresentation Claim Must Be Dismissed

Altbach proved that SKAT could not have reasonably relied on his supposedly negligent statements in reclaim applications because SKAT received them from an agent of the Roadcraft Plan. *See* Defs.' Br. 95-96. He also argued that SKAT failed to show a special relationship or privity between Altbach and SKAT, which is required for a negligent misrepresentation claim. *Id.* at 96-97. Finally, Altbach argued that, where information is provided pursuant to federal or similar requirements, there can be no special relationship. *See id.* at 97. In opposition, SKAT does not adduce evidence of privity or a special relationship with Altbach, requiring dismissal of this claim. SKAT merely attempts to distinguish *Jurgensen v. Felix Storch, Inc.,* 2012 WL 2354247, at *9 (S.D.N.Y. June 14, 2012), which holds that there is no special relationship between a manufacturer and consumers despite the requirement imposed by law that manufacturers must provide accurate information concerning their products' energy consumption. SKAT does not cite any case holding that the government would have a special relationship in this circumstance. Nor does it cite a case holding that a special relationship is not required where a tax authority is the plaintiff.

Summary judgment in favor of Altbach should be awarded on the fraud-based claims.

### CONCLUSION

The Court should grant Defendants' motion and enter judgment for Defendants.

50

Dated:  June 27, 2022

Respectfully submitted,

*/s/ Alan Schoenfeld*
Alan Schoenfeld
Julia Pilcer Lichtenstein
Michael Bongiorno
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
julia.lichtenstein@wilmerhale.com
michael.bongiorno@wilmerhale.com

*/s/ Andrew S. Dulberg*
Andrew S. Dulberg
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel. (617) 526-6000
andrew.dulberg@wilmerhale.com

*Attorneys for Bellwether Defendants Richard
Markowitz and RJM Capital Pension Plan*

*/s/ Sharon L. McCarthy*
Sharon L. McCarthy
Nicholas S. Bahnsen
KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Fl.
New York, NY 10007
Tel. (212) 808-8100
Fax: (212) 808-8108
smccarthy@kflaw.com
nbahnsen@kflaw.com

*Attorneys for Bellwether Defendants Basalt
Ventures LLC Roth 401(k) Plan and John van
Merkensteijn*

*/s/ John C. Blessington*

51

John C. Blessington (*pro hac vice*)
Brandon R. Dillman (*pro hac vice*)
Michael R. Creta (*pro hac vice*)
John L. Gavin (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel. (617) 261 3100
Fax: (617) 261 3175
john.blessington@klgates.com
brandon.dillman@klgates.com
michael.creta@klgates.com
john.gavin@klgates.com

*Attorneys for Bellwether Defendants American Investment Group of New York, L.P. Pension Plan, Riverside Associates Defined Benefit Plan, Robert Crema, David Schulman, Stacey Kaminer, and Acer Investment Group, LLC*

*/s/ Michelle Rice*
Michelle Rice
Consuelo Mejer
KAPLAN RICE LLP
142 W. 57th Street
Suite 4A
New York, NY 10019
Tel. (212) 333-0227
Fax: (212) 235-0301
mrice@kaplanrice.com
cmejer@kaplanrice.com

*Attorneys for Bellwether Defendants Roadcraft Technologies LLC Roth 401(K) Plan and Ronald Altbach*

*/s/ Zhanna A. Ziering*
Zhanna A. Ziering
MOORE TAX LAW GROUP LLC
11 Broadway, Ste. 615
New York, NY 10004
Tel. (646) 357-3875
Fax: (312) 549-9991
zhanna.ziering@mooretaxlawgroup.com

52

*Attorney for Bellwether Defendants RAK Investment Trust and Robert Klugman*

*/s/ Thomas E.L. Dewey*
Thomas E.L. Dewey
Sean K. Mullen
DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue, 37th Fl.
New York, NY 10017
Tel. (212) 943-9000
Fax: (212) 943-4325
tdewey@dpklaw.com
smullen@dpklaw.com

*Attorneys for Bellwether Defendant Michael Ben-Jacob*

*/s/ Joseph LoPiccolo*
Joseph LoPiccolo
John N. Poulos
Daniella DaCunzo Dalia
POULOS LOPICCOLO PC
311 West 43rd Street
11th Floor, Suite 124
New York, NY 10036
Tel. (732) 757-0165
Fax: (732) 358-0180
lopiccolo@pllawfirm.com
poulos@pllawfirm.com
ddalia@pllawfirm.com

*Attorneys for Bellwether Defendants Doston Bradley, The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401K Plan, and Roger Lehman*

*/s/ Neil S. Binder*
Neil S. Binder
BINDER & SCHWARTZ, LLP
366 Madison Avenue, Sixth Floor
New York, NY 10017
Tel. (212) 510-7008
Fax: (212) 510-7299
nbinder@binderschwartz.com

*Attorney for Third-Party Defendant*
*ED&F Man Capital Markets, Ltd.*