# Exhibit 36

CERTIFIED TRANSLATION

Extract from "Ejendomsretten 1" (Proprietary Right 1)
Edition: 4
Published by: Djøf Forlag
Year of publication: 1999
ISBN: 978-87-574-5212-9
Authors: Michael Elmer & Lise Skovby

2.5. **Segregation** of genus objects

### 2.5.1. General remarks

In the case of genus purchases, the acquirer is only protected against the transferor's creditors if a segregation has been made, i.e. a separation of objects to fulfill the agreement that meet certain specific requirements. However, it is a very controversial question in the literature, what further requirements must be made for a segregation in order for it to provide the acquirer with protection against the transferor's creditors. The controversy in theory is whether a segregation in order to provide protection in this respect should be binding, or whether it should instead or in addition be normal.[42]

The term *binding* segregation does not mean whether a separation is binding in relation to the transferor's creditors - that would be a completely circular way of thinking. It must also be irrelevant whether the separation is binding on the acquirer in the sense that he does not default by rejecting an object of the same kind. The crucial thing when looking at whether an segregation is binding is whether the segregation is binding is whether the separation is binding on the transferor. In other words, by requiring a segregation to be binding, the resolution of the property law problem between the acquirer and the transferor's creditors, refers to the law of obligations between the transferor and the acquirer.

The term *normal* segregation refers to whether the separation is made as a normal (final) part of the turnover-trading. Normality must be the objective measure of whether the parties have acted disloyal in relation to the creditors. As will be seen in the following sections, the terms binding and normal indicate far from unambiguous terms. In the relationship between the

---

[42] Except the view asserted by Hans Verner Højrup in Property law, p. 78, and according to which segregation should be unnecessary in the case of genus purchases. Højrup admitted that the view is not consistent with practice. Nor can Højrup's point of view be joined in terms of legal policy.

transferor and the acquirer, the problem of the effect of a separation of certain goods in order to fulfil a genus obligation must be split up into several different legal effects, and it therefore does not bring greater clarity to refer to segregation as »binding«. A requirement that a segregation in order to hold creditors must be »normal« also does not provide any more precise guidance. Before going into more detail on what requirements must be set for a segregation in order for it to provide the acquirer with protection against the transferor's creditors, the two theories must be explained in more details.

### 2.5.2. The theory of binding segregation

*2.5.2.1* As a justification for a requirement for binding segregation it has first and foremost been pointed out that it is a general principle in Danish property law, that creditors' liabilities and self-restraining must be counteracted to the widest extent possible and that creditors can demand overruling foreclosures that are not general and thus cuts off dispositions both  to creditors and to contract acquirers, cf. the code of Civil Procedure section 514, subsection 3. The creditors of the transferor should therefore not be barred from prosecuting in objects which their debtor is entitled to dispose ofs.[43]

In theory, there has been some ambiguity when a segregation is binding.

*Torp:* Danish law of Property, p. 369, did not find the mere dispatch of certain goods sufficient, as this in his opinion is not binding for the transferor. Torp would in all cases require that the buyer had received notification of the segregation, presumably from that mindset that the notification acts as a promise not to reverse the segregation.

*O.K. Magnussen* (U 1925 B. 286ff.) Emphasized that there may be cases where the seller will get in payment delay by changing the segregation that takes place when the item is sent, regardless of whether the buyer has not been notified. In such cases, Magnussen would also provide the buyer protection, as the seller's reversal of the segregation would also be a violation of the law in this situation.

---

[43] Thus Illum: Danish law of Property, p. 125, (less clear in Illum and Carstensen: Danish law of Property, p. 189 ff.), von Eyben: Property Rights, p. 174.

*Henry Ussing* (U 1926 B. 126 ff. and 198) agreed with Magnussen's presentation and noted that the disagreement that has existed about when a segregation is binding mainly due to the lack of clarity about the natural contract of the purchase contract.

*Ross:* Property Law and Property Transfer , p. 322 ff., described on the basis of a comprehensive review of existing case law of the time (1935) such that protection against creditors occurred not only by mutual segregation, but also by the seller's unilateral, but for him binding segregation through delivery, first and foremost dispatch, but without requiring the buyer to receive notification about the shipment.[44]

*Illum:* Danish Property Law, p. 124 f., emphasizes whether the seller will commit a breach of contract by reversing the segregation. Is this the case, e.g. where the buyer in connection with a prepayment has ordered the seller after the completion to label the goods as intended for the buyer, it is compatible with the requirement of binding segregation to »consider the buyer as the owner«, even if he has not been notified of the separation. Illum will also consider a dispatch as a binding segregation, if it has taken place at the buyers' expense and risk, regardless of whether the buyer has been notified in such cases.

*Illum and Carstensen:* Danish Law of Property, p. 194 ff., and Carstensen: Objects and Items 1, p. 80 ff., also emphasizes whether the seller's reversal of the segregation would be unlawful constituted violation of the law. A segregation is binding if it takes place by express order of the buyer cf. the second edition of Danish Law of Property mentioned example. It emphasizes whether it is a standard product or whether it is an order purchase of a segregation item, where the product can be identified at an early stage in the manufacturing  process. In the case of the dispatch of items, the question must be decided concretely, e.g. under consideration to the possibilities of counter-modification (redirection of the shipped item).

*2.5.2.2.* Although the rationale for a binding segregation requirement is simple, some might say obvious, it has– as is clear from the statements just references – caused the authors who have agreed to the requirement considerable difficulty in specifying its content.

---

[44] Ross advocated (p. 320) more legal policy in favor of claiming relinquishment as a condition of giving the acquirer protection against the transferors' creditors.

It is clear however, that the requirement that the separation of certain items of fulfilment of the genus obligation must be binding on the transferor refers to the obligation law relationship between the transferor and the acquirer. However, the law of obligation indicates just as little as the law of property a simple formula for when the effects of a property transfer agreement occur. In other words, it must also be made clear in law of obligation considerations, in relation to the legal effect of the question of the seller's lack of freedoms.

In the law of obligations, the term concentration is used as a collective term for the legal effects resulting from the selection and provision of a specific service in fulfilment of a genus obligation. These legal effects are the loss of the seller's right of option, the passing of the consideration risk, the passing of the service risk and the application of the species rule in assessing the seller's obligation to specific performance and the seller's liability for delay, etc.[45]

These legal effects do not necessarily occur under the same conditions or at the same time. One must examine each relation separately to determine when concentration occurs. It is conceivable that the seller's right of option will end at an earlier stage than the buyer's right to require specific performance under the genus rules. In the law of obligations, concentration generally occurs only if a separation has occurred in accordance with the purchase agreement, if the separation has legal basis and if notice of the separation has been given to the buyer.

Firstly, there must have been a separation in accordance with the purchase agreement. Separation may be performed, for example, by marking with the buyer's special mark, possibly in a separate warehouse, by handing the goods over to a carrier with the buyer's address specified, or, in the circumstances, by allocating the goods in the fixed quantity and the special dimensions, shades, shapes, etc., in which they were to be delivered under the contract.[46] If something else than what the parties have agreed has been separated, the buyer is unlikely, as a result of the separation, to lose his right to enforce his remedies for breach of contract under the genus rules.

---

[45] On concentration, see Gomard: Obl.ret, p. 6 ff., Gomard: Obl.ret, 1. part, p. 79 f., Ussing: ordinary part, p. 25, 195, 197 og198, Ussing: Purchase, p. 11, 57, 73 og 79, Elmelund et.al.: Danish og international purchase law, p. 38 f ., Lookofsky: Purchase, p. 95 f ., Nørager-Nielsen and Theilgaard: The Danish Sale of Goods Act, p. 64 ff. and Almen: on purchase and exchange of loose property (Om kop och byte av los egendorn), p. 64 og 180 ff.

[46] Nørager-Nielsen og Theilgaard: The Danish Sale of Goods Act, p. 654.

The separation must have legal basis. Such legal basis to separation of certain objects to fulfil a genus obligation may be found in the agreement between the parties, in specific legal provisions (as an example The Sale of Goods Act section 37 and CISG art. 69 on claimant's default) or according to custom cf. The Sale of Goods Act section 1 and CISG art. 9. It is a naturalia negotii that delivery must take place upon a purchase, and there will therefore always be a legal basis for the seller to separate certain items in connection with the delivery. The requirement for the intensity of the legal basis probably depends on the legal effect in which the question of concentration is discussed. The requirements for the seller to lose his right of option through concentration must be less than the requirements for the buyer to bear the risk of the product's accidental destruction or deterioration through concentration.

Notice of separation must be given to the buyer in order for the separation to transfer the risk of the accidental destruction or deterioration of the item for sale, cf. U 1916.598 H. This has i.e., coherence with insurance considerations. If the separation takes place upon delivery it may not be necessary to give notice for certain consignment purchases, see further Nørager-Nielsen og Theilgaard: The Sale of Goods Act, p. 67 and 224 ff.[47]

Notification of an agreed separation will also mean that the right to choose lapses, and possibly the parties' agreement on separation may be interpreted as meaning that the seller's subsequent fulfillment measures with regard to liability are assessed in accordance with the species rules.[48] Notification to the buyer is hardly required to transfer the risk in cases where separation has taken place due to the buyer's creditor default cf. the Sale of Goods Act section 37 and CISG art. 69.

As can be seen from this, the concept of concentration is merely a collective term under which a number of different issues are discussed. It cannot be stated by a simple formula when the segregation legal effects occur in the segregation purchases. For this reason alone, the problem of segregation cannot be solved by requiring a concentration to be made in accordance with law of obligations.[49]

---

[47] See Elmelund et al.: Danish and International Sale of Goods, p. 67 ff., and Lookofsky: Buy, p. 95 ff.

[48] Nørager-Nielsen og Theilgaard: Sale of Goods Act, p. 67

[49] Cf. hereby Gomard: Law of Obligations, 1st part, p. 67 ff, Gomard: Law of Obligations, p. 8, and Gomard: The Service, p. 112, which rightly emphasizes that the segregation requirements of property rights are not identical with the law of contract's requirements for concentration, i.e. because the service be identified with a high degree of certainty according to property right.

Therefore, instead of discussing in general terms whether a segregation must be binding, the general requirements to segregation must be determined by examining the specific conditions, which according to the mentioned laws of obligations may lead to, that a separation of certain objects to fulfill a genus-agreement becomes binding on the transferor. However, even if a separation is binding on the transferor, creditors may not have to respect it.

### 2.5.3. The theory of normal segregation

*2.5.3.1.* Just as little as where the object of sale has already been handed over to the acquirer, the creditors must, when delivery has not taken place, respect *disloyal dispositions*, e.g. if the transaction is reversed or if it is affected by the special invalidity rule referred to in section 2.2.5. above. It has therefore been argued that, as a safeguard against disloyal segregations, a requirement must be made that a segregation, in order to provide the acquirer with protection against the transferor's creditors, must be carried out as a normal concluding part of the transaction.

In its original form, the theory of normal segregation was launched as part of a protest against the binding segregation. Fr. Vinding Kruse expressed in its final form[50] his theory thus »any provable, clearly established segregation on the part of the seller before the bankruptcy, made as a natural part of a normal conclusion of trade, should validly transfer ownership to the buyer in relation to the seller's proceeding creditors«.

In an article from Fr. Vinding Kruse about »Transfer of ownership «, which was published as a special edition of TfR 1924, the theory of normal segregation was presented in a broader form. The dissertation appeared to distance itself from the requirement of binding segregation, as protection of goods arises »from segregation when it appears from the facts of the trade that there is a real and normal trade agreement - and not pro forma work or circumvention - and there is sufficient evidence for segregation« (note p. 80). This distancing from the prevailing view, which required binding segregation, led to significant debate. See O.K. Magnussen in U 1925 B. 286 ff., Vinding Kruse in U 1925 B. 310 ff., Ussing in U 1926 B. 125 ff., Vinding Kruse in U 1926 B. 195 ff., Ussing in U 1926 B. 198 f., and Ross: Property Rights and Property Transfer, p. 322 ff.

---

[50] Proprietary Law II, p. 1200.

The theory of normal segregation was further developed by W.E. von Eyben,[51] who emphasized that segregation must serve as a protection against fraudulent transactions and that the requirement of normal segregation can and should be discussed regardless of whether a requirement of binding segregation is made. According to von Eyben, segregation must be a regular part of the settlement of a trade, and the normality must be established by a particularly concrete examination, which may lead to the existence of abnormal segregations, which the courts for evidentiary reasons cannot overcome.

von Eyben emphasizes that a binding segregation can have a dubious character, e.g. if it is made in collaboration with the buyer, and one does not usually make the segregation in this way. One should not, with effect for the creditors, a few days before a bankruptcy, be able to make mutual segregations by separating out ordered goods together with business associates. Such a separation should be able to be regarded as disloyal, even if it cannot be affected by the rules of avoidance, e.g. because there is no evidence of bad faith from the other contracting party regarding the insolvency of the supplier.

von Eyben concludes (p. 175) that a binding segregation cannot unconditionally be required, but on the other hand one cannot stand by any unilateral segregation either, just because it is clear. It must be required that the segregation is normal. The formulation of the theory of normal segregation, which is found in von Eyben: Proprietary Rights, p. 174 ff., is in reality about, that abnormal segregations are without effect in relation to the creditors. Abnormality is seen as an expression of disloyalty. Lack of evidence harms the *creditors*.[52]

*2.5.3.2.* At first glance, it may seem doubtful whether it can be readily assumed that any segregation that has taken place as a normal part of trade turnover is loyal without further proof. And it must also seem doubtful whether one can readily that any segregation that has taken place in an abnormal way is disloyal. However, disloyal segregations should not be able to stand against the transferor's creditors, and the *normality* can be an objective expression of whether there is something disloyal.

---

[51] Proprietary Rights, pp. 174 ff.

[52] Cf. the statement that there are abnormal segregations that the courts cannot overcome for evidentiary reasons.

The assessment must take into account that in all practical cases these are situations where the acquirer has prepaid in full or in part, and where the danger of pro forma and concealed preferences of creditors can far from be said to be remote. The creditor's possibility to prove pro forma and other disloyal actions, etc.. will i.a. could be dependent on whether it is possible – and financially responsible – at reconstruct accounting material, as it very often happens that debtors in the time leading up to the economic collapse have not kept accounts.[53]

If you formulate the rule on protection against disloyal dispositions in such way that the creditors must prove (render probable) that there is a disloyal relationship, the rule will therefore in reality not give the creditors much protection. The costs to reconstruct accounts will seldom be commensurate with the amounts that will be included in the bankrupt estate if the segregation is disregarded. If the rule is to give the creditors real protection, a lack of evidence should harm the *acquirer*.

One should therefore probably – with inspiration in the rule in the Danish Bankruptcy Act section 67, subsection 1 – phrase the requirement so that a segregation must appear as ordinary in order to provide the acquirer protection against the transferor's creditors.

Against a requirement that segregation must appear ordinary, it can be stated that to a certain extent it is possible to apply disloyal segregations in accordance with the rules in the bankruptcy legislation. However, revocation can only take place during bankruptcy and in connection with compulsory composition and debt restructuring,and there is hardly complete clarity about the extent to which the revocation rules in the Bankruptcy Act's in particular section 67 regarding payments, applies to segregations, cf. immediately below. Although, in accordance with what is stated above in point 2.2.5, it is assumed that in addition to these rules, a special invalidity rule applies to certain intentional dispositions, such a rule will also be due to the evidentiary requirements that must be imposed, hardly in itself be sufficient to safeguard the creditors against disloyal segregations. A requirement that a segregation must appear as ordinary in order to provide the acquirer protection against the transferor's creditors is also simpler to work with in the practical legal life than the Bankruptcy Act's avoidance rules.

---

[53] See about the difficulties of getting to the bottom of financial crime in such cases Report No 1066/1986 on combating financial crime, pp. 103 et seq.

Mogens Munch: The Bankruptcy Act, p. 487, assumes that the separation of goods in fulfilment of a delivery obligation must probably be equated more closely with a payment, cf. the Bankruptcy Act section 72, subsection 1, than with the other transactions mentioned in the Bankruptcy Act section 72, subsection 2. If this is correct, a segregation made after the deadline (e.g. after notification of suspension of payments) may be required to be overturned under the conditions mentioned in the provision of the Bankruptcy Act section 72, subsection 1. In the case of a segregation made before the deadline of commencement of bankruptcy, the view leads to the fact that avoidance may be required under the conditions laid down in the Bankruptcy Act section 67 which otherwise contains a provision that the payment may not appear as ordinary.[54]

However, it seems very doubtful whether segregation of goods still in the possession of the seller can be equated with a payment. Surely, the claim is on goods, not on money, but the term payment refers to theclaim being fulfilled.. This is not the case with segregation, here the claim remains. It could presumably be more obvious to equate segregation with collateral. The Bankruptcy act section 70 provides that security for non-simultaneously incurred debt may be required void if the security deed has been made later than 3 months before the date of commencement of bankruptcy. Although the provision contains no reservation regarding the security appearing as ordinary.[55] Consequently, it would be too far-reaching to apply the Bankruptcy act section 70.

Segregation of a genus obligation can thus neither be considered as a payment nor as a security for older depts, cf. von Eyben and Møgelvang-Hansen: Debt Enforcement, p. 259. It likewise appears obviously inadequate to refer to the fact that segregations can beoverturned under the conditions mentioned in the Bankruptcy act section 74.[56] The Bankruptcy act section 74 presupposes that it can be proved that certain subjective conditions regarding the creditor in question are met (bad faith about insolvency and about the disposition improperness).

---

[54] Von Eyben and Møgelvang-Hansen: Debt Enforcement, p. 222 and 228, and Mogens Munch: The Bankruptcy Act, p. 458 ff.

[55] Cf. von Eyben and Møgelvang-Hansen: Debt Enforcement, p. 200, and Mogens Munch: The Bankruptcy Act, p. 425 ff.

[56] Carstensen: Things 1, p. 110 ff.

See in accordance with what has been stated about the unfortunate thing of being content with the bankruptcy rules of avoidance possibly supplemented with dubious solutions in the case of foreclosure proceedings, von Eyben: Proprietary Right, p. 180.

I, the undersigned, Julie Marie Christiansen, certify that I am fluent in both the English and Danish languages and that the preceding text in the English language is to the best of my knowledge and belief a true and faithful translation of the attached extract from the Danish textbook "Ejendomsretten 1" in the Danish language.

Copenhagen, 6 June 2022

Julie Marie Christiansen
Assistant Attorney, LLM

Uddrag fra "Ejendomsretten 1"
Udgave: 4
Udgivet af: Djøf Forlag
År: 1999
Forfattere: Michael Elmer og Lise Skovby

2.5. Individualisering af genusgenstande

### 2.5.1. Almindelige bemærkninger

Ved genuskøb er erhververen kun beskyttet over for overdragerens kreditorer, såfremt der er foretaget en individualisering, dvs. en udskillelse af genstande til opfyldelse af aftalen, som opfylder visse nærmere krav. Det er imidlertid i litteraturen et meget omstridt spørgsmål, hvilke nærmere krav man skal stille til en individualisering, for at den kan give erhververen beskyttelse over for overdragerens kreditorer. Striden i teorien står om, hvorvidt en individualisering for at give beskyttelse i denne henseende skal være bindende, eller om den i stedet eller tillige skal være normal.[57]

Med udtrykket *bindende* individualisering tænkes der naturligvis ikke på, om en udskillelse er bindende i forhold til overdragerens kreditorer - det ville jo være en helt cirkulær tankegang. Det må også være uden betydning, om udskillelsen er bindende for erhververen i den forstand, at han ikke kommer i misligholdelse ved at afvise en genstand af samme art. Det afgørende, når man ser på, om en individualisering er bindende, er, om udskillelsen er bindende for overdrageren. Ved at kræve, at en individualisering er bindende, henviser man med andre ord ved afgørelsen af det ejendomsretlige problem om forholdet mellem erhververen og overdragerens kreditorer til det obligationsretlige forhold mellem overdrageren og erhververen.

---

[57] Der bortses her i det hele fra det synspunkt, som Hans Verner Højrup har gjort gældende i Ejendomsret, s. 78, og hvorefter individualisering skulle være ufornøden ved genuskøb. Højrup indrømmede, at synspunktet ikke er i overensstemmelse med praksis. Heller ikke retspolitisk kan Højrups synspunkt tiltrædes.

Udtrykket *normal* individualisering henviser til, om udskillelsen er foretaget som et normalt (afsluttende) led i handelsomsætningen. Normaliteten skal være den objektive målestok for, om parterne subjektivt har optrådt illoyalt i forhold til kreditorerne. Som det vil fremgå af de følgende afsnit, angiver begreberne bindende og normal langtfra entydige begreber. I forholdet mellem overdrageren og erhververen må man spalte problemet om virkningen af en udskillelse af bestemte varer til opfyldelse af en genusforpligtelse op i en række forskellige retsvirkninger, og det bringer derfor ikke større klarhed at henvise til, at en individualisering skal være »bindende«. Et krav om, at en individualisering for at holde over for kreditorerne skal være »normal«, giver heller ikke nogen mere præcis vejledning. Før der gås nærmere ind på, hvilke krav der nærmere må stilles til en individualisering, for at den kan give erhververen beskyttelse over for overdragerens kreditorer, skal der imidlertid redegøres nærmere for de to teorier.

### 2.5.2. Teorien om bindende individualisering

*2.5.2.1.* Som *begrundelse* for et krav om bindende individualisering er der først og fremmest blevet henvist til, at det er en *almindelig* grundsætning i dansk ejendomsret, at man i videst muligt omfang skal modvirke kreditorly og selvbåndlæggelser, og at kreditorer kan forlange båndlæggelser tilsidesat, som ikke er generelle og således afskærer dispositioner såvel over for kreditorer som over for aftaleerhververe, jfr. Rpl. § 514, stk. 3. Overdragerens kreditorer bør derfor ikke være afskåret fra at foretage retsforfølgning i genstande, som deres skyldner er berettiget til at disponere over.[58]

Der har i teorien været nogen uklarhed om, hvornår en individualisering er bindende.

*Torp:* Dansk Tingsret, s. 369, fandt ikke den blotte afsendelse af bestemte varer tilstrækkelig, idet denne efter hans opfattelse ikke er bindende for overdrageren. Torp ville i alle tilfælde kræve, at køberen havde modtaget underretning om individualiseringen, formentlig ud fra den tankegang, at underretningen virker som et løfte om ikke at gøre individualiseringen om.

*O.K. Magnussen* (U 1925 B. 286 ff.) fremhævede, at der kan forekomme tilfælde, hvor sælgeren vil komme i mora ved at gøre den individualisering, som sker ved afsendelse af varen, om, uanset at der ikke er givet køberen underretning. Magnussen ville i sådanne tilfælde også give

---

[58] Således Illum: Dansk Tingsret, s. 125, (mindre klart i Illum og Carstensen: Dansk tingsret, s. 189 ff.), von Eyben: Formuerettigheder, s. 174.

køberen beskyttelse, idet sælgerens omgørelse af individualiseringen også i denne situation ville være et retsbrud.

*Henry Ussing* (U 1926 B. 126 ff. og 198) tilsluttede sig Magnussens fremstilling og bemærkede, at den uenighed, der har været om, hvornår en individualisering er bindende, overvejende beror på, at der ikke er klarhed over købekontraktens naturale negotii.

*Ross:* Ejendomsret og ejendomsovergang, s. 322 ff., beskrev på grundlag af en omfattende gennemgang af den da (1935) foreliggende retspraxis gældende ret således, at beskyttelse over for kreditorerne indtrådte ikke blot ved den gensidige individualisering, men også ved sælgerens ensidige, men for ham forbindende individualisering gennem levering, først og fremmest afsendelse, men uden at der stilles krav om købers modtagelse af meddelelse om afsendelsen.[59]

*Illum:* Dansk Tingsret, s. 124 f., lægger vægt på, om sælger. vil begå et kontraktsbrud ved at gøre individualiseringen om. Er dette tilfældet, f.eks. hvor køber i forbindelse med en forudbetaling har pålagt sælgeren efter færdiggørelsen at mærke varen som bestemt for køberen, er det foreneligt med kravet om bindende individualisering at »anse køberen som ejer«, selvom han ikke har fået meddelelse om den stedfundne udskillelse. Illum vil endvidere anse en afsendelse for en bindende individualisering, såfremt den er sket på køberens regning og risiko, uanset om der er givet køber meddelelse i sådanne tilfælde.

*Illum og-Carstensen:* Dansk tingsret, s. 194 ff., og Carstensen: Ting og Sager 1, s. 80 ff., lægger ligeledes vægt-på, om sælgers omgørelse af individualiseringen ville være-retsstridig, konstitueret retsbrud. En-individualisering er bindende, hvis den sker efter udtrykkelig ordre fra køber, jfr. det i 2. udg. af Dansk Tingsret nævnte eksempel. Der lægges vægt på, om der er tale om en standardvare, eller om der er tale om et bestillingskøb vedrørende en individuel genstand, hvor produktet kan identificeres på et tidligt tidspunkt i fremstillingsprocessen. Er der tale om afsendelse af genstande, må spørgsmålet afgøres konkret, bl.a. under hensyn til mulighederne for kontramandering (omdirigering af den afsendte vare).

---

[59] Ross gik (s. 320) mere retspolitisk ind for at kræve besiddelsesafgang som betingelse for at give erhververen beskyttelse over for overdragerens kreditorer.

*2.5.2.2.* Selvom begrundelsen for at opstille et krav om bindende individualisering er enkel, nogle vil måske sige indlysende, har det - som det fremgår af de netop refererede udtalelser - voldt de forfattere, som er gået ind for kravet, betydelige vanskeligheder nærmere at angive indholdet heraf.

Vel er det klart, at kravet om, at udskillelsen af bestemte genstande til opfyldelse af genusforpligtelsen skal være bindende for overdrageren, henviser til det obligationsretlige forhold mellem overdrageren og erhververen indbyrdes. Imidlertid angiver obligationsretten lige så lidt som ejendomsretten en enkel formel for, hvornår virkningerne af en aftale om ejendomsoverdragelse indtræder. Man må med andre ord også ved obligationsretlige overvejelser gøre sig klart, i relation til hvilken retsvirkning spørgsmålet om sælgerens »bundethed« drøftes.

I obligationsretten bruges begrebet koncentration som en samlebetegnelse for de retsvirkninger, der er en følge af, at der sker udvælgelse og levering af en bestemt ydelse til opfyldelse af en genusforpligtelse. Disse retsvirkninger er bortfald af sælgerens valgret, overgang af vederlagsrisikoen, overgang af ydelsesrisikoen og anvendelse af speciesregler ved bedømmelsen af sælgers forpligtelse til naturalopfyldelse og sælgers erstatningsansvar for forsinkelse m.v.[60]

De nævnte retsvirkninger indtræder ikke nødvendigvis under de samme betingelser eller på samme tidspunkt. Man må undersøge i hver enkelt relation for sig, hvornår koncentration sker. Det kan således godt tænkes, at sælgers valgret ophører på et tidligere tidspunkt end købers ret til at forlange naturalopfyldelse efter genusreglerne. Koncentration indtræder i obligationsretten i almindelighed kun, hvis der er sket en udskillelse i overensstemmelse med købsaftalen, hvis udskillelsen har hjemmel, og hvis der er givet meddelelse om udskillelsen til køberen.

Der skal for det første være sket en udskillelse i overensstemmelse med købsaftalen. Udskillelse antages f.eks. at kunne ske ved mærkning med køberens særlige mærke, evt. på særskilt lager, ved overgivelse af genstandene til en transportør med angivelse af køberens adresse eller efter

[60] Om koncentration, se Gomard: Obl.ret, s. 6 ff., Gomard: Obl.ret, 1. del, s. 79 f., Ussing: Alm. del, s. 25, 195, 197og198, Ussing: Køb, s. 11, 57, 73 og 79, Elmelund m.fl.: Dansk og international køberet, s. 38 f ., Lookofsky: Køb, s. 95 f ., Nørager-Nielsen og Theilgaard: Køberloven, s. 64 ff. samt Almen: Om kop och byte av los egendorn, s. 64og180 ff.

omstændighederne ved at henlægge varerne i den bestemte mængde og de særlige dimensioner, nuancer, former etc., i hvilke de efter aftalen skulle leveres.[61] Er der udskilt noget andet end det, som parterne har aftalt, vil køberen næppe gennem udskillelsen kunne miste sin ret til at gøre sine misligholdelsesbeføjelser gældende efter genusreglerne.

Udskillelsen skal have hjemmel. Sådan hjemmel til at udskille bestemte genstande til opfyldelse af en genusforpligtelse kan findes i parternes aftale, i særlige lovbestemmelser (f.eks. kbl. §.37 og CISG art. 69 om fordringshavermora) eller i sædvane, jfr. kbl. § 1 og CISG art. ·9. Det er et naturale negotii, at der ved køb skal ske en levering, og der vil derfor altid i leveringspligten være hjemmel for sælger til at udskille bestemte genstande i forbindelse med leveringen. Kravet til hjemlens intensitet afhænger formentlig af, i forhold til hvilken retsvirkning spørgsmålet om koncentration drøftes. Kravene til, at sælgeren gennem koncentration mister sin valgret, må være mindre end kravene til, at køberen gennem en koncentration kommer til at bære risikoen for varens hændelige undergang eller forringelse.

Meddelelse om udskillelse skal være givet til køberen, for at udskillelsen kan overføre risikoen for salgsgenstandens hændelige undergang eller forringelse, jfr. U 1916.598 H. Dette har bl.a. sammenhæng med forsikringsmæssige hensyn. Sker udskillelsen ved leveringen, er det dog muligvis ved visse afsendelseskøb ikke nødvendigt at give underretning, se nærmere Nørager-Nielsen og Theilgaard: Købeloven, s. 67 og 224 ff.[62] Underretning om en aftalt udskillelse vil også medføre, at valgretten bortfalder, og muligvis kan parternes aftale om udskillelse fortolkes således, at sælgerens efterfølgende opfyldelsesforanstaltninger i henseende til ansvar bedømmes efter speciesreglerne.[63] Der kræves næppe meddelelse til køberen for at overføre risikoen i tilfælde, hvor udskillelse er sket på grund af købers fordringshavermora, jfr. kbl. § 37 og GISG art. 69.

Som det fremgår heraf, er begrebet koncentration alene en samlebetegnelse, under hvilken man drøfter en række forskellige problemstillinger. Det kan ikke ved en enkel formel angives, hvornår de enkelte retsvirkninger indtræder ved de enkelte køb. Man kan allerede af denne

---

[61] Nørager-Nielsen og Theilgaard: Købeloven, s. 654.

[62] Se også Elmelund m.fl.: Dansk og international køberet, s. 67 f., og Lookofsky: Køb, s. 95 f.

[63] Nørager-Nielsen og Theilgaard: Købeloven, s. 67.

grund ikke løse individualiseringsproblemet ved at stille krav om, at der skal være foretaget en koncentration efter obligationsrettens regler.[64]

I stedet for helt generelt at drøfte, om en individualisering skal være bindende, bør man derfor ved den nærmere fastlæggelse af kravene til individualiseringer undersøge de enkelte betingelser, som efter de nævnte obligationsretlige regler kan medføre, at en udskillelse af bestemte genstande til opfyldelse af en genusaftale bliver bindende for overdrageren. Men selvom en udskillelse er bindende for overdrageren, er det ikke sikkert, at kreditorerne skal respektere den.

### 2.5.3. Teorien om normal individualisering

*2.5.3.1.* Lige så lidt, som hvor salgsgenstanden allerede er overgivet til erhververen, skal kreditorerne, når overgivelse ikke er sket, respektere *illoyale dispositioner*, f.eks. hvis handlen kan omstødes, eller hvis den rammes af den særlige ugyldighedsregel, der er omtalt ovenfor i nr. 2.2.5. Man har derfor været inde på, at man som et værn imod illoyale individualiseringer- må opstille et krav om, at en individualisering for at give erhververen beskyttelse over for overdragerens kreditorer skal være foretaget som et normalt afsluttende led i handlen.

I sin oprindelige form blev teorien om normal individualisering lanceret som led i et opgør med kravet om bindende individualisering. Fr. Vinding Kruse udtrykte i dens endelige form[65] sin teori således, at »enhver bevislig, klart konstateret individualisering fra sælgerens side inden fallitten, foretaget som et naturligt led i en normal handelsafslutning, gyldig bør overføre ejendomsretten til køberen i forhold til sælgerens retsforfølgende kreditorer«.

Fr. Vinding Kruse havde i en artikel om »Ejendomsrettens overgang«, som udkom som et særtryk af TfR 1924, i en mere bred fremstillingsform præsenteret teorien om normal individualisering. Afhandlingen fremtrådte som en afstandtagen fra kravet om bindende individualisering, idet beskyttelse ved varer indtræder »fra individualiseringen, når det af handlens faktiske omstændigheder fremgår, at der foreligger en virkelig aftale og en normal handelsaftale - og ikke proformaværk eller omgåelse - og der foreligger tilstrækkelige bevisdata

---

[64] Jfr. herved Gomard: Obl.ret, 1. del, s. 67 f, Gomard: Obl.ret, s. 8, samt Gomard: Ydelsen, s. 112, der med rette fremhæver, at ejendomsrettens individualiseringskrav ikke er identisk med kontraktsrettens krav til koncentration, bl.a. fordi der ejendomsretligt må stilles krav om, at ydelsen lader sig identificere med en høj grad af sikkerhed.

[65] Ejendomsretten Il, s. 1200.

for individualiseringen« (anf. sted s. 80). Denne afstandtagen fra den herskende opfattelse, der krævede bindende individualisering, medførte betydelig debat. Se O.K. Magnussen i U 1925 B. 286 ff., Vinding Kruse i U 1925 B. 310 ff., Ussing i U 1926 B. 125 ff., Vinding Kruse i U 1926 B. 195 ff., Ussing i U 1926 B. 198 f., og Ross: Ejendomsret og ejendomsovergang, s. 322 ff.

Teorien om normal individualisering blev videreudviklet af W.E. von Eyben,[66] der navnlig fremhævede, at individualiseringen skal tjene som et værn mod svigagtige transaktioner, og at kravet om normal individualisering kan og bør drøftes uafhængigt af, om der opstilles et krav om bindende individualisering. Individualiseringen skal efter von Eyben være et normalt led i handelsafviklingen, og normaliteten må konstateres ved en særlig konkret prøvelse, som kan tænkes at medføre, at der findes unormale individualiseringer, som domstolene af bevismæssige grunde ikke kan få bugt med.

von Eyben fremhæver, at en bindende individualisering kan have en dubiøs karakter, f.eks. hvis den er foretaget i samarbejde med køberen, og man ikke plejer at foretage individualiseringen på denne måde. Man bør ikke med virkning i forhold til kreditorerne få dage før en kohkurs kunne foretage gensidige individualiseringer ved at få forretningsforbindelser til sammen med sig at udskille bestilte varer. En sådan udskillelse bør kunne rammes som illoyal, selvom den ikke kan rammes af omstødelsesreglerne, f.eks. fordi der ikke kan føres bevis for ond tro hos medkontrahenten om leverandørens insolvens.

von Eyben konkluderer (s. 175), at der ikke ubetinget kan kræves en bindende individualisering, men at man dog på den anden side heller ikke kan blive stående ved enhver ensidig individualisering, blot den er klar. Det må kræves, at individualiseringen er normal. Den udformning af teorien om normal individualisering, som findes i von Eyben: Formuerettigheder, s. 174 ff., går i realiteten ud på, at unormale individualiseringer er uden virkning i forhold til kreditorerne. Unormalitet ses som et udtryk for illoyalitet. Bevismangel kommer *kreditorerne* til skade.[67]

*2.5.3.2.* Det kan for en umiddelbar betragtning forekomme tvivlsomt, om man uden videre kan gå ud fra, at enhver individualisering, der er foregået som et normalt led i handelsomsætningen,

---

[66] Formuerettigheder, s. 174 ff.

[67] Jfr. udtalelsen om, at der findes unormale individualiseringer, som domstolene af bevismæssige grunde ikke kan få bugt med.

uden videre er loyal. Og det må også forekomme tvivlsomt, om man uden videre kan lægge til grund, at enhver individualisering, der er foregået på unormal måde, er illoyal. Men illoyale individualiseringer bør ikke kunne holde over for overdragerens kreditorer, og *normaliteten* kan være et objektivt udtryk for, om der
foreligger noget illoyalt.

Ved vurderingen må det også tages i betragtning, at der i alle praktiske tilfælde er tale om situationer, hvor erhververen har forudbetalt helt eller delvis, og hvor faren for proforma og hemmelige kreditorbegunstigelser langtfra kan siges at være fjerntliggende. Kreditorernes muligheder for at sandsynliggøre proforma og andre illoyale handlinger m.v. vil bl.a. kunne være afhængige af, om det er muligt - og økonomisk forsvarligt - at rekonstruere regnskabsmateriale, idet det meget ofte forekommer, at skyldnere i tiden op til det økonomiske sammenbrud ikke har ført regnskaber.[68]

Formulerer man reglen om værn mod illoyale dispositioner således, at kreditorerne skal bevise (sandsynliggøre), at der foreligger illoyalt forhold, vil reglen derfor i realiteten ikke give kreditorerne
meget værn. Udgifterne til rekonstruktion af regnskaber vil sjældent stå mål med de beløb, som vil indgå i boet, hvis individualiseringen tilsidesættes. Skal reglen give kreditorerne et reelt værn, bør bevismangel komme *erhververen* til skade.
Man bør derfor formentlig - med inspiration i reglen i KL.§ 67, stk. 1 - formulere kravet således, at en individualisering for at give erhververen beskyttelse over for overdragerens kreditorer skal fremtræde som ordinær.

Det kan imod et krav om, at individualiseringen skal fremtræde som ordinær, anføres, at der i et vist omfang er mulighed for at ramme illoyale individualiseringer efter konkurslovgivningens regler. Imidlertid kan omstødelse kun ske under konkurs og i forbindelse med tvangsakkord og gældssanering, og der er næppe fuldstændig klarhed over, i hvilket omfang konkurslovens omstødelsesregler, navnlig § 67 om betalinger, finder anvendelse på individualiseringer, jfr. straks nedenfor. Selvom det i overensstemmelse med det, som er anført ovenfor i nr. 2.2.5, antages, at der ved siden af disse regler gælder en særlig ugyldighedsregel for visse forsætlige dispositioner, vil en sådan regel også på grund af de beviskrav, som må stilles, næppe i sig selv

---

[68] Se om vanskelighederne med at trænge til bunds i økonomisk kriminalitet i sådanne tilfælde Betænkning nr. 1066/1986 om bekæmpelse af økonomisk kriminalitet, s. 103 ff.

være tilstrækkelig til at sikre kreditorerne imod illoyale individualiseringer. Et krav om, at en individualisering skal fremtræde som ordinær for at give erhververen beskyttelse over for overdragerens kreditorer, er også enklere at arbejde med i det praktiske retsliv end konkurslovens omstødelsesregler.

Mogens Munch: Konkursloven, s. 487, antager, at udskillelse af varer til opfyldelse af en leveringsforpligtelse formentlig nærmere må sidestilles med en betaling, jfr. KL § 72, stk. 1, end med de »andre dispositioner«, som er nævnt i KL § 72, stk. 2. Hvis dette er rigtigt, vil en individualisering foretaget efter fristdagen (f.eks. efter anmeldelse om betalingsstandsning) kunne fordres omstødt under de i KL § 72, stk. 1, nævnte betingelser. Er der tale om en individualisering foretaget før fristdagen, fører synspunktet til, at omstødelse vil kunne fordres under de betingelser, der er fastsat i KL § 67, der i øvrigt indeholder et forbehold om, at betalingen ikke må fremtræde som ordinær.[69]

Det forekommer imidlertid meget tvivlsomt, om individualisering af varer, der fortsat befinder sig i sælgers besiddelse, kan sidestilles med en betaling. Vel lyder fordringen på varer, ikke på penge, men udtrykket betaling henviser til, at fordringen herved opfyldes. Det er ikke tilfældet ved en individualisering, her består fordringen fortsat. Det kunne formentlig være mere nærliggende at sidestille individualisering med sikkerhedsstillelse. KL § 70 fastsætter, at sikkerhedsstillelse for ikke samtidig stiftet gæld kan fordres omstødt, hvis sikringsakten er foretaget senere end 3 måneder før fristdagen. Bestemmelsen indeholder imidlertid ikke noget forbehold om, at sikkerhedsstillelsen ikke må fremtræde som ordinær.[70] Det ville derfor være alt for vidtgående at anvende KL § 70.

Individualisering af en genusforpligtelse kan således hverken betragtes som en betaling eller som en sikkerhed for ældre gæld, jfr. herved von Eyben og Møgelvang-Hansen: Kreditorforfølgning, s. 259. Det forekommer også klart utilfredsstillende at henvise til, at individualiseringer kan omstødes under de betingelser, der nævnes i KL § 74.[71] KL § 74 forudsætter jo, at det kan bevises, at visse subjektive betingelser vedrørende den pågældende kreditor er opfyldt (ond tro om insolvens og om dispositionens

---

[69] Se herved von Eyben og Møgelvang-Hansen: Kreditorforfølgning, s. 222 og 228, samt Mogens Munch: The Bankruptcy act, s. 458 f

[70] Jfr. von Eyben og Møgelvang-Hansen: Kreditorforfølgning, s. 200, samt Mogens Munch: The Bankruptcy act, s. 425 f.

[71] Se således Carstensen: Objects and Items 1, s. 110 ff.

utilbørlighed).

Se i overensstemmelse med det anførte om det uheldige i at nøjes med konkurslovens omstødelsesregler, eventuelt suppleret med tvivlsomme løsninger ved udlægsforfølgning, von Eyben: Formuerettigheder, s. 180.